UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT EDGAR, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br>v.<br><br>ANADARKO PETROLEUM CORPORATION, R.A. WALKER, and ROBERT G. GWIN,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 4:17-cv-01372<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Iron Workers Benefit and Pension Fund – Iron Workers District Counsel Philadelphia & Vicinity ("Philadelphia Iron Workers" or "Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its complaint against Defendants Anadarko Petroleum Corp. ("Anadarko"), R. A. Walker, Robert G. Gwin, Robert K. Reeves, and Darrell E. Hollek ("Defendants"), alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based on an investigation made by and through its counsel.

## I. NATURE OF THE ACTION

1. This is a securities class action brought on behalf of all persons who purchased or acquired the common stock of Anadarko between February 8, 2016 and May 2, 2017, both dates inclusive (the "Class Period"), pursuing remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against Anadarko and certain of its top officials.

2. Anadarko engages in oil and gas exploration, development, and production, as well as other oil industry-related businesses.

3. Anadarko primarily conducts its oil activities in three geographic areas: the Delaware Basin in Texas, the Gulf of Mexico, and the Denver-Julesberg ("DJ") Basin in Colorado. About a quarter of Anadarko's employees work out of its Colorado offices.

4. Between 2011 and 2014, Anadarko accrued more than $9 billion in charges for environmental fines and settlements. These liabilities chiefly arose from the explosion of the Macondo well, in which Anadarko owned a 25% interest, and its acquisition of Kerr-McGee Corp., whose operations had so devastated the environment in the U.S. that Anadarko was forced to pay out the largest environmental settlement in U.S. history to settle the resulting liabilities.

5. But for these liabilities, Anadarko would have earned about $8 billion of profits in 2011-2013. Giving effect to the accruals, Anadarko lost about $1 billion during that time period.

6. With its troubled past, Anadarko's compliance with safety and environmental regulations was extremely material to investors. Indeed, Anadarko eagerly and repeatedly assured investors that it had turned a new leaf and now complied with all safety and environmental regulations. Anadarko specifically assured investors that its high-tech Colorado control center allowed it to monitor, in real-time, all of its wells in the region, rapidly pinpointing and addressing any potential safety issues.

7. In late 2013, Anadarko acquired more than 1,500 Colorado wells and accompanying land in a land swap with a competitor (the "Land Swap"). Within six months, Anadarko discovered that up to several hundred of these wells were safety and

environmental hazards. They had deteriorated with age and were not up to code. Anadarko initially authorized a budget of tens of millions of dollars to remediate the wells.

8. Very little remediation work had been done by the time oil prices crashed in the fall of 2014.

9. After oil prices collapsed, Anadarko reconsidered its commitment to safety. It slashed the remediation budget. What was left of the budget was spent remediating wells that were either good producers or whose poor condition interfered with Anadarko's drilling schedule. Anadarko did not consider safety threats in determining which few wells to remediate, even though many of these wells were located near houses or schools.

10. Senior Colorado Anadarko executives were well aware of these safety issues. They held several meetings specifically to discuss whether it was appropriate to ignore safety and focus on supporting drilling.

11. Anadarko took other action in light of the oil price collapse. In March 2016, Anadarko laid off 20-30% of its workforce. Colorado was hit particularly hard, as this and subsequent layoffs cut its workforce from 1,500 to 1,000 employees.

12. The remaining employees were not sufficient to perform operations in the DJ Basin safely, particularly as Anadarko increased drilling in late 2016. Anadarko determined that a 28,000 gallon oil spill in January 2017 near Denver had been caused by lack of trained personnel. Then, at an internal meeting in February 2017 attended by a senior Colorado-based Anadarko executive, Anadarko decided not to inform Colorado regulators of the cause of the spill. When a senior public relations employee present at the meeting raised concerns, a senior Anadarko executive told her to stop complaining as her job was to "shovel shit and clean up the messes that [Anadarko's employees] make."

13. In Colorado, Anadarko complied with the law when violations were easy to detect and officials made efforts to investigate violations. But Anadarko ignored laws – even safety laws – that were not regularly enforced.

14. On April 17, 2017, a home located near an Anadarko-owned well in Firestone, Colorado exploded. The explosion killed two men and critically injured a woman who was married to one of them. The couple's 11 year-old son barely escaped by jumping out of a window.

15. The Firestone Well was drilled in 1993. Anadarko acquired it in the Land Swap, but never remediated it. The cause of the explosion was not disclosed at first.

16. On April 26, 2017, after close of trading, Anadarko announced that it owned a nearby well that may have been involved in the explosion. Anadarko also announced that it was shutting down 3,000 similar vertical wells in Colorado.

17. The following day, April 27, 2017, Anadarko's stock price fell by 4.7%, damaging investors.

18. On May 2, 2017, the Firestone-Frederick Fire Department announced that the Firestone Explosion had been linked to a well owned by Anadarko. A flowline connected to the Firestone Well had been abandoned but never sealed, in violation of the Colorado Oil & Gas Conservation Commission's (the "Commission") Rule 1103. Anadarko later admitted that 2,400 of its flowlines had been abandoned but not sealed. The Firestone Well had been turned on, but Anadarko's measurements did not report any methane, a physical impossibility. Though Anadarko had sent a work crew to inspect this anomalous result, the overworked employees had not found the problem. The flowline had leaked methane into the home, which exploded when the homeowner tried to install a heater.

19. On May 3, 2017, Anadarko's stock price fell by 7.7%, damaging investors.

20. Following the explosion, Anadarko publicly expressed sympathy. Internally, however, Anadarko executives admitted that they were not concerned with the incident in which they had just negligently killed two people.

21. Anadarko callously disregarded the safety of the Colorado communities in which it did business. It lied about it to investors. It violated the securities laws.

## II. JURISDICTION AND VENUE

22. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78b-1 and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

23. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

24. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Defendants maintain their principal executive offices in this District and many of the acts, practices and transactions complained of herein occurred in substantial part in this District.

25. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III. PARTIES

26. Court-appointed Lead Plaintiff Philadelphia Iron Workers administers benefits for over 4,900 members in the Philadelphia area, managing assets with a market value of more

than $300 million. As set out in its PSLRA Certification, which was previously filed with the Court and is incorporated by reference, Philadelphia Iron Workers purchased Anadarko common stock during the Class Period and was damaged thereby.

27. Defendant Anadarko Petroleum Corp. is an oil and gas exploration and production company. Anadarko focuses its operations on the DJ Basin in Colorado, the Delaware Basin in Texas, and the Gulf of Mexico. Headquartered in The Woodlands, Anadarko's stock was actively traded on the NYSE during the Class Period under ticker APC. At all relevant times, about a quarter of Anadarko's employees worked out of its Colorado offices.

28. Defendant R. A. Walker has been Anadarko's Chairman since May 14, 2013, and has served as its Chief Executive Officer since May 15, 2012 and President since February 2010. He served as Anadarko's Chief Operating Officer from March 1, 2009 to May 15, 2012. Walker first joined Anadarko on September 6, 2005 as Senior Vice President of Finance and Chief Financial Officer, and served in those roles until March 2009. He has been a director of Anadarko since May 2012. Anadarko's Executive Committee reported directly to Walker as Chairman and CEO.

29. Defendant Robert G. Gwin is Anadarko's Executive Vice President, Finance and Chief Financial Officer. He is responsible for accounting, financial reporting and tax; treasury, corporate finance and risk management; investor relations and communications; corporate development; corporate planning; and corporate audit. Gwin joined Anadarko in January 2006 as Vice President, Finance and Treasurer and was named Senior Vice President in March 2008. Gwin has been a member of Anadarko's Executive Committee since at least May 2013.

30. Defendant Robert K. Reeves is Anadarko's Executive Vice President, Law and

Chief Administrative Officer. He joined Anadarko in March 2004 as Senior Vice President, Corporate Affairs and Law. He is responsible for Anadarko's legal, government relations, information technology and administration functions. Reeves has been a member of Anadarko's Executive Committee since at least May 2013.

31. Defendant Darrell E. Hollek has been a Senior Advisor of Anadarko since May 10, 2017, after serving as Executive Vice President, Operations from August 23, 2016 to May 10, 2017 and Executive Vice President, U.S. Onshore Exploration & Production since April 28, 2015. Hollek previously served as Senior Vice President of Operations - Deepwater Americas, Vice President of Gulf of Mexico Operations and Global Deepwater Drilling, Vice President - Gulf of Mexico and Vice President of Operations since May 2007. He was responsible for overseeing all of Anadarko's producing assets, operations and development activities in the Deepwater Gulf of Mexico. Hollek began his career in 1980 with Kerr-McGee Corporation. He was a member of Anadarko's Executive Committee from April 2015 through at least May 2017.

32. Together, Walker, Gwin, Reeves and Hollek are referred to as the "Executive Committee Defendants."

## IV. FORMER EMPLOYEES

33. Former Employee 1 ("FE 1")[1] was initially hired as Anadarko's Regional Director of Government Relations for the Rockies Region in August 2007. In March 2015, he was promoted to Director of Engagement and Strategy for the Rockies Region. He reported to Brad Holly. He managed all government relations, social investment, and stakeholder relations teams, and managed Anadarko's public affairs group. He attended regular leadership team

[1] This Complaint does not list the former employees' names to protect their privacy. However, confidentiality was neither promised nor requested. Their names will be provided to Defendants or the Court upon request.

meetings headed by Brad Holly, Anadarko's Vice President of the Rockies Division until August 2016. Also attending regular leadership team meetings were Anadarko's General Manager for the Wattenberg Asset, General Manager for the Wyoming Asset, General Manager for the Utah Asset, General Manager for Field Operations, General Manager for Drilling Operations, and General Manager for Completion. Korby Bracken, Anadarko's Director of Environment, Health & Safety, U.S. Onshore E&P, also attended. FE 1 left Anadarko in November 2016.

34. Former Employee 2 ("FE 2") was Anadarko's Government and Public Affairs Manager from July 2012 to March 2017. She reported to FE 1 and then, after his promotion, John Christiansen, Vice President of Corporate Communications. FE 2 was responsible for handling crisis communications, *i.e.* media relations whenever Anadarko was involved in any safety or hazard controversies, such as oil spills, injuries, and fires. She stated that there were "a lot of them."

35. Former Employee 3 ("FE 3") was a Health, Safety & Environment Representative for the Southern Region of Onshore Drilling between July 2014 and April 2016. FE 3 worked in Anadarko's The Woodlands headquarters, and reported to Anadarko's HSE Manager for the Delaware Basin.

36. Former Employee 4 ("FE 4") was an Anadarko Senior International Health, Safety & Environment Representative, between September 2014 and March 2016, working out of The Woodlands. FE 4 reported to Jeff Ostmeyer, Anadarko's Environment, Health & Safety Inspector, Phillis Schlagel, Anadarko's Director of Health, Safety & Environment Services, and Greg Hamilton, Anadarko's Health, Safety & Environment audit manager. Ostmeyer, Schlagel, and Hamilton all reported to David McBride, Anadarko's Vice-President, Global Health, Safety & Environment, an officer position. FE 4's responsibilities included auditing Anadarko's

contractors to make sure they were up-to-date with regulations, such as Occupational Safety & Health Administration ("OSHA") regulations.

37. Former Employee 5 ("FE 5") was employed by Anadarko as a contract safety inspector between October 2013 and February 2015. FE 5 worked out of Weld County, Colorado.

38. Former Employee 6 ("FE 6") was employed by Anadarko as a contract Environmental Specialist from July 2015 to September 2016. FE 6 worked in Weld County, Colorado.

39. Contractor Employee 1 ("CE 1") was a Safety Inspector for Gulf Interstate Engineering Co., a third party that had contracts for all of the Anadarko wells in the Permian Basin. CE 1 worked exclusively on Anadarko wells from 2014 through 2015.

## V. ANADARKO EMPLOYEES

40. David McBride has been Anadarko's Vice-President, Global Health, Safety & Environment since 2013, working out of The Woodlands, and overseeing Anadarko's global Health, Safety & Environment programs.

41. Bradley J. Holly served as Anadarko's Senior Vice President of Operations - Rockies from November 2014 through August 2016. The Senior Vice President of Operations - Rockies is responsible for Anadarko's operations in Colorado, Wyoming, and Utah, and works out of Denver. In August 2016, he was promoted to Senior Vice President of U.S. Onshore Exploration & Production, an officer position at Anadarko, who is responsible for all upstream activities in the U.S. other than offshore operations, and works out of The Woodlands. In May 2017, he was promoted to Executive Vice President of U.S. Onshore Exploration & Production. He was let go in a corporate reshuffling on October 4, 2017.

42. Craig Walters served as Anadarko's Vice President - DJ Basin from 2013 through May 2017, overseeing all of Anadarko's activities in the DJ Basin. He reported to Holly until August 2016. In May 2017, he was promoted to the position of Vice President - Rockies. Walters works in Denver.

43. John Christiansen has served as Anadarko's Vice President - Corporate Communications since October 2015. He is the overall head of Anadarko's external communications. Christiansen works in The Woodlands.

44. Korby Bracken has been Anadarko's Health Safety and Environment Director since June 2013. Bracken works in Colorado and reports to McBride.

***Respondeat Superior***

45. Anadarko is liable for the acts of the Executive Committee Defendants, Holly, Walters, Christiansen, and its other employees and agents under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

46. The scienter of the Executive Committee Defendants, Holly, Walters, Christiansen, and other employees and agents of Anadarko is similarly imputed to Anadarko under *respondeat superior* and agency principles.

## VI. BACKGROUND

### A. Glossary

47. "BBL" means barrels of oil. One barrel is equivalent to 42 U.S. gallons.

48. "BOE" means barrel of oil equivalent, a unit of energy based on the approximate energy released by burning one barrel of crude oil. BOE is used by oil and gas companies in their financial statements as a way of combining oil and natural gas reserves and production into a

single uniform measure, although this energy equivalence does not take into account the lower financial value of energy in the form of gas. Six thousand cubic feet (6 MCF) of natural gas is equal to one barrel of oil.

a. MBOE - One thousand barrels of oil equivalent.

b. MMBOE - One million barrels of oil equivalent.

c. BBOE - One billion barrels of oil equivalent.

49. "Downstream" is the sector of the oil and gas industry that involves the refining of petroleum crude oil and the processing and purifying of raw natural gas, as well as the marketing and distribution of products derived from crude oil and natural gas.

50. A "flowline" is a surface or subsurface pipe through which oil or gas travels from a well to processing equipment or storage.

51. A "horizontal well" is a well that is turned horizontally at depth, providing access to oil and gas reserves at a wide range of angles. Horizontal wells became technically feasible during the 1980s, as natural gas and oil exploration sought ways to produce more hydrocarbons than were available from less productive vertical wells. Horizontal wells are much more technologically advanced and expensive to drill than vertical wells.

52. "Midstream" is the sector of the oil and gas industry that involves the transportation, storage, and wholesale marketing of crude or refined petroleum products. Pipelines and other transport systems can be used to move crude oil from production sites to refineries and deliver the various refined products to downstream distributors. Natural gas pipeline networks aggregate gas from natural gas purification plants and deliver it to downstream customers, such as local utilities.

53. A "return line" is a pipeline (or flowline) used to transport natural gas to power a

separator near the well that separates the raw mixture of oil, natural gas, and water.

54. "Upstream" is the segment of the oil and gas industry that refers to searching for potential underground or underwater crude oil and natural gas fields, drilling exploratory wells, and drilling and operating the wells that recover and bring the crude oil or raw natural gas to the surface.

55. A "vertical well" is a well that is not turned horizontally at depth, allowing access to oil and gas reserves located directly beneath the surface access point. Historically, natural gas and oil exploration involved the use of vertical wells because directional drilling technology was not understood, expensive and complicated.

56. A "wellhead" is the component at the surface of an oil or gas well that provides the structural and pressure-containing interface for the drilling and production equipment.

**B. Anadarko Boasts of its Operations in the Wattenberg Field in Colorado**

57. Anadarko was incorporated in 1959 as a subsidiary of Panhandle Eastern Corporation Pipe Line Company, and spun off in 1986.

58. In 2006, Anadarko acquired a troubled oil and gas company, Kerr-McGee Corporation.

59. Through the acquisition of Kerr-McGee and another company, Western Gas Partners, LP, Anadarko acquired substantial oil and gas interests in the DJ Basin. As of the end of 2006, the DJ Basin accounted for 38% of Anadarko's proved onshore lower 48 oil and gas onshore reserves.

60. By the end of 2015, Anadarko had focused its efforts on three areas: the DJ Basin, the Delaware Basin, and Gulf of Mexico - Deepwater. These three areas, which Anadarko referred to as the "three Ds," were expected to receive more than 60% of Anadarko's 2016

capital expenditures. Of the total budget of $2.6-2.8 billion, $700 million was budgeted for the Gulf of Mexico Deepwater, $500 million for the Delaware Basin, and $500 million for the DJ Basin.

61. The Wattenberg field, located in the DJ Basin in Colorado just north of Denver, is not a new oil field. Operators have been drilling in the Wattenberg field since 1970.

62. Over the years, operators have built up an inventory of more than 20,000 oil and gas wells in the Wattenberg field.

63. During the mid to late 2000's, the Wattenberg field languished. Operators there were late to join the horizontal drilling revolution that accounted for the resurgence of the U.S. domestic oil and gas industry.

64. But in 2009, the first horizontal well was drilled in the Wattenberg field, rejuvenating operators' interest in the field. From then on, the Wattenberg field showed far more drilling activity than any other part of the DJ Basin.

65. As of the end of 2015, Anadarko operated approximately 5,000 vertical wells and 1,000 horizontal wells in the Wattenberg field. In 2013, the Wattenberg field accounted for 17.6% of Anadarko's worldwide oil production, and 10.5% of its worldwide natural gas production. By 2015, these numbers had risen to 30.1% and 20.7%, respectively.

66. Anadarko had many advantages over its competitors in the Wattenberg field. Unlike other producers, Anadarko owned much of the acreage outright. Indeed, Defendant Gwin boasted at the May 20, 2015 UBS Global Oil & Gas conference that approximately 40% of Anadarko's operations in the Wattenberg were on mineral acres that Anadarko owned. For those operations, Anadarko did not have to pay any lease fees. Moreover, Anadarko, along with Noble Energy, Inc., was one of two players who dominated the Wattenberg field, and therefore had

lower costs because of the size and scale of its operations and of its infrastructure. Moreover, Anadarko's subsidiary Western Gas Partners had more than 240 miles of pipeline and two massive processing treating plants in the Wattenberg field. Anadarko was thus able to drill, process, and transport oil from the Wattenberg field at rock-bottom prices. As a result, according to Anadarko's 10-K for the year ended December 31, 2015 (the "2015 10-K"), Anadarko's production costs in the Wattenberg field were only $7.64/BOE – against average worldwide production costs of $8.31/BOE.

67. At the August 16, 2016 EnerCom Oil & Gas Conference, Holly noted that the breakeven point for Anadarko in the Wattenberg field was $30/barrel. If the price of oil were $30/barrel, Anadarko would break even in the Wattenberg field. It would make a profit if the price of oil was higher.

68. Anadarko actively expanded operations in the Wattenberg field. It completed 487 horizontal wells in the Rockies in 2014, and 390 in 2015, in both years focusing mostly on the Wattenberg field. In 2016, it completed 220 horizontal wells in the DJ Basin alone, again focusing on the Wattenberg field.

69. Defendants repeatedly boasted to investors and the public of the quality of the Wattenberg field. For example, at the May 20, 2015 UBS Global Oil & Gas Conference, Defendant Gwin touted that the cost of drilling a horizontal well there had fallen to $3.5 million. And at the September 17, 2015 UBS Houston Energy Tour, Defendant Gwin explained that Anadarko's U.S. onshore activity would be "primarily" in the Wattenberg field, chiefly because of the returns it was earning even with low oil prices. At the June 28, 2016 JP Morgan Energy Equity Investor Conference, Defendant Gwin said that Anadarko's operation in the Wattenberg field was "just about the best unconventional asset in the world" and "competes economically

with anything that's out there." At the November 29, 2016 Jefferies Energy Conference, Defendant Gwin stated that the DJ Basin "is, I think, maybe arguably, but in our opinion, this is about the most attractive basin in North America from an economic standpoint for Anadarko. Quite frankly, economically, even better than the Delaware." Defendant Gwin added that the DJ Basin's "economics are phenomenal."

70. Indeed, at the November 29, 2016 conference, Defendant Gwin noted that Anadarko had five rigs drilling horizontal wells in the DJ Basin, and that it would add more the next year unless oil prices fell. Defendant Gwin also noted at the same time that on average each rig took 4 days to drill a horizontal well.

71. And Anadarko also repeatedly boasted that the Wattenberg field was massive, and that it had identified 4,000 locations to drill horizontal wells with total reserves of 1.5 billion barrels. This included Holly's representation at the August 16, 2016 EnerCom Oil & Gas Conference.

72. Colorado also employed an outsize number of Anadarko employees. As of the end of 2015, Anadarko had about 5,800 employees; 1,500 of them, or more than a quarter, worked in Colorado.

**C. The price of oil collapses**

73. The closing price of New York Mercantile Exchange ("NYMEX") West Texas Intermediate ("WTI") fell from $95.83/barrel on September 1, 2014, to $54.56/barrel on January 1, 2015. More than three years later, the price has not recovered, trading at approximately $50/barrel.

74. The price collapse had a devastating impact on Anadarko.

| In million USD | Revenues | Operating Profit (Loss) – giving effect to Kerr-McGee and Deepwater Horizon fines and settlements | Net Income (Loss) – giving effect to Kerr-McGee and Deepwater Horizon fines and settlements |
|---|---|---|---|
| 2011 | 13,967 | (1,870)[2] | (2,568) |
| 2012 | 13,411 | 3,727 | 2,445 |
| 2013 | 14,581 | 3,333 | 941[3] |
| 2014 | 18,470 | 5,403 | (1,563)[4] |
| 2015 | 8,698 | (8,809)[5] | (9,689) |
| 2016 | 7,869 | (2,599)[6] | (2,808) |

75. Community relations, safety, and remediation budgets were cut across the board. According to FE 4, when the price of oil fell, Anadarko's attitude to safety completely changed.

76. According to FE 1, the level at which a decision is made in Anadarko depended significantly on the impact of the decision on Anadarko's profit margins. A given dollar expense had a much smaller impact on Anadarko's margins when oil trades at $100/barrel than when it trades at $30/barrel. Accordingly, as the price of oil fell in September 2014, decisions regarding

[2] Anadarko owned a 25% interest in the Macondo well. Following the Deepwater Horizon explosion, Anadarko paid $4,000 million to BP as Anadarko's share of any private liabilities. Anadarko's 2011 operating loss reflects a $3,930 million charge for the BP settlement.

[3] Over its nearly 80 years of existence, Kerr-McGee Corp., had accumulated massive environmental liabilities through its environmental misconduct. To evade these liabilities, shortly before the Kerr-McGee acquisition, they were placed in a company that Kerr-McGee spun off, Tronox Inc. Faced with massive liabilities and no way to pay for them, by design, Tronox quickly filed for bankruptcy. The Department of Justice sued Anadarko under a fraudulent conveyance theory, and Anadarko eventually settled with the Department of Justice for $5.15 billion, the largest environmental contamination settlement in U.S. history. Anadarko's 2013 net income reflects an $850 million contingent loss related to the Tronox litigation.

[4] Reflects a $4,360 million contingent loss related to the Tronox settlement.

[5] Reflects a $5,075 million impairment in connection with the collapse of oil prices.

[6] Reflects a $159.5 million penalty paid to the Justice Department in connection with the Deepwater Horizon explosion.

safety were pushed up the chain of command.

## VII. ANADARKO'S COLORADO OPERATIONS WERE A TICKING TIME BOMB

### A. Anadarko Acquires More Than 1,500 Decrepit Wells From a Competitor

77. On October 21, 2013, Anadarko and its chief competitor in the Wattenberg field, Noble Energy, Inc., announced that they had exchanged ownership of approximately 100,000 acres of land in the Wattenberg field in Colorado – the Land Swap. The Land Swap was effective retroactively to January 1, 2013, pursuant to an Assignment dated October 18, 2013.

78. The purpose of the Land Swap was to consolidate each company's holding in the Wattenberg field and to consolidate operating areas.

79. The land Anadarko transferred to Noble was located in the North-East portion of the DJ Basin, a sparsely inhabited corner of Colorado. In contrast, the land Anadarko received from Noble was in the South-West part of the Wattenberg field, just north of Denver, that included numerous housing complexes, schools, and populated areas.

80. Through the Land Swap, Anadarko acquired not only the right to drill wells, but also, according to records filed with the Commission, more than 1,500 existing wells. The wells Anadarko acquired had been drilled up to 50 years before on land that was, at the time, rural. However, over the ensuing decades, Denver had expanded over much of the area where the wells were located. Accordingly, many of the acres and wells Anadarko acquired in the Land Swap were located in residential areas or close to schools. The wells Anadarko received in the Land Swap included the Firestone Well, which was drilled in 1993.




81. While the Commission imposed setback rules prohibiting drilling wells close to houses,[7] it did not prohibit developers from building houses close to wells. Many developers in

[7] The Commission passed new setback rules for oil and gas facilities in February 2013 with the purpose of decreasing the "potential adverse health and safety risks to the public and the environment, including spills, odors, noise, dust, and lighting." Prior rules permitted drilling within 150 feet of occupied buildings in rural areas and within 350 feet in urban areas. The 2013 regulations increased the minimum setback distance to 500 feet, added a 350-foot setback from outdoor recreational areas such as playgrounds or sports fields, and added a 1,000-foot setback from high occupancy buildings such as schools or hospitals. It also included 1,000-foot buffer distances from these outdoor areas and buildings, where facilities are permitted but only with increased on-site mitigation to prevent air, noise, and water pollution. These rules took effect on August 1, 2013.

fact did build houses close to wells.

82. Moreover, the Commission did not impose any setback rules on the flowlines that transported oil and gas and waste from the wells. Nor did it require companies to disclose to the public or to developers the location of oil and gas lines. As a matter of practice, Anadarko did not disclose the location of its oil and gas lines. Accordingly, in many cases, developers were simply not aware of the location of flowlines. This created a hazard that in building a house, developers might sever a flowline without even knowing it. Whenever a well was turned on, that flowline would then spew dangerous gases into a residential neighborhood.

83. According to FE 1, because of the sheer number of wells exchanged in the Land Swap (more than 1,500), Anadarko was not able to inspect anything more than a tiny proportion of the wells it was acquiring from Noble. Instead, Anadarko and Noble each contributed a reserve into an escrow account to deal with any safety or environment problem that arose. After the deal closed, the two companies would inspect the wells they received and draw from the cash escrow to resolve any problems.

84. According to FE 1, the problems with the wells Anadarko received in the Land Swap were far out of proportion to what it was expecting. The thousands of wells it received had predominantly been drilled 30 or 40 years before. In the meantime, Colorado had tightened its safety and emissions rules. The wells were not in compliance with Colorado's standards. In particular, the wells did not have methane emissions controls on them at all, which were not required at the time they were drilled. And instead of pressurizing the gas emitted and placing it back into the system, the wells simply vented the gas into the air. Moreover, the wells' piping and oil storage tanks had never been upgraded. Beyond that, the wells had become dangerous with age. For example, many of the cellars and cement pits that prevent liquids from going into

the ground or groundwater had completely deteriorated.

85. According to FE 1, Anadarko's top management, including the Executive Committee, well understood these problems within at most six months after the Land Swap closed. The problems were a frequent topic of conversation.

86. According to FE 1, Anadarko's Colorado Health, Safety & Environment staff put together a ranked excel spreadsheet of risky and problematic wells. There were up to several hundred wells listed on the spreadsheet. The Health, Safety & Environment staff regularly updated and presented the list to Anadarko's Colorado senior leadership team. FE 1 attended the presentations.

87. Anadarko leased 60% of the land on which it conducted its Wattenberg operations. According to FE 1, the lease terms generally included a provision requiring Anadarko to actually operate the wells in order to maintain its lease. If Anadarko lost a lease, it would have to renegotiate it with the owner of the mineral rights.

88. The leases were signed decades ago, when there was considerably less interest in the Wattenberg field. Accordingly, their terms were far more advantageous than what Anadarko could secure by renegotiating lease terms.

89. According to FE 1, maintaining these old leases was a high priority for Anadarko. To do so, Anadarko had to turn on and keep on many of the wells it received from Noble in the Land Swap, even if these wells were in desperate need of repairs.

90. According to FE 1, Anadarko's Executive Committee authorized a budget for remediation of the wells, considered a safety or environmental risk, it acquired in the Land Swap. FE 1 believes the budget was in the low tens of millions of dollars.

**B. After the September 2014 Oil Price Collapse, Anadarko Eviscerates the Remediation Budget**

91. At first, Anadarko prepared to actually spend the budget on remediation. However, with the collapse of oil prices in Fall 2014, Anadarko drastically reduced the remediation budget. Thereafter, Anadarko dedicated only a trickle of resources to remediation. When FE 1 left in November 2016, Anadarko had done very little remediation work.

92. According to FE 1, Anadarko put together its budgets based on estimates of various oil price levels. While remediation was important in its budgets if the price of oil reached $100/barrel, according to FE 1, who saw the budgets, "remediation and repair of old wells was very rarely a significant percentage of the capital allocation in a lower commodity price environment [of $40-50/barrel]."

93. According to FE 6, Anadarko was notorious for being "stingy" on environmental issues, such as remediation. FE 6 added that because of its stinginess, "[i]n my industry, not a lot of people like to work for them. It's a money thing, mostly. They're tough to work for, as far as environmental consultants. They were a little stingy with that."

94. According to FE 1, the Executive Committee received status reports on efforts to remediate the Noble wells.

95. Compounding the problem, in March 2016, according to FE 1 and FE 2, Anadarko laid off 20-30% of its staff in every division. This included 30% of the Field Operations Personnel who were responsible for well remediation, as well as 30% of the Health, Safety & Environment Division.

96. As stated on Anadarko's website, Colorado was hit particularly hard by the layoffs, going from 1,500 employees at the beginning of 2016 to 1,100 employees by November to 1,000 employees by the middle of 2017.

97. According to FE 2 and FE 6, in late 2016 and early 2017, Anadarko "ramped up" its activity levels in Colorado. Indeed, Anadarko increased its count of well-drilling rigs in Colorado from 1 in August 2016 to 5 in November 2016. Yet Anadarko did not hire employees to do the additional work – leaving 1,100 employees to do ***more*** work than had been done by 1,500.

98. The layoffs and deprioritization of remediation left Anadarko with a skeleton staff for well remediation, or more broadly for Health, Safety, & Environmental initiatives. According to FE 2, Anadarko simply did not have the labor force and skill set to ramp up its oil production in Colorado. Indeed, according to FE 2, a single employee was responsible for checking the safety of all of Anadarko's flow lines in the Wattenberg field in Weld County. There should have been twelve to twenty employees.

99. FE 2 brought up the issue of inadequate staffing with her superior Christiansen approximately 12 times between late 2016 and March 2017, when she quit in disgust. FE 2 also raised her concerns with Walters, Shane Fross, an engineer, and Paul Schneider, the Health, Safety & Environment Manager for the DJ Basin.

100. Similarly, CE 1 reported that even before the March 2016 layoffs, for the entire Permian Basin (of which the Delaware Basin is a part), Anadarko had only two Health, Safety & Environment inspectors. These inspectors were responsible for inspecting between 400 and 500 wells. According to CE 1, "there was no way they could do it."

101. According to FE 4, Anadarko only paid "lip service" to safety. FE 4 found that a host of Anadarko's contractors did not comply with safety regulations, including OSHA regulations. FE 4 found that many contractors did not have the proper training to do the work that they were hired to do. When he found that contractors did not comply with safety

regulations, he sent a formal email to the contractors, copying "everyone and their brother" within Anadarko, including Ostmeyer, Schlagel, and Hamilton. He never received responses, and Anadarko continued to hire the infringing contractors.

102. Internally, Anadarko attributed safety incidents to personnel issues. But externally, Anadarko made sure to shift the blame. For example, on January 20, 2017, Anadarko spilled 28,000 gallons of oil in Weld County, Colorado. Anadarko held an internal meeting in early February 2017 to prepare for a hearing before the Commission to discuss the spill. The meeting was attended by, among others, FE 2, Fross, Schneider, and Walters. During the meeting, Anadarko officials noted that the cause of the accident was that Anadarko did not have "skilled staff". Rather than disclose the true cause, though, Fross stated "[d]on't say that during the [Commission] hearing." Anadarko did in fact conceal that the cause of the spill was inadequate staffing at the Commission hearing.

103. Moreover, Anadarko had determined that there was oil stuck in the pipe even before the well spilled on January 20, 2017. Anadarko determined that if it attempted a quick fix of the well, there was a 50-60% chance that the well would explode. Yet instead of filling in the well and drilling another, Anadarko chose to proceed with the fix, endangering its employees and others. FE 2 was present for the meetings at which this was discussed. This also was not disclosed to the Commission.

104. In connection with the January 20, 2017 incident, FE 2 voiced concerns about Anadarko's safety practices and lack of skilled staff. Instead of addressing the concerns, Christiansen told her to "keep quiet" as her job "was to shovel shit, and to clean up the messes that [Anadarko's employees] make." FE 2 warned Christiansen that there would be future major problems in Colorado if Anadarko didn't expend the necessary resources on Health, Safety &

Environment matters.

**C. Anadarko Spends the Remediation Budget to Boost Drilling**

105. While the Health, Safety & Environment Division had prepared and ranked a list of wells to remediate, the final decision was in the hands of Anadarko's Field Operations division. According to FE 1, the Field Operations division spent what little remediation resources there were on supporting production and, to a lesser extent, avoiding fines. A well's potential safety risks, and whether it was located in a residential area or near a school, played no part in whether it was chosen for remediation. According to FE 1, "Operations had the veto power, drilling wells was the priority. Operations trumped everything else within the company."

106. For production, Anadarko remediated wells if either they produced a great deal of oil or if their poor condition or regulatory violations interfered with Anadarko's drilling schedule.

107. When it was drilling new horizontal wells, Anadarko would cross-reference the location against the location of the lease-maintaining assets. Anadarko would then perform mechanical integrity tests on older well to ensure they could withstand the pressures of the nearby horizontal frack. If the old well did not pass these tests, Anadarko would plug and abandon the well to install a new horizontal well. In that way, Anadarko used the remediation budget to ensure "the machine of the horizontal drilling program did not get slowed down," rather than to address the actual health and safety risks of the wells.

108. As to fines, federal and state law imposed penalties for methane emissions. Anadarko was aware that Colorado State Department of Health and Environmental Protection Agency inspectors were traveling in the field with infrared cameras to observe emissions from older wells. Potential fines were calculated by the amount of tons of methane released into the

air, and could reach hundreds of thousands of dollars.

109. Because it was easy to detect violations of methane emissions laws, Anadarko took into consideration whether the well was a high emitter of methane. Anadarko remediated wells that emitted a lot of methane.

110. But Anadarko did not take into consideration health and safety considerations, including whether the well was located near a residential area or a school. According to FE 1, the scheduled remediation of wells had "nothing to do with the probability of the wells, or flowlines, creating environmental or safety hazards. The company prioritized either the decommissioning of a well, the upgrade or a repair of the well, based on where the drilling schedule was." Nor did Anadarko take into account whether a well violated standards if violations were not easy to detect.

111. Anadarko's Colorado-based upper executives were aware that Anadarko's poor remediation efforts were a problem. Anadarko convened several meetings of its senior Colorado staff, including FE 1, Walters, Bracken, and three or four others, specifically to discuss how prioritizing remediation funds on supporting drilling as opposed to addressing environment, safety, and health hazards might lead to disasters.

112. Moreover, prioritization of remediation funds to support drilling efforts was occasionally discussed at the team leadership meetings referenced in ¶33, above.

113. Anadarko ignored safety concerns from other employees. Bracken regularly attended the meetings referenced in ¶33, above. According to FE 1, Bracken regularly raised health and safety concerns at these meetings, along with suggested remediation efforts. Mr. Bracken's concerns were then pushed aside for other issues such as timing and location.

### D. Anadarko Violated Commission rules

114. The Commission is the state body with jurisdiction over oil & gas operators in Colorado.

115. The Commission has enacted a series of rules to govern oil & gas operations in Colorado. The rules the Commission enacted include the 1100 series regulating pipelines.

116. Among these is Rule 1103 – Abandonment, which provided during the entirety of the Class Period that "[e]ach pipeline abandoned in place shall be disconnected from all sources and supplies of natural gas and petroleum […] and cut off […] and sealed at the ends." Rule 1103 continued that "[n]otice of such abandonment shall be filed with the Commission and with the local governmental designee or local governmental jurisdiction."

117. As further set out below in ¶138, Anadarko violated Rule 1103 at least 2,400 times.

118. Nor was it possible for Anadarko to comply, because Anadarko did not even know the location of many of its lines.

119. According to FE 5, "all the time" Anadarko found lines that did not appear on internal maps. FE 5 blamed a variety of factors, including incomplete information from Noble, and failure to use sufficient due diligence.

120. This was not an isolated phenomenon. According to CE 1, Anadarko had no idea where many lines were located in the Permian basin, either. When CE 1 was sent out on a job, it was common to "find a line that was not even on the map". For that reason, CE 1 carried a metal detector when he went out to inspect Anadarko locations. CE 1 thought it was "scary."

## VIII. THE FIRESTONE WELL EXPLOSION EXPOSES ANADARKO'S DANGEROUS DISREGARD OF SAFETY

121. In January 2017, Anadarko turned on the Firestone Well, in order to maintain

Anadarko's lease.

122. According to FE 1, the data from the well was "not lining up." Specifically, the Firestone Well did not have a compressor which would dispose of methane. Thus, when it was turned on, it should have begun to emit methane. Yet it did not.

123. During the two first weeks of April 2017, Anadarko sent two crews to the Firestone well to inspect it. They could not explain how the well was not emitting methane. Yet Anadarko did not shut off the well.

124. FE 1 learned these facts from discussions with former colleagues still employed by Anadarko at the time of the conversations.

125. According to FE 2, because Anadarko was short-staffed, no one checked the flowlines of the Firestone Well after turning it on to ensure that they were not leaking. It wouldn't have helped. Anadarko was unaware of the existence of the line that was leaking.

126. On April 17, 2017, a house located approximately 200 feet away from the Firestone Well exploded, killing Mark Martinez and his brother-in-law, Joseph Irwin III. Mr. Martinez's wife, Erin Martinez, suffered severe injuries, and she and their son were taken to the hospital. Ms. Martinez remained in the hospital for a month and a half. The son, aged 11, escaped serious injuries by jumping out of his bedroom window even as the house exploded.

127. On April 26, 2017, after close of trading, Anadarko announced that it had operated a well located 200 feet from the explosion site (*i.e.* the Firestone Well), and that authorities were investigating whether the explosion was linked to the well. Anadarko also announced that it was shutting down 3,000 vertical wells in North East Colorado, or all of the wells of the same vintage that it operated. These wells had previously been producing 13,000 barrels of oil per day, or about 1.6% of Anadarko's total worldwide production.

128. On April 27, 2017, Anadarko's stock price fell by $2.84 from its previous closing price of $59.96 to close at $57.12, or 4.7%, damaging investors.

129. On May 2, 2017, after close of trading, the Frederick-Firestone fire department announced that a 1-inch return line connected to the Anadarko-operated Firestone Well had been abandoned but not disconnected from the wellhead and sealed (a violation of Colorado law). The line later leaked methane into the Martinez' home's drains, which exploded when Mr. Martinez and Mr. Irwin attempted to install a hot water heater.

130. In a notice to oil & gas operators dated May 2, 2017 (the "Notice to Operators"), Colorado Governor John Hickenlooper ordered inspections and tests of all active and abandoned gas pipelines within 1,000 feet of occupied buildings. The Notice to Operators also reminded operators like Anadarko of Rule 1103's requirements that abandoned flowlines be cut and sealed. The Notice to Operators gave operators until June 30, 2017 to ensure that any abandoned flowlines located within 1,000 feet of occupied buildings were taken out of service pursuant to Rule 1103 ("Phase II").

131. On May 3, 2017, Anadarko's stock price fell $4.32 from its previous closing price of $56.15 to close at $51.83, or 7.7%, damaging investors.

132. On May 2, 2017, Anadarko published a statement attributed to its CEO Walker that "[o]ur thoughts and prayers remain with the Martinez and Irwin families as they continue to mourn the loss of their loved ones", adding that "[t]he safety of our employees and the people who live and work in the communities in which we operate is our number one priority."

133. According to FE 2, who discussed the issue with friends who were at the time employed by Anadarko, at the next Anadarko town hall meeting, Holly did not mention the Firestone explosion. Discussion of the Firestone explosion only came up when Defendant

Walker mentioned that Anadarko was not too concerned with it. After hearing Walker's statement, several Anadarko employees walked out of the Town Hall in disgust.

134. On May 10, 2017, the Denver Post reported that the National Transportation Safety Board ("NTSB") joined the local investigation into the Firestone Explosion. The Denver Post reported that NTSB spokesman Keith Holloway said in an email that the NTSB was probing whether there were any safety issues that could have a national policy impact.

135. On May 17, 2017, the International Business Times reported that Anadarko had successfully lobbied Colorado lawmakers to block legislation that would have required operators to disclose the location of lines located near homes, which was blocked in a filibuster. Since Anadarko did not know the location of a significant portion of its lines, it would have been unable to provide the information required by the statute.

136. On May 24, 2017, Anadarko and the Commission reported that a new methane cloud had been discovered west of the Firestone explosion site, with methane levels even higher than those at the site of the explosion.

137. On May 25, 2017, a fire occurred at an Anadarko oil storage container in Weld County, Colorado, killing one worker and injuring three, one of them seriously.

138. On June 30, 2017, Anadarko announced that in response to the Notice to Operators, it cut and sealed ***more than 2,400*** abandoned flowlines located within 1,000 feet of buildings. Every one of those flowlines had been violating Rule 1103, which required that abandoned flowlines be cut and sealed. In addition, Anadarko disconnected, plugged, and abandoned 3,600 1-inch return lines associated with its vertical wells.

139. On September 12, 2017, Erie, Colorado, located in Boulder and Weld counties, voted to require operators to map lines within town limits by October 31, 2017. Lafayette,

Colorado, is considering a similar measure.

## IX. DEFENDANTS' FALSE STATEMENTS

140. On or before February 8, 2016 Anadarko published its 2016 HSE Fact Sheet (the "2016 HSE Fact Sheet"). The 2016 HSE Fact Sheet provided that "our HSE team works seamlessly with operations and facilities to ensure compliance with all applicable laws and regulations." The 2016 HSE Fact Sheet further provided that "[w]e work to ensure that all of our activities are conducted to meet or surpass applicable health, safety and environmental (HSE) laws, regulations, and international standards."

141. The statements were false because: (a) Anadarko intentionally violated Colorado law and regulations as a matter of course, including Rule 1103; and (b) Anadarko knew that hundreds of the wells it had acquired in the Land Swap did not comply with a variety of Colorado laws and regulations, including those violations leading to the Firestone Well explosion.

142. The 2016 HSE Fact Sheet prominently displayed Anadarko's NYSE ticker in the top margin. It was available on Anadarko's website until publication of the 2017 HSE Fact Sheet (defined below) on or before February 23, 2017.

143. On February 16, 2016, Anadarko filed its 10-K for the year ending December 31, 2015. Defendants Walker and Gwin signed the 2015 10-K.

144. The 2015 10-K provided that:

> Anadarko's business operations are subject to numerous international, provincial, federal, regional, state, tribal, local, and foreign environmental and occupational health and safety laws and regulations.
>
> * * * * * *
>
> Many states where the Company operates also have, or are developing, similar environmental laws and regulations governing many of these same types of activities. In addition, many foreign countries where the Company is conducting business also have, or may be developing, regulatory initiatives or analogous controls that regulate

> Anadarko's environmental-related activities. While the legal requirements imposed under state or foreign law may be similar in form to U.S. laws and regulations, in some cases the actual implementation of these requirements may impose additional, or more stringent, conditions or controls that can significantly alter or delay the permitting, development or expansion of a project or substantially increase the cost of doing business. In addition, environmental laws and regulations, including new or amended legal requirements that may arise in the future to address potential environmental concerns such as air and water impacts, are expected to continue to have an increasing impact on the Company's operations.
>
> * * * * * *
>
> ***The Company believes that it is in material compliance with existing environmental and occupational health and safety regulations.*** Further, the Company believes that the cost of maintaining compliance with these existing laws and regulations will not have a material adverse effect on its business, financial condition, results of operations, or cash flows, but new or more stringently applied existing laws and regulations could increase the cost of doing business, and such increases could be material.
>
> (Emphasis added).

145. The emphasized statement was false because: (a) Anadarko intentionally violated Colorado law and regulations as a matter of course, including Rule 1103; and (b) Anadarko knew that hundreds of the wells it had acquired in the Land Swap did not comply with a variety of Colorado laws and regulations.

146. Throughout the Class Period, Anadarko published a Wattenberg Integrated Operations Center Factsheet (the "Operations Center Factsheet"). The Operations Center Factsheet was available on Anadarko's website at all relevant times. The Operations Center Factsheet boasts that the Operations Center "[p]rovides real-time remote-monitoring capabilities for 6,800+ wells and 3,700+ tank facilities", and that it "[a]pplies state of the art oil, natural gas, and water management to Anadarko tank batteries, facilities and pipeline infrastructure." The Operations Center Factsheet added that Anadarko "[i]mmediately pinpoints issues associated with field alerts and alarms."

147. The statements were false because: (a) a large proportion of Anadarko's facilities and pipeline infrastructure was not state of the art, but old and decaying; and (b) the Operations

Center could not pinpoint issues or provide real-time monitoring consistently because Anadarko did not know where many of its lines in Colorado were located.

148. On or before March 12, 2016, Anadarko published its Health, Safety, Environment and Sustainability Overview 2015 (the "2015 Safety Report"). The 2015 Safety Report was signed by Defendants Walker and McBride. It was made available on Anadarko's website until publication of the 2016 Safety Report (defined below).

149. The 2015 Safety Report represented that:

> Oil and natural gas upstream and midstream operations are subject to laws and regulations in every country in which Anadarko operates. ***Anadarko operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations.***

(Emphasis added).

150. The 2015 Safety Report further represented that:

> Spills Prevention Anadarko is committed to preventing and minimizing the impacts of spills at all operations. This commitment is demonstrated by the implementation of best management practices, engineering design, mechanical integrity, product assessment and training. Anadarko promotes a culture that allows for employee involvement in maintaining a safe work environment while recognizing that environmental incidents are preventable. ***The teams strive for ZERO incidents. Spills can be prevented by designing and operating equipment and training staff to avoid releases.***

(Emphasis added).

151. The emphasized statements were false because: (a) Anadarko intentionally violated Colorado law and regulations as a matter of course, including Rule 1103; and (b) Anadarko knew that hundreds of the wells it had acquired in the Land Swap were not in compliance with a variety of Colorado laws and regulations. Moreover, in truth, Anadarko was aware that it did not have enough skilled employees to prevent regular spills in Colorado.

Further, Anadarko did not attempt to hire sufficient employees, choosing instead to cause spills when the costs of clean up were expected to be cheaper than remediation (as in the case of the 28,000 gallon January 2017 spill) and then address them through public relations strategies.

152. On August 12, 2016, Anadarko filed a Registration Statement on Form S-3 (the "Registration Statement"), which incorporated by reference the 2015 10-K. On September 12, 2016, Anadarko sold 40,537,500 shares, raising net proceeds of $2.2 billion at an offering price of $54.50/share. By dollar amount, this was the largest stock offering in Anadarko's history.

153. On or before February 23, 2017, Anadarko published its HSE/CSR Fact Sheet (the "2017 HSE Fact Sheet"). The 2017 HSE Fact represented that "[w]e work to ensure that all of our activities are conducted to meet or exceed applicable laws, regulations and international standards."

154. The statements were false because: (a) Anadarko intentionally violated Colorado law and regulations as a matter of course, including Rule 1103; and (b) Anadarko knew that hundreds of the wells it had acquired in the Land Swap were not in compliance with a variety of Colorado laws and regulations.

155. The 2017 HSE Fact Sheet prominently displayed Anadarko's NYSE ticker in the top margin.

156. On or before March 3, 2017, Anadarko Health, Safety, Environment and Sustainability Overview 2016 (the "2016 Safety Report"). The Report was signed by Defendant Walker, as well as by McBride. It was made available on Anadarko's website for the remainder of the Class Period.

157. The 2016 Safety Report represented:

> Oil and natural gas upstream and midstream operations are subject to laws and regulations in every country in which Anadarko operates. ***Anadarko operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations.***
>
> (Emphasis added).

158. The 2016 Safety Report also represented that:

> Anadarko is committed to preventing and minimizing the impacts of spills everywhere it operates. This commitment is demonstrated by the implementation of best management practices, engineering design, mechanical integrity, product assessment and training. We promote a culture that enables employee involvement in maintaining a safe work environment, while recognizing that environmental incidents are preventable***. The teams strive for ZERO incidents. We believe spills can be prevented by designing and operating equipment and training staff to avoid releases.***
>
> (Emphasis added).

159. The statements were false because: (a) Anadarko intentionally violated Colorado law and regulations as a matter of course, including Rule 1103; and (b) Anadarko knew that hundreds of the wells it had acquired in the Land Swap were not in compliance with a variety of Colorado laws and regulations. Moreover, Anadarko was aware that it did not have enough skilled employees to prevent regular spills in Colorado. Further, Anadarko did not attempt to hire sufficient employees, choosing instead to cause spills when the costs of clean up were expected to be cheaper than remediation, (as in the case of the 28,000 gallon January 2017 spill) and then address them through public relations strategies.

## X. CLASS ACTION ALLEGATIONS

160. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased or otherwise acquired Anadarko securities traded on the NYSE during the Class

Period (the "Class"). Excluded from the Class are Defendants herein, current and former officers and directors of Anadarko, and members of their immediate families; any entity in which Defendants have or had a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

161. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, there were approximately 560 million shares of Anadarko outstanding and actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class who are geographically dispersed. Record owners and other members of the Class may be identified from records maintained by Anadarko or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

162. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

163. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

164. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts or omitted to state material information about the business, operations, and management of Anadarko;

c. whether Defendants caused Anadarko to issue false and misleading financial statements during the Class Period;

d. whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e. whether the prices of Anadarko securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein;

f. whether Defendants acted with the requisite level of scienter;

g. whether the Executive Committee Defendants were controlling persons of the Company;

h. whether reliance may be presumed; and

i. whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, what is the proper measure of damages.

165. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

166. Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

167. In addition, Plaintiff and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory, because Anadarko's securities traded in an efficient market during the Class Period, as follows:

a. Throughout the Class Period, Anadarko's securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market. Anadarko's securities were highly liquid during the Class Period, with an average daily volume of 5,228,786 shares;

b. As a regulated issuer, Anadarko filed periodic public reports with the SEC and the NYSE;

c. The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

d. The market reacted promptly to public information disseminated by the Company, as new, Company-specific information was rapidly reflected in the price of Anadarko's securities;

e. Anadarko's securities were covered by more than twenty securities analysts employed by major brokerage firms who wrote reports about the Company during the Class Period, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

f. On average, 4.6% of Anadarko's securities were traded weekly, permitting a very strong presumption that its shares traded on an efficient market;

g. 7 specialist firms made a market in Anadarko's securities; and

h. The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Anadarko's securities.

168. Therefore, the market for Anadarko's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in Anadarko's share price. Under these circumstances, all purchasers of Anadarko securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices and a presumption of reliance applies.

## COUNT I

## Violation of § 10(b) of the Exchange Act and Rule 10b-5

## (against Anadarko)

169. Plaintiff repeats and realleges the allegations set out above as if fully set forth herein.

170. This Count is asserted against Anadarko for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

171. During the Class Period, Anadarko engaged in a plan, scheme, conspiracy and

course of conduct, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon the Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Anadarko securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Anadarko securities and options at artificially inflated prices.

172. By virtue of their positions at Anadarko, the Executive Committee Defendants, Walters, Christiansen, and Holly had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Anadarko, the Executive Committee Defendants, Walters, Christiansen, and Holly. In addition to the facts alleged herein demonstrating a strong inference of scienter, certain information showing that Anadarko, the Executive Committee Defendants, Walters, Christiansen, and Holly acted knowingly or with reckless disregard for the truth is peculiarly within these Defendants' knowledge and control. As the senior managers of Anadarko, the Executive Committee Defendants, Walters, Christiansen, and Holly had knowledge of the details of Anadarko's internal affairs, including the deficiencies in the Company's compliance program and internal

controls.

173. As officers and/or directors of a publicly-held company, the Executive Committee Defendants, Walters, Christiansen, and Holly had a duty to disseminate timely, accurate, full and truthful information regarding Anadarko's business, operations, and financial controls. As a result of the dissemination of the aforementioned false and misleading reports and filings, the market price of Anadarko securities was artificially inflated throughout the Class Period.

174. In ignorance of the adverse facts concerning Anadarko's operations that were concealed by the misrepresentations and omissions alleged herein, Plaintiff and the other members of the Class purchased or otherwise acquired Anadarko securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Anadarko and were damaged upon the disclosure of the wrongdoing described herein.

175. During the Class Period, Anadarko securities were traded on an active and efficient market. Plaintiff and the other members of the Class, directly relying on the materially false and misleading statements described herein, and/or relying upon the integrity of the market, purchased or otherwise acquired shares of Anadarko securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Anadarko securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Anadarko securities declined sharply upon public disclosure of the facts alleged

herein to the injury of Plaintiff and Class members.

176. By reason of the conduct alleged herein, Anadarko knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

177. As a direct and proximate result of Anadarko's wrongful conduct, Plaintiff and the other Class members suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period upon the disclosures alleged herein. Anadarko is liable for damages in connection with these losses under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**

**Violation of § 20(a) of the Exchange Act**

**(against the Executive Committee Defendants)**

178. Plaintiff repeats and realleges the foregoing allegations as though fully set forth herein.

179. During the Class Period, the Executive Committee Defendants participated in the operation and management of Anadarko, and conducted and participated, directly and indirectly, in the conduct of Anadarko's business affairs. Because of their senior positions, they knew the adverse non-public information about Anadarko's operations, including Anadarko's compliance and ethics program and internal control policies.

180. As officers of a publicly owned company, the Executive Committee Defendants had a duty to disseminate accurate and truthful information with respect to Anadarko's reports and filings and to correct promptly any public statements issued by Anadarko which had become materially false or misleading.

181. Because of their positions of control and authority as senior officers, the

Executive Committee Defendants were able to, and did, control the contents of the reports and public filings that Anadarko disseminated in the marketplace during the Class Period concerning Anadarko's compliance and ethics program and internal control policies. Throughout the Class Period, these Defendants exercised their power and authority to cause Anadarko to engage in the wrongful acts complained of herein.

182. As control persons, the Executive Committee Defendants are liable pursuant to Section 20(a) of the Exchange Act for the primary violations of the Exchange Act committed by Anadarko as set forth in Count I.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: October 13, 2017

Respectfully submitted,

**STECKLER GRESHAM COCHRAN PLLC**

/s/ R. Dean Gresham
R. Dean Gresham
Texas Bar No. 24027215
Bruce W. Steckler
Texas Bar No. 00785039
dean@stecklerlaw.com
L. Kirstine Rogers
Texas Bar No. 24033009
krogers@stecklerlaw.com
12720 Hillcrest Road, Suite 1045
Dallas, TX 75230
Telephone: 972-387-4040
Facsimile: 972-387-4041

*Liaison Counsel for Plaintiff and the Class*

**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen, Esq. (pro hac vice to be filed)
Phillip Kim, Esq. (pro hac vice to be filed)
275 Madison Avenue, 34th Floor
New York, NY 10116
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

*Lead Counsel for Plaintiff and the Class*

-and-

MOTLEY RICE LLC
Marlon E. Kimpson
Joshua C. Littlejohn
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Phone: (843) 216-9000

Fax: (843) 216-9450
Email: mkimpson@motleyrice.com
Email: jlittlejohn@motleyrice.com

*Additional Counsel for Plaintiff and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on this October 13, 2017, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ R. Dean Gresham
R. Dean Gresham