United States District Court
Southern District of Texas
**ENTERED**
June 19, 2018
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ROBERT EDGAR, Individually and on behalf of all others similarly situated, | § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. 17-1372 |
| ANADARKO PETROLEUM CORPORATION, *et al.*, | § § § | |
| Defendants. | § § | |

### ORDER GRANTING MOTION TO DISMISS, WITHOUT PREJUDICE

The plaintiffs, a class of investors who purchased or acquired Anadarko common stock between February 8, 2016 and May 2, 2017, brought this securities class action against the defendants, Anadarko Petroleum Corporation and several of its executives.[1] (Docket Entry No. 35). The plaintiffs allege violations of § 10(b) of the Exchange Act and Rule 10b-5 against Anadarko and violations of § 20(a) of the Exchange Act against the executives. *Id.* at ¶¶ 38, 41. The defendants moved to dismiss, the plaintiffs responded, and the defendants replied. (Docket Entry Nos. 36, 46, 47). The parties appeared at a hearing on June 15 and presented oral argument.

Based on the law, the record, and the parties' arguments, the motion to dismiss is granted, without prejudice and with leave to amend by **August 3, 2018**. The reasons for this ruling are explained below.

---

[1] The defendant executives include: R.A. Walker, Anadarko's chairman since may 14, 2013, chief executive officer since May 15, 2012, and president since February 2010; Robert G. Gwin, Anadarko's executive vice-president, finance and chief financial officer; Robert K. Reeves, Anadarko's executive vice-president, law and chief administrative officer; and Darell E. Hollek a senior advisor at Anadarko since May 10, 2017 and Anadarko's executive vice-president, U.S. onshore exploration and production since April 28, 2015. (Docket Entry No. 35 at ¶¶ 28–31).

I.   **Background**

    I.   **The Factual Allegations**

Anadarko is a publicly traded oil and gas exploration and production company headquartered in the Woodlands.  (Docket Entry No. 35 at ¶ 27).  Anadarko focuses its operations on the Gulf of Mexico, the Delaware Basin in Texas, and the Denver-Julesburg Basin in Colorado.  *Id.* at ¶ 27. Approximately one quarter of Anadarko's employees work out of its Colorado offices.  *Id.* at ¶ 3. The plaintiffs allege that Anadarko's disregard for safety regulations led to the endangerment and death of Colorado residents.  *Id.* at ¶¶ 1, 21.  The plaintiffs contend that this, and Anadarko's failure to be honest, harmed investors and violated securities laws.  The plaintiffs allege the following facts.

In 2006, Anadarko acquired the oil and gas company, Kerr-McGee Corporation.  *Id.* at ¶ 58. This, combined with Anadarko's acquisition of Western Gas Partners, LP, substantially increased Anadarko's oil and gas interests in the Denver-Julesburg Basin.  *Id.* at ¶ 59.  By the end of 2006, this region accounted for 38% of Anadarko's proved onshore oil and gas reserves in the lower 48 states. *Id.*

Anadarko accrued $9 billion in environmental fines and settlements between 2011 and 2014. *Id.* at ¶ 4.  The liabilities came primarily from the Macondo well explosion and the Kerr-McGee acquisition.  *Id.*  Anadarko paid what was  the largest environmental settlement in United States history for the environmental damage Kerr-McGee had caused.  *Id.*  If not for these fines and settlements, Anadarko would have enjoyed multi-billion dollar profits between 2011 to 2013.  *Id.* at ¶ 5.  Instead, Anadarko lost one billion dollars.  *Id.*

On October 21, 2013, Anadarko and its closest competitor engaged in a land swap in the Wattenberg field, the most actively drilled part of the Denver-Julesburg Basin, located just north of

Denver.  *Id.* at ¶¶ 61, 77.  Anadarko received about 1,500 existing wells in the swap.  *Id.* at ¶¶ 77–80.  The land surrounding the wells was primarily rural when the wells were drilled.  As Denver expanded, the surrounding land became more residential.  *Id.* at ¶ 80.  The wells, most of which were drilled 30 to 40 years ago, were not in compliance with Colorado's standards.  *Id.* at ¶ 84.  They lacked methane emission controls to prevent gas from being vented into residential airspace.  *Id.* Other issues included outdated piping and oil storage tanks and deteriorated cellars and cement pits intended to prevent liquids from going into the ground or groundwater.  *Id.* Anadarko's top management knew about these problems within six months after the land swap and were regularly presented with an up-to-date list of wells determined to be problematic by Anadarko's Colorado health, safety, and environment division.  *Id.* at ¶¶ 85–86.

At the end of 2015, Anadarko operated approximately 5,000 vertical wells and 1,000 horizontal wells in the Wattenberg field.[2]  *Id.* at ¶¶ 64–65.  Drilling in the Wattenberg field accounted for 30.1% of Anadarko's worldwide oil production and 20.7% of its worldwide natural gas production.  *Id.* at ¶ 65.

Anadarko assured investors that it had turned over a new leaf in regulation compliance.  *Id.* at ¶ 6.  Anadarko told investors that it had the ability to monitor all the wells in the Colorado region and could rapidly identify and address safety issues.  *Id.*  After making these assurances, Anadarko discovered that several hundred wells acquired in the land swap were safety and environmental

---

[2] Anadarko had several advantages over its competitors in the Wattenberg field of the Denver-Julesburg Basin.  (Docket Entry No. 35 at ¶ 69).  Approximately 40% of Anadarko operations in the field were on mineral acres owned by Anadarko, so those operations incurred no lease fees.  *Id.*  Anadarko had the benefit of economies of scale, with enough land ownership and infrastructure to substantially reduce marginal costs.  *Id.*  Anadarko's subsidiary, Western Gas Partners, had "more than 240 miles of pipeline and two massive process treating plants in the Wattenberg field," which, again, allowed Anadarko to operate at a significantly reduced cost.  *Id.*  Altogether, "Anadarko's production costs in the Wattenberg field were only $7.46/BOE—against average worldwide productions costs of $8.31/BOE."  *Id.*

3

hazards and would require remediation. *Id.* at ¶ 7.  Anadarko authorized tens of millions of dollars for remediation. *Id.*

Oil prices dropped from $95.83 a barrel on September 1, 2014 to $54.56 a barrel on January 1, 2015. *Id.* at ¶ 73.  Anadarko reversed course on its commitment and slashed its remediation budget before any substantial remediation had been performed. *Id.* at ¶ 9.  Senior Colorado Anadarko executives were aware of the safety issues, but they acted to support Anadarko's bottom line by laying off 20% to 30% of the workforce in March 2016. *Id.* at ¶¶ 10–11.  Included in the layoffs were 30% of the field operations personnel who were responsible for well remediation, as well as 30% of the company's health, safety, and environmental division. *Id.* at ¶ 95.  There were not enough employees to operate the Denver-Julesburg Basin safely. *Id.* at ¶ 12.

In late 2016 and early 2017, Anadarko "ramped up" its activity in Colorado. *Id.* at ¶ 97.  In August 2016, Anadarko had one well-drilling rig in Colorado. *Id.*  By November 2016, it had five. *Id.*  Despite this increased drilling, Anadarko hired no additional employees. *Id.*  One former employee brought up the inadequate staffing with John Christiansen, Anadarko's vice-president of corporate communications, approximately 12 times between late 2016 and March 2017. *Id.* at ¶ 99.  She also brought her concerns to Craig Walters, vice-president of the Denver-Julesburg Basin; Shane Fross, an engineer; and Paul Schneider, the health, safety, and environment manager for the Denver-Julesburg Basin. *Id.* at ¶ 99.  When another former employee found out that many of Anadarko's contractors did not comply with safety regulations, he sent an email to the contractors and "everyone and their brother" within Anadarko, but he received no responses. *Id.* at ¶ 101.  Anadarko continued to hire the infringing contractors. *Id.*

Anadarko determined that a 28,000-gallon oil spill in January 2017 was caused by the lack of trained personnel. *Id.* at ¶ 12. At an internal meeting to prepare for a hearing before the Colorado Oil and Gas Conservation Commission to discuss the spill, Anadarko officials noted that the cause of the accident was a lack of "skilled staff." *Id.* at ¶ 103. Anadarko executives decided not to inform Colorado regulators of the cause of the spill. *Id.* Fross instructed meeting attendants not to admit that cause to during the Commission hearing. *Id.* at ¶ 102. When a senior public-relations employee voiced concerns about Anadarko's lack of skilled staff and safety practices, Christiansen told her to "keep quiet" and that her job was to "shovel shit and clean up the messes that [Anadarko's employees] make." *Id.* at ¶ 104.

Anadarko used its remediation budget to support production and avoid fines. *Id.* at ¶ 105. Anadarko chose the wells to remediate based on the amount of oil they would produce or when failing to remediate would affect Anadarko's drilling schedule. *Id.* at ¶ 106. When Anadarko drilled new horizontal wells, it would:

> [C]ross-reference the location against the location of the lease-maintaining assets. Anadarko would then perform mechanical integrity tests on [an] older well to ensure they could withstand the pressure of the nearby horizontal frack. If the old well did not pass these tests, Anadarko would plug and abandon the well to install a new horizontal well. In that way, Anadarko used the remediation budget to ensure "the machine of the horizontal drilling program did not get slowed down," rather than to address the actual health and safety risks of the wells.

*Id.* at ¶ 107. Only when it faced potential fines for methane emissions did Anadarko use funds in the remediation budget to remediate the high-emitting wells. *Id.* at ¶¶ 108–09.

Safety risks and proximity to residential areas or schools were not factors considered in remediation. *Id.* at ¶ 105. According to one former employee, well remediation had "nothing to do with the probability of the wells, or flowlines, creating environmental or safety hazards. The

company prioritized either the decommissioning of a well, the upgrade or a repair of the well, based on where the drilling schedule was." *Id.* at ¶ 110.   Colorado-based upper executives met several times to talk about how to prioritize using remediation funds to support drilling rather than to address environmental and safety hazards.   *Id.* at ¶ 111.   At group leadership meetings, Korby Bracken, the director of environment, regularly raised health and safety concerns.   *Id.* at ¶ 113.   His concerns were pushed aside.   *Id.* at ¶ 113.

On April 17, 2017, a home in Firestone, Colorado exploded, killing two people and critically injuring another.   *Id.* at ¶ 14.   The home was 200 feet away from the Anadarko-operated Firestone Well.   *Id.* at ¶ 127.   The well was one of the several hundred acquired in the land swap but was never remediated.   *Id.* at ¶ 15.   On April 26, 2017, Anadarko announced that the Firestone Well may have been involved in the explosion, and that the company would be shutting down 3,000 similar wells in Colorado.   *Id.* at ¶ 16.   Anadarko's stock price fell 4.7% the next day.   *Id.* at ¶ 17.

Anadarko had turned on the Firestone Well, in January 2017 to maintain the lease.   *Id.* at ¶ 121.   The well did not emit methane when it was turned on because it did not have a compressor to dispose methane.   *Id.* at ¶¶ 122.   In early April 2017, Anadarko had sent crews to the Firestone Well. *Id.* at ¶ 123.   Though the crews could not explain why the well was not emitting methane, Anadarko did not shut off the well.   *Id.*   Because Anadarko was short-staffed, it did not check to make sure the Firestone Well's flowlines were not leaking.[3]  *Id.* at ¶ 125.   It did not know about the existence of the leaking line that caused the explosion.   *Id.*

On May 2, 2017, the Firestone-Frederick Fire Department confirmed the link between Anadarko's well and the Firestone explosion.   *Id.* at ¶ 18.   A return line that was connected to the

---

[3] A "flowline" is a surface or subsurface pipe through which oil or gas travels from a well to process equipment or storage.

6

Firestone Well leaked methane into the home's drains, which exploded when a hot-water heater was being installed. *Id.* at ¶ 129. Anadarko violated Colorado Oil and Gas Conservation Commission Rule 1103 by abandoning the flowline without disconnecting and sealing it. *Id.* at ¶¶ 18, 129. On May 3, 2017, Anadarko's stock price fell by 7.7%. *Id.* at ¶ 19. On June 30, 2017, Anadarko announced that it had cut and sealed more than 2,400 abandoned flowlines located within 1,000 feet of buildings, each of which violated Rule 1103. *Id.* at ¶ 138. Anadarko additionally disconnected, plugged, and abandoned 3,600 return lines. *Id.*

Anadarko publicly expressed sympathy in a published statement attributed to its Robert Walker, Anadarko's chief executive officer, but its executives admitted internally that they were not worried about the explosion. *Id.* at ¶¶ 20, 132. At the next Anadarko town hall meeting, the Firestone explosion came up only when Walker mentioned that Anadarko was "not too concerned" about it. *Id.* at ¶ 133.

On May 24, 2017, a new methane cloud was discovered west of the Firestone explosion site, with even higher levels of methane. *Id.* at ¶ 136. The following day, a fire at an Anadarko oil container in Weld County, Colorado killed one worker and injured three others. *Id.* at ¶ 137.

### ii.     The False Statement Allegations

In February 2016 and 2017, Anadarko published its 2016 and 2017 Health, Safety, and Environment Fact Sheets. *Id.* at ¶ 140, 153. The documents stated: "[w]e work to ensure that all of our activities are conducted to meet or surpass applicable health, safety, and environmental laws, regulations, and international standards." *Id.* The 2016 Fact Sheet additionally stated: "our [health, safety, and environment] team works seamlessly with operations and facilities to ensure compliance with all applicable laws and regulations." *Id.* at ¶ 140. The plaintiffs argue that these statements

were false because: "(a) Anadarko intentionally violated Colorado law and regulations as a matter

of course, including Rule 1103; and (b) Anadarko knew that hundreds of the wells it had acquired

in the Land Swap did not comply with a variety of Colorado laws and regulations, including those

violations leading to the Firestone Well explosion." *Id.* at ¶ 141, 154.

On February 16, 2016, Anadarko filed its 2015 Form 10-K, which Walker and Robert Gwin,

Anadarko's executive vice-president of finance and chief financial officer, signed. *Id.* at ¶ 143. The

2015 Form 10-K stated:

> Anadarko's business operations are subject to numerous international, provincial,
> federal, regional, state, tribal, local, and foreign environmental and occupational
> health and safety laws and regulations.
> . . .
>
> Many states where the Company operates also have, or are developing, similar
> environmental laws and regulations governing many of these same types of
> activities.  In addition, many foreign countries where the Company is conducting
> business also have, or may be developing, regulatory initiatives or analogous
> controls that regulate Anadarko's environmental-related activities.  While the legal
> requirements imposed under state or foreign law may be similar in form to U.S. laws
> and regulations, in some cases the actual implementation of these requirements may
> impose additional, or more stringent, conditions or controls that can significantly
> alter or delay the permitting, development or expansion of a project or substantially
> increase the cost of doing business.  In addition, environmental laws and regulations,
> including new or amended legal requirements that may arise in the future to address
> potential environmental concerns such as air and water impacts, are expected to
> continue to have an increasing impact on the Company's operations.
> . . .
>
> The Company believes that it is in material compliance with existing environmental
> and occupational health and safety regulations.  Further, the Company believes that
> the cost of maintaining compliance with these existing laws and regulations will not
> have a material adverse effect on its business, financial condition, results of
> operations, or cash flows, but new or more stringently applied existing laws and
> regulations could increase the cost of doing business, and such increases could be
> material.

*Id.* at ¶¶ 143–44.  The plaintiffs allege that the statement, "the Company believes that it is in material compliance with existing environmental and occupational health and safety regulations," was false because: "(a) Anadarko intentionally violated Colorado law and regulations as a matter of course, including Rule 1103; and (b) Anadarko knew that hundreds of the wells it had acquired in the Land Swap did not comply with a variety of Colorado laws and regulations." *Id.* at ¶ 145.

On August 12, 2016, Anadarko filed a Registration Statement on Form S-3, which incorporated the 2015 Form 10-K by reference. *Id.* at ¶ 152.  On September 12, 2016, Anadarko sold 40,537,500 shares at an offering price of 54.50 per share, its largest stock offering by dollar amount. *Id.*  The offering raised net proceeds of $2.2 billion.  *Id.*

Anadarko published a Wattenberg Integrated Operations Center Factsheet on its website. The Factsheet stated that the Operations Center "[p]rovides real-time remote-monitoring capabilities for 6,800+ wells and 3,700+ tank facilities," and that it "applies state of the art oil, natural gas, and water management to Anadarko tank batteries, facilities and pipeline infrastructure." *Id.* at ¶ 146. It also stated that Anadarko "[i]mmediately pinpoints issues associated with field alerts and alarms." *Id.* at ¶ 146.  The plaintiffs allege that these statements were false because: "(a) a large proportion of Anadarko's facilities and pipeline infrastructure was not state of the art, but old and decaying; and (b) the Operations Center could not pinpoint issues or provide real-time monitoring consistently because Anadarko did not know where many of its lines in Colorado were located." *Id.* at ¶ 147.

In March 2016 and 2017, Anadarko published its Health, Safety, Environmental and Sustainability Overviews for 2015 and 2016 on its website.  *Id.* at ¶¶ 148, 156.  The reports, which Walker and David McBride, Anadarko's vice-president of global health, safety, and environment signed, stated:

> Oil and natural gas upstream and midstream operations are subject to laws and regulations in every country in which Anadarko operates.  Anadarko operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations.
> . . .
>
> Anadarko is committed to preventing and minimizing the impacts of spills [at all operations/everywhere it operates].  This commitment is demonstrated by the implementation of best management practices, engineering design, mechanical integrity, product assessment and training.  Anadarko promotes a culture that allows for employee involvement in maintaining a safe work environment while recognizing that environmental incidents are preventable.  The teams strive for ZERO incidents.  Spills can be prevented by designing and operating equipment and training staff to avoid releases.

*Id.* at ¶¶ 148–50, 156–58.  The plaintiffs challenge two statements: (1) "Anadarko operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations"; and (2) "[t]he teams strive for ZERO incidents.  We believe spills can be prevented by designing and operating equipment and training staff to avoid releases."  The plaintiffs allege that the statements were false because: "(a) Anadarko intentionally violated Colorado law and regulations as a matter of course, including Rule 1103; and (b) Anadarko knew that hundreds of the wells it had acquired in the Land Swap were not in compliance with a variety of Colorado laws and regulations."  *Id.* at ¶¶ 151, 159.  The plaintiffs also allege that Anadarko knew that it did not have enough employees to prevent Colorado spills and that instead of hiring employees, it allowed spills when the costs of clean up were cheaper than remediation.  *Id.*

### iii.    The Legal Allegations

The plaintiffs assert that Anadarko violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and the Security Exchange Commission's Rule 10b-5.  *Id.* at ¶ 170.  The plaintiffs assert that the executive committee defendants, Bradley Holly, Craig Walters, and John Christiansen, violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  *Id.* at ¶ 182.

### III.    The Legal Standards

#### A.    Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2).  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008).  In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court elaborated on the pleading standards discussed in *Twombly*.  The Court explained that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).  *Iqbal* explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  (citing *Twombly*, 550 U.S. at 556).

"[I]n deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint."  *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).  A court may "consider documents integral to and explicitly relied on in the complaint, that the defendant appends to his motion to dismiss, as well as the full text of documents that are partially quoted or referred to in the complaint."  *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 882 (S.D. Tex. 2001) (internal quotation marks omitted). Consideration of documents attached to a defendant's

motion to dismiss is limited to "documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Scanlan v. Tex. A & M. Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (citing

*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000). In securities cases, courts may take judicial notice of the contents of public disclosure documents that the law requires be filed with government agencies, such as the SEC, and that are actually filed with the agency. *Lovelace*, 78 F.3d at 1018 n.1. The court may consider these matters of public record without converting the motion into one seeking summary judgment. *See Funk v. Stryker Corp.*, 631 F.3d 777, 780 (5th Cir.2011); *Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193 n.3 (5th Cir. 1988) (quoting 5 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1366); *Jathanna v. Spring Branch Indep. Sch. Dist.*, No. CIV.A. H-12-1047, 2012 WL 6096675, at *3 (S.D. Tex. Dec. 7, 2012).

**B.     The Exchange Act**

Under § 10(b) of the Securities Exchange Act of 1934, "[i]t shall be unlawful for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b–5 implements § 10(b) by forbidding, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b–5. The Supreme Court has held that § 10(b) affords a right of action to purchasers or sellers of securities injured by its violation.     *Tellabs, Inc., v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007). "But the statutes make these latter actions

available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (internal citations omitted).

To state a private claim under § 10(b), a plaintiff must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005) (internal citations omitted).

### 1.    Material Misrepresentations and Omissions

A plaintiff who asserts securities fraud in violation of § 10(b) and Rule 10b-5 must comply with the pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act. *See Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); *see also Tellabs*, 551 U.S. at 322.   Rule 9(b) requires the complaint to "state with particularity the circumstances constituting the fraud."   FED. R. CIV. P. 9(b).   In the Fifth Circuit, the Rule 9(b) standard requires "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005).   "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out."   *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003); *see also Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006).

As Judge Ellison explained in a similar case arising from the BP Deepwater Horizon securities fraud multidistrict litigation:

The PSLRA enhances the requirements of Rule 9(b) in two ways.  First, plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u–4(b)(1).  Second, for each act or omission alleged to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* at § 78u–4(b)(2).

In order to meet these additional requirements of the PSLRA, a plaintiff must, therefore: (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir.2002).  These allegations constitute the "who, what, when, where, and how" required under Rule 9(b) and the PSLRA.  *Id.*  What constitutes particularity will necessarily differ with the facts of each case.  *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir.1992). A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim.  *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir.2004).

*In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 746 (S.D. Tex. 2012) ["*BP I*"].  For each statement that the plaintiffs identify as misleading, they must explicitly and precisely set out why the statement was false or misleading and why the speaker knew (or recklessly disregarded the fact that) the statement was misleading.

The Fifth Circuit has made clear its disapproval of "group pleading" in securities-fraud complaints.  Allegations that an undifferentiated group of "defendants" made false or misleading statements are insufficient.  Individualized allegations about the specific speaker are required.  The plaintiffs cannot rely on or impute to individuals the collective knowledge of all or a group of persons associated with the defendant company.  *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008).

Even if misrepresentations and omissions are pleaded with sufficient specificity and individualization, they must be material to state a claim.  There is no bright-line rule for materiality.

14

It requires a fact-intensive inquiry into "the source, content, and context" of the allegedly misleading or omitted information. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011). A representation is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). Omitted facts make a statement material only if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *BP I*, 843 F. Supp.2d at 747 (citing *Basic*, 485 U.S. at 232).

Applying these principles, courts have found that "corporate cheerleading" in the form of "generalized positive statements about a company's progress" is not a basis for liability under the securities laws. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001). "[N]o reasonable investor would consider such statements material and . . . investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *BP I*, 843 F. Supp. 2d at 748. The statements the plaintiffs rely on must be something more than a corporate officer's generalized optimistic comments about the company's policies, programs, or performance. As in other areas of the law, "puffery" is not an actionable misrepresentation.

### 2.     Scienter

In addition to pleading that specific statements made by identified persons misrepresented or omitted material facts, the plaintiffs must plead that the responsible person acted with the necessary culpability, or scienter. *Tellabs*, 551 U.S. at 319. Section 10(b) and Rule 10b-5 are not insurance against bad corporate management. Rather, they protect only against intentional or knowing misstatements. *Shaw Group*, 537 F.3d at 535. "Scienter, in the context of securities fraud,

is defined as 'an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (quoting *R2 Investments LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005)). "[F]or 'each act or omission alleged,' securities fraud plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Shaw Group*, 537 F.3d at 533 (quoting 15 U.S.C. § 78u–4(b)(2)); *TXU Corp.*, 565 F.3d at 207.

In considering a motion to dismiss challenging whether the factual allegations create a strong inference of scienter, the court can consider documents incorporated by reference into the complaint and matters proper for judicial notice. *BP I*, 843 F. Supp. 2d at 748 (citing *Tellabs*, 551 U.S. at 323). The court looks to all of the allegations about a particular individual's state of mind when he or she made the statement to determine whether they support a strong inference of scienter. *Tellabs*, 551 U.S. at 324; *Southland*, 365 F.3d at 364–65. The inference of scienter must be "cogent and compelling," not simply "reasonable" or "permissive." The inference must be "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The court must consider "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323–24. "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind.'" *Id.* at 326 (quoting 15 U.S.C. § 78u–4(b)(2)). "Although circumstantial evidence can support a strong inference of scienter, allegations of motive and opportunity standing alone will not suffice." *BP I*, 843 F. Supp.2d at 749

16

(citing *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002)).

The rule against group pleading applies to scienter allegations. The plaintiffs must make specific factual allegations about each responsible individual's state of mind when each challenged statement was made. The plaintiffs cannot simply allege that some other person at the corporation knew of facts that make the statement misleading and impute that knowledge to the speaker. *Southland*, 365 F.3d at 366. Allegations about another person's knowledge, or the defendants' collective knowledge, are insufficient. The plaintiffs must plead facts that give rise to a strong inference of scienter, for each individual defendant, for each alleged misstatement. *Id.* Simply pleading that a defendant had access to internal information that contradicted his or her public statements is not enough. *In re BP P.L.C. Sec. Litig.*, 852 F. Supp. 2d 767, 817 (S.D. Tex. 2012) ["*BP II*"]. To the extent that the plaintiffs' scienter argument is based on the availability of some internal document setting out certain facts, the complaint must make specific allegations about the document, its author, contents and character, and when and by whom it was received, to link it to the person making the challenged statement, at the time the statement was made. *Abrams*, 292 F.3d at 432.

### 3. Statements of Opinion After *Omnicare*

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015), clarifies how a trial court should evaluate whether a plaintiff has alleged an actionably misleading statement of opinion.[4] *Omnicare* provides "two potential avenues for plaintiffs to

---

[4] Even though "*Omnicare* was decided in the context of Section 11 of the Securities Act, courts have overwhelmingly applied its holdings in the context of alleged omissions under Section 10(b) of the Securities Exchange Act . . . ." *In re: BP p.l.c. Sec. Litig.*, No. 4:10-MD-2185, 2016 WL 3090779, at *10 (S.D. Tex. May 31, 2016) (collecting cases). Its analysis bears both on the material misrepresentation aspect of a § 10(b) claim and on the scienter aspect. *Id.* Therefore, the *Omnicare* opinion's discussions about an "issuer's" statements are equally applicable to an Exchange Act defendant speaker's statements.

establish the falsity of an opinion." *In re: BP p.l.c. Sec. Litig.*, No. 4:10-MD-2185, 2016 WL 3090779, at *9 (S.D. Tex. May 31, 2016). First, "every . . . statement [of opinion] explicitly affirms one fact: that the speaker holds the stated belief." *Omnicare*, 135 S. Ct. at 1327. A speaker can be liable for an opinion statement if the speaker did not in fact hold that opinion. Second, "depending on the circumstances," a reasonable investor could

> understand an opinion statement to convey facts about the speaker's basis for holding that view. Specifically, [a speaker's] statement of opinion may fairly imply facts about the inquiry the issuer conducted or the knowledge it had. And if the real facts are otherwise, but not provided, the opinion statement will mislead by omission.

*Id.* at 1328. Even if

> a speaker's opinion may be sincerely held, the statement may nonetheless be actionable under 10b-5's omissions provision if: (I) the speaker "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion," and (ii) "those facts conflict with what a reasonable investor would take from the statement itself."

*In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *9 (quoting *Omnicare*, 135 S. Ct. at 1329).

The *Omnicare* Court emphasized that this avenue to liability does not allow a plaintiff to circumvent the particularity and materiality requirements of a § 10(b) claim by alleging in general terms that the defendant improperly failed to reveal the basis for his opinion, or failed to disclose "some fact cutting the other way." 135 S. Ct. at 1329. "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why a [speaker] may frame a statement as an opinion, thus conveying uncertainty." *Id.*

One hypothetical the *Omnicare* Court raised bears on the dispute here:

> Consider an unadorned statement of opinion about legal compliance: "We believe our conduct is lawful." If the [speaker] makes that statement without having consulted a lawyer, it could be misleadingly incomplete. In the context of the securities market, an investor, though recognizing that legal opinions can prove wrong in the end, still likely expects such an assertion to rest on some meaningful

legal inquiry—rather than, say, on mere intuition, however sincere.  Similarly, if the [speaker] made the statement in the face of [her] lawyers' contrary advice, or with knowledge that the Federal Government was taking the opposite view, the investor again has cause to complain:  He expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the [speaker]'s possession at the time.

*Omnicare*, 135 S. Ct. at 1328–29.

### 4.    Section 20(a) of the Securities Exchange Act of 1934

Under § 20(a) of the Exchange Act, every "person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . ."  15 U.S.C. § 78t(a).  Control person liability under § 20(a) is derivative, "predicated on the existence of an independent violation of the securities laws." *Rubinstein v. Collins*, 20 F.3d 160, 166 n.15 (5th Cir. 1994).  A party who fails to state an underlying primary claim for an Exchange Act violation fails to state a claim for control-person liability under § 20(a).

## IV.    Analysis

Anadarko argues that the plaintiffs have not pleaded with specificity why or how any of the alleged statements were materially false and misleading.[5]  (Docket Entry No. 36 at 17).  "[The Private Securities Litigation Reform Act] requires the complaint to specify each allegedly

---

[5] Anadarko also argues that the plaintiffs' allegations of falsity that are substantially based on unnamed witnesses' statements carry no weight.  (Docket Entry No. 36 at 17).  "[C]ourts must discount allegations from confidential sources.  Such sources afford no basis for drawing the plausible competing inferences required . . . ." *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) (citation omitted).  This argument is moot.  On December 18, 2017, the court ordered the release of the confidential witnesses' names without the restriction of attorneys eyes only, on the condition that if any witness requests a job reference or similar recommendation from Anadarko, information about the witness role in this lawsuit must be kept from the person at Anadarko receiving the request as well as the person who receives the reference or recommendation.  (Docket Entry No. 41).

misleading statement and the reason why it is misleading . . . ." *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006).   Anadarko asserts its arguments statement-by-statement.

### A.      The Health, Safety, and Environment Fact Sheet Statements

Anadarko published its 2016 and 2017 Health, Safety, and Environment Fact Sheets in February 2016 and 2017, respectively.  (Docket Entry No. 35 at ¶¶ 140, 153).  The statements are, "[w]e work to ensure that all of our activities are conducted to meet or surpass applicable health, safety, and environmental laws, regulations, and international standards," (Docket Entry No. 35 at ¶¶ 140, 153), and "our [health, safety, and environment] team works seamlessly with operations and facilities to ensure compliance with all applicable laws and regulations," *id.* at ¶ 140.

Anadarko argues that a reasonable investor would not view these high-level statements as guarantees.  (Docket Entry No. 36 at 12); *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 909 (S.D. Tex. 2017).  It argues that:

> None of Anadarko's statements regarding high-level regulatory and legal compliance was specific to the Land Swap wells or the wells involved in the Release and Firestone Accident.  Instead, it is clear that the statements broadly describe Anadarko's substantial and far-reaching global operations and its general compliance goals.  Anadarko's extensive global operations require compliance with numerous different health, safety, and environmental laws and regulations.

(Docket Entry No. 36 at 19).  The plaintiffs respond that Anadarko's statements are statements of "present fact" that Anadarko met or exceeded safety requirements.  (Docket Entry No. 46 at 23).  The plaintiffs' argument is unpersuasive because a reasonable investor would not understand Anadarko's statements as "implicitly assuring absolute compliance." *Plains*, 245 F. Supp. 3d at 909.  Anadarko's statement that it "work[s] to ensure" that its activities comply with applicable laws says that Anadarko makes an effort to achieve compliance.  Anadarko cites cases in which statements that

a company or corporate team works or strives toward "ensuring" an outcome have been found too vague to be actionable under Section 10(b).  For example, in *New York State Teachers' Ret. Sys. v. Fremont Gen. Corp.*, 2009 WL 3112574, *15 (C.D. Cal. Sept. 25, 2009),"strive[s] to ensure appropriate loan to collateral valuations" was "so broad or vague as to not be actionable."

The plaintiffs' conclusory allegation that a regulatory violation may have occurred despite Anadarko's work might support an inference that Anadarko's efforts fell short of its goals, not that those efforts did not occur.  The "work to ensure" statements are not actionably misleading.

### B.    The 2015 Form 10-K Statement

### I.    Timeline

The following timeline of alleged events is helpful:

- **February 16, 2016**: Anadarko files its 2015 Form 10-K.  (Docket Entry No. 35 at ¶ 143).

- **August 12, 2016**: Anadarko filed a Registration Statement on Form S-3, incorporating the 2015 Form 10-K by reference.  *Id.* at ¶ 152.

- **January, 2017**: Anadarko turned on the Firestone Well.  *Id.* at ¶ 121.

- **Early April, 2017**: Anadarko sent crews to the Firestone Well.  *Id.* at ¶ 123.

- **April 17, 2017**: The Firestone Well exploded.  *Id.* at ¶ 126.

- **May 2, 2017**:  Colorado Governor John Hickenlooper sent a notice to oil and gas operators ordering inspections and tests of all active and abandoned gas pipelines within 1,000 feet of occupied buildings and reminding operators that abandoned flow lines must be cut and sealed.  The notice gave operators until June 30, 2017 to comply.  *Id.* at ¶ 130.

- **June 30, 2017**: In response to the May 2 notice, Anadarko announced that it cut and sealed more than 2,400 abandoned flowlines located within 1,000 feet of buildings. *Id.* at ¶ 138.

ii.      **Analysis**

Anadarko's 2015 Form 10-K was filed on February 16, 2016.  (Docket Entry No. 35 at

¶ 143).  The 2015 Form 10-K stated:

> [Anadarko] believes that it is in material compliance with existing environmental and
> occupational health and safety regulations.  Further, the Company believes that the
> cost of maintaining compliance with these existing laws and regulations will not
> have a material adverse effect on its business, financial condition, results of
> operations, or cash flows, but new or more stringently applied existing laws and
> regulations could increase the cost of doing business, and such increases could be
> material.

(Docket Entry No. 35 at ¶ 144).

Anadarko argues that this statement is an opinion that "is not actionable unless Plaintiff

alleges facts showing that the speaker did not actually hold the stated beliefs."  (Docket Entry No.

36 at 19); *Omnicare*, 135 S. Ct. at 1328 ("[A] statement of opinion is not misleading just because

external facts show the opinion to be incorrect.").  It asserts that the plaintiffs' allegations are

conclusory and that there are no allegations that any authorities found Anadarko noncompliant at

the time the statements were made.  (Docket Entry No. 36 at 20).  The plaintiffs respond that opinion

statements can be misleading "where the speaker does not believe the opinion or . . . omits facts that

conflict with what a reasonable investor would understand from the statement, itself."  (Docket

Entry No. 46 at 22); *Omnicare*, 135 S. Ct. at 1329.

"To show that these opinion statements are actionable under *Omnicare*, the plaintiffs must

allege, with particularity, each individual defendant's knowledge of material facts inconsistent with

the compliance-opinion statements at issue."  *Plains*, 245 F. Supp. 3d at 908.  In *Plains*, the court

found that opinion statements as to legal compliance were not actionably misleading because the

complaint "[did] not adequately allege that the individual defendants were aware of the facts the

plaintiffs rely on to show that they made statements that they did not believe or knew to be false of misleading."  *Plains*, 245 F. Supp. 3d at 907–08.  The court found that the complaint relied on group-pleading allegations that "the company" or "the defendants" were aware of facts inconsistent with the compliance-opinion statements.  *Id.* at 908.  "[A] bare allegation that a given specific individual knew, when the statements were made," facts inconsistent with the compliance-opinion statements is not sufficient.  "[T]he plaintiffs must allege the character of the reports, the author and contents, who received them, and when."  *Id.* (citing *Abrams*, 292 F.3d at 432).

The significant dates are February 16, 2016, when Anadarko filed its 2015 Form 10-K, and August 12, 2016, when it filed its Registration Statement on Form S-3.  There are no allegations that on these dates, the individual defendants knew of significant violations inconsistent with the statement that Anadarko believed its operations were "in material compliance with existing environmental and occupational health and safety regulations as a whole."  The allegations that come closest are:

> [T]he problems with the wells Anadarko received in the Land Swap were far out of proportion to what it was expecting.  The thousands of wells it received had predominantly been drilled 30 or 40 years before.  In the meantime, Colorado had tightened its safety and emissions rules.  The wells were not in compliance with Colorado's standards.  In particular, the wells did not have methane emissions controls on them at all, which were not required at the time they were drilled.  And instead of pressurizing the gas emitted and placing it back into the system, the wells simply vented the gas into the air.  Moreover, the wells' piping and oil storage tanks had never been upgraded.  Beyond that, the wells had become dangerous with age.  For example, many of the cellars and cement pits that prevent liquids from going into the ground or groundwater had completely deteriorated.
> . . .
>
> Anadarko's top management, including the Executive Committee, well understood these problems within at most six months after the Land Swap closed.  The problems were a frequent topic of conversation.
> . . .

> Anadarko's Colorado Health, Safety & Environment staff put together a ranked excel spreadsheet of risky and problematic wells.  There were up to several hundred wells listed on the spreadsheet.  The Health, Safety & Environment staff regularly updated and presented the list to Anadarko's Colorado senior leadership team.

*Id.* at ¶¶ 84–86.

These allegations are insufficient.  There are no particularized allegations as to individual defendants.  *Plains*, 245 F. Supp at 908.  The allegations do not include facts showing that the individual defendants necessarily, or even likely, knew the facts that made their statements false.  The plaintiffs allege that Walker and Gwin signed the 2015 Form 10-K, but they allege nothing to indicate that those defendants knew material facts inconsistent with the compliance-opinion statements at issue.  Unlike *Plains*, the plaintiffs do not allege regulatory notices of recordkeeping violations.  The only government notice Anadarko received was Colorado Governor John Hickenlooper's May 2, 2017 notice to oil and gas operators ordering inspections and tests of all active and abandoned gas pipelines within 1,000 feet of occupied buildings.  (Docket Entry No. 35 at ¶ 130).  If the compliance-opinion statements in *Plains* did not form the basis of an Exchange Act claim, neither do Anadarko's 2015 Form 10-K statements.  *Plains*, 245 F. Supp at 909–10 ("A reasonable investor would understand the use of 'hedges and disclaimers' like the phrase '*substantial* compliance' and would not reasonably infer that the company was in absolute compliance or that its regulators had no objections to the company's compliance on any pipeline.  Instead, reasonable investors would understand that, for a very large pipeline company in this heavily regulated industry, regulatory notices of recordkeeping violations on minor portions of the company's operation are commonplace and unremarkable.").

The legal-compliance statements in Anadarko's 2015 Form 10-K are not actionable.  The allegations of material falsity are not particularized or individualized.

24

## C.     The Wattenberg Integrated Operations Center Factsheet Statements

The Wattenberg Integrated Operations Center Factsheet stated that the Operations Center "[p]rovides real-time remote-monitoring capabilities for 6,800+ wells and 3,700+ tank facilities," and that it "applies state of the art oil, natural gas, and water management to Anadarko tank batteries, facilities and pipeline infrastructure." (Docket Entry No. 35 at ¶ 146).  It also stated that Anadarko "[i]mmediately pinpoints issues associated with field alerts and alarms." *Id.* at ¶ 146.  The plaintiffs allege that these statements were false because: "(a) a large proportion of Anadarko's facilities and pipeline infrastructure was not state of the art, but old and decaying; and (b) the Operations Center could not pinpoint issues or provide real-time monitoring consistently because Anadarko did not know where many of its lines in Colorado were located."  *Id.* at ¶ 147.

As to the first, Anadarko argues that the statement describes the Operations Center's management, not Anadarko's facilities and infrastructure, as "state of the art."  (Docket Entry No. 36 at 21).  That is right.  The plaintiffs' allegations change the subject of Anadarko's statements from "management" to "infrastructure."   And even if the statements did describe Anadarko's facilities and infrastructure as "state-of-the-art," this type of description is generally, and is here, the sort of "corporate cheerleading" that cannot be the basis of a securities-fraud claim.  *See Plains*, 245 F. Supp. 3d at 901.

As to the second statement, the plaintiffs argue that Anadarko must have been aware of either regulatory failures in the 2,400 flowlines that violated Rule 1003, or that its safety-monitoring systems were grossly ineffective.  (Docket Entry No. 46 at 26).  Anadarko asserts that it did not represent that it was able to pinpoint all regulatory failures in all wells, lines, or facilities.  (Docket Entry No. 36 at 21).  Anadarko is correct.  The statement represents that Anadarko could

25

instantaneously identify issues associated with field alerts and alarms, not that field alerts and alarms would go off if there was an issue in each of Anadarko's wells or lines.

The statements in Anadarko's Wattenberg Integrated Operations Center Factsheet are not actionably misleading. The allegations of material falsity do not accurately describe the first statement and are not particularized or individualized as to the second.

### D. Health, Safety, Environmental and Sustainability Overviews Statements

#### I. Timeline

The following timeline is helpful:

- **March 12, 2016**: The 2015 Health, Safety, Environmental and Sustainability Overview states: "Anadarko operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations." (Docket Entry No. 35 at ¶¶ 148–49).

- **March 3, 2017**: The 2016 Health, Safety, Environmental and Sustainability Overview states: "Anadarko operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations." *Id.* at ¶¶ 156–57.

- **April 17, 2017**: The Firestone Well exploded. *Id.* at ¶ 126.

- **May 2, 2017**: Anadarko published a statement attributed to Walker expressing sympathy for the families of those who had been killed. *Id.* at ¶ 132. "At the next Anadarko town hall meeting," Walker said that Anadarko was "not too concerned" with the Firestone explosion. *Id.* at ¶ 132.

- **May 2, 2017**: Colorado Governor John Hickenlooper sent a notice to oil and gas operators ordering inspections and tests of all active and abandoned gas pipelines within 1,000 feet of occupied buildings and reminding operators that abandoned flow lines must be cut and

sealed.  The notice gave operators until June 30, 2017 to comply.  *Id.* at ¶ 130.

- **June 30, 2017**: In response to the May 2 notice, Anadarko announced that it cut and sealed more than 2,400 abandoned flowlines located within 1,000 feet of buildings. *Id.* at ¶ 138.

### ii.    Analysis

Anadarko published on its website its Health, Safety, Environmental and Sustainability Overviews for 2015 and 2016 in March 2016 and 2017.  *Id.* at ¶¶ 148, 156.  Both Overviews stated: "[t]he teams strive for ZERO incidents.  Spills can be prevented by designing and operating equipment and training staff to avoid releases" and that Anadarko "operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations."  *Id.* at ¶¶ 149–50, 157–58.  The plaintiffs argue that these statements were false because: "(a) Anadarko intentionally violated Colorado law and regulations as a matter of course, including Rule 1103; and (b) Anadarko knew that hundreds of the wells it had acquired in the Land Swap were not in compliance with a variety of Colorado laws and regulations."  (Docket Entry No. 35 at ¶¶ 151, 159. The plaintiffs also allege that although Anadarko knew that it did not have enough employees to prevent Colorado spills, instead of hiring employees, it allowed spills when the costs of clean up were cheaper than remediation.  *Id.*

Anadarko argues that the plaintiffs' allegation, even if true, does not make the statement "[t]he teams strive for ZERO incidents" materially false or misleading.  (Docket Entry No. 36 at 22). Anadarko is right.  The fact that there was an explosion or release does not mean that Anadarko's teams did not strive for zero spills.  *See Owens v. Jastrow*, 789 F.3d 529, 544–45 (5th Cir. 2015).

The other statement, that  Anadarko "operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations," is trickier.  (Docket Entry No. 35

at ¶¶ 149, 157).  The plaintiffs allege that the Firestone Well explosion on April 17, 2017 was caused by a flowline that was not disconnected or sealed, in violation of Colorado law.  *Id.* at ¶ 129.  The plaintiffs also allege that no one checked the flowlines of the Firestone Well after turning it on in January 2017 to make sure that they were not leaking.  *Id.* at ¶ 125.

Anadarko's statement that it operated "in compliance with the applicable laws and associated regulations" was made in both March 12, 2016 and March 3, 2017.  *Id.* at ¶¶ 148, 156.  The statement is specific, is not limited, and is not an opinion.  Unlike the statement in *Plains* that the company was operating in "substantial compliance," there is no qualifying language in Anadarko's statement.  Anadarko asserted that it was "in compliance" with all applicable laws and regulations. The plaintiffs have sufficiently alleged that Anadarko was not in compliance with all laws and regulations.  At least one regulation, Colorado Oil and Gas Conservation Commission Rule 1103, was allegedly violated.  Based on the plaintiffs' allegations, the statement of compliance was an actionable misstatement, and one that a reasonable investor would consider important in making an investment decision.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988).

The next issues are whether the plaintiffs have adequately alleged scienter as to Walker or McBride, and whether their scienter can be imputed to Anadarko.  The plaintiffs must allege that either Walker or McBride acted with the necessary culpability, or scienter; namely, "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known . . . or so obvious that the defendant must have been aware of it."  *Flaherty & Crumrine*, 565 F.3d at 207; *Tellabs*, 551 U.S. at 319.  The plaintiffs must plead facts that give rise to a "cogent and compelling inference" that persons to whom statements are attributed intended to deceive or were severely reckless.  *Plains*, 245 F. Supp. 3d at 921.

28

The plaintiffs allege that both Walker, Anadarko's chairman, chief executive officer, and president, and McBride, Anadarko's vice-president of global health, safety, and environment, signed the 2015 and 2016 Health, Safety, Environmental and Sustainability Overviews. (Docket Entry No. 35 at ¶¶ 148, 156). The plaintiffs do not allege that McBride knew of Anadarko's legal violations. Walker is a closer call. Anadarko is correct that "the fact that an individual defendant made a statement or signed a document containing a statement shows only that the statement is attributable to that defendant, not that he or she had the legally required state of mind." *Plains*, 245 F. Supp. 3d at 923. But the plaintiffs allege that Walker knew about the Firestone Well explosion. On May 2, 2017, Anadarko published a statement attributed to Walker expressing sympathy for the families of those who had been killed. (Docket Entry No. 35 at ¶ 132). And later, at an Anadarko town hall meeting, Walker said that Anadarko was "not too concerned" with the Firestone Well explosion. *Id.* at ¶ 133. The question is the sufficiency of allegations that when Walker made the statements, he knew or should have known that the cause of the explosion stemmed from Anadarko's violations of Rule 1103.

The Firestone Well exploded in April 2017. *Id.* at ¶ 126. The "in compliance with the applicable laws and associated regulations" statement was made in March 12, 2016 and March 3, 2017. *Id.* at ¶¶ 148, 156. Both statements were made before the explosion. Anadarko's announcement that it had cut and sealed more than 2,400 abandoned flowlines located within 1,000 feet of buildings—statements that the plaintiffs allege show that Anadarko violated Rule 1103—did not come until June 30, 2017. *Id.* at ¶ 138. The plaintiffs have not sufficiently alleged that, at the time the 2015 and 2016 Health, Safety, Environmental and Sustainability Overviews were made, Walker had "an intent to deceive, manipulate, or defraud or that severe recklessness in which the

danger of misleading buyers or sellers is either known . . . or so obvious that the defendant must have been aware of it." *Flaherty & Crumrine*, 565 F.3d at 207; *Tellabs*, 551 U.S. at 319.

The statement, "[t]he teams strive for ZERO incidents.  Spills can be prevented by designing and operating equipment and training staff to avoid releases," is not actionably misleading.  The statement "[Anadarko] operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations," is actionably misleading, but the plaintiffs have not sufficiently alleged Walker's scienter.

## V.   Conclusion

The plaintiffs have what at first looks like a narrative that would counsel against dismissal. The plaintiffs allege that Anadarko got bad wells in a land swap, said they were going to remediate them, failed to remediate because of costs and external financial pressures, failed to prevent explosions, and then announced that it had violated Colorado laws.  The biggest hurdle for the plaintiffs is the timing of the facts alleged as the basis for this theory of liability.  The plaintiffs clearly allege that at least by June 30, 2017, Anadarko knew that more than 2,400 of its abandoned flowlines were violating Rule 1103.   But the only statement that is an actionable misrepresentation—that Anadarko "operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations"—predated the explosion.  What the plaintiffs did not allege is that the individuals who stated that "[Anadarko] operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations" knew, or should have known, before the explosion that Anadarko was violating at least some laws. The plaintiffs' present complaint is insufficient.

The motion to dismiss is granted, but without prejudice and with leave to amend.  The record

does not permit the court to conclude that amendment would be futile.  The plaintiffs are granted leave to amend by **August 3, 2018**.

SIGNED on June 19, 2018, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge