UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT EDGAR, Individually and On Behalf of All Others Similarly Situated, | § § § | CIVIL ACTION NO. 4:17-cv-01372 |
| | § | **SECOND AMENDED CLASS ACTION** |
| Plaintiff, | § | **COMPLAINT FOR VIOLATION OF THE** |
| v. | § | **SECURITIES LAWS** |
| | § | |
| ANADARKO PETROLEUM | § | **CLASS ACTION** |
| CORPORATION, R.A. WALKER, and | § | |
| ROBERT G. GWIN, | § | |
| | § | **JURY TRIAL DEMANDED** |
| Defendants. | § | |
| | § | |
| | § | |
| | § | |

Lead Plaintiff Iron Workers Benefit and Pension Fund – Iron Workers District Counsel Philadelphia & Vicinity ("Philadelphia Iron Workers" or "Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its complaint against Defendants Anadarko Petroleum Corp. ("Anadarko"), R. A. Walker, David J. McBride, and John M. Christiansen ("Defendants"), alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based on an investigation made by and through its counsel.

## I.   NATURE OF THE ACTION

1.   This is a securities class action brought on behalf of all persons who purchased or acquired the common stock of Anadarko between February 8, 2016 and May 2, 2017, both dates inclusive (the "Class Period"), pursuing remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against Anadarko and certain of its top officials.

2.      Anadarko engages in oil and gas exploration, development, and production, as well as other oil industry-related businesses.

3.      Anadarko primarily conducts its oil activities in three geographic areas: the Delaware Basin in Texas, the Gulf of Mexico, and the Denver-Julesberg ("DJ") Basin in Colorado. About a quarter of Anadarko's employees work out of its Colorado offices.

4.      Between 2011 and 2014, Anadarko accrued more than $9 billion in charges for environmental fines and settlements. These liabilities chiefly arose from the explosion of the Macondo well, in which Anadarko owned a 25% interest, and its acquisition of Kerr-McGee Corp., whose operations had so devastated the environment in the U.S. that Anadarko was forced to pay out the largest environmental settlement in U.S. history to settle the resulting liabilities.

5.      But for these liabilities, Anadarko would have earned about $8 billion of profits in 2011-2013. Giving effect to the accruals, Anadarko lost about $1 billion during that time period.

6.      With its troubled past, Anadarko's compliance with safety and environmental regulations was extremely material to investors.  Indeed, Anadarko eagerly and repeatedly assured investors that it had turned a new leaf and now complied with all safety and environmental regulations. Anadarko specifically assured investors that its high-tech Colorado control center allowed it to monitor, in real-time, ***all*** of its wells in the region, rapidly pinpointing and addressing any potential safety issues.

7.      In late 2013, Anadarko acquired more than 1,550 aging Colorado wells and accompanying land in a land swap with a competitor, Noble Energy Inc. (the "Land Swap" and the "Noble Wells"). These wells were located in Weld County, which had been rural

when the wells were drilled but had become more suburban beginning in the 1990's as Denver expanded.

8.      Within six months, Anadarko discovered that up to several hundred of the Noble Wells were safety and environmental hazards. They had deteriorated with age and were not mechanically nor environmentally up to the current code of operations under Colorado regulations.

9.      Anadarko initially authorized a budget of tens of millions of dollars in order to either abandon them or bring them into current State compliance. Very little remediation work had been done on the Noble Wells by the time oil prices crashed in the fall of 2014.

10.     After oil prices collapsed, Anadarko reconsidered its commitment to safety. It slashed the remediation budget. What was left of the budget was spent remediating Noble Wells that were either good producers or whose poor condition interfered with Anadarko's drilling schedule. Anadarko did not consider safety threats in determining which few Noble Wells to remediate, even though many of these wells were located near houses or schools.

11.     Former Employee 7 ("FE 7"), who was in charge of the division responsible for plugging Anadarko's abandoned wells and sealing its abandoned flowlines in Colorado from 2016-2018, observed that about 25% of the Noble Wells he plugged were dangerous. Notably, that percentage did not decline at all over time, because Anadarko did not prioritize plugging unsafe wells, focusing solely on economics.

12.     Anadarko's widespread violations of five rules of the Colorado Oil & Gas Conservation Commission (the "Commission") all but guaranteed a disaster. First, according to FE 7, Anadarko did not know the location of flowlines and pipelines for about 20-30% of the wells it acquired in the Land Swap. These lines were not identified with

tracer lines or location devices, in violation of Commission Rule 1101, nor were they registered with Colorado authorities, in violation of Commission Rule 1102 (d). Therefore, Weld County residential developers would not be able to locate the flowlines before beginning construction, and neither Anadarko nor the public would know where to look to see if Anadarko's flowlines and pipelines were severed or ruptured. It was inevitable that lines would be severed in construction in Weld County, as there was so much of it. Second, the Anadarko contractors employed to conduct safety inspections of the Noble Wells were unskilled and overworked. Each was responsible for weekly inspections of about 120 wells. Time spent driving from well to well left them about 5 minutes for each inspection. This was only enough time for a look and a quick sniff for dangerous gases, leaving them unable to detect odorless methane and natural gas leaks. Anadarko's contractors were so untrained and overworked that they actually missed, and therefore never inspected approximately 3-5% of Anadarko's wells.

13.    Third, the Commission's Rule 1101 e. (1) mandated that Anadarko must pressure test all of its flowlines every year. These pressure tests are designed to detect methane leaks. Yet Anadarko instead only pressure tested the 20% of its flowlines it believed were located in high risk areas like wetlands, and even these 20% it pressure tested only every other year.

14.    Because Anadarko wouldn't know where to look to see if its flowlines and pipelines were severed and didn't check to see if they were, an explosion was inevitable.

15.    Senior Colorado Anadarko executives were well aware of these safety issues. By November 2016, they had held several meetings specifically to discuss whether it was appropriate to ignore safety and focus on supporting drilling.

16. Anadarko's senior Houston executives knew as well. Defendants R.A. Walker, David McBride, and John Christiansen regularly attended biannual meetings at which Colorado's five Production Superintendents,[1] including FE 7, presented their most pressing problems and salient successes. The PowerPoint slides for the presentations the Production Superintendents made at these biannual meetings were provided to Walker and McBride, among others. Between 2014 and 2016, during at least one of the biannual meetings, Anadarko's Colorado Production Superintendents raised the issue that Anadarko did not know where all of the flowlines were located. The Production Superintendents likewise repeatedly raised the issue that they had too few contractors to check wells and that those they did have on the payroll were unskilled. The Production Superintendents requested additional resources. These resources were never provided. Instead, senior Houston executives instructed the Production Superintendents to figure out solutions for themselves with the resources they had, which the Superintendents were unable to do, which was why they were asking for additional resources.

17. And the policy of only pressure-testing 20% of Anadarko's wells and only every other year,  though it clearly violated the Commission's regulations, was nonetheless enshrined in Anadarko's Colorado Standard Operating Procedures. The Standard Operating Procedures were approved by McBride's Health, Safety & Environment division, subject to McBride's review, and summarized for Walker's benefit.

18. To create the misleading impression for investors and residents that it kept tight control over the safety of its Colorado wells, Anadarko created a purportedly high-

---

[1] The Production Superintendents are the five senior Anadarko officials responsible for its operations in Colorado. Each Superintendent is responsible for an Anadarko division with 200-500 employees or contractors. Each division has complete responsibility for one aspect of Anadarko's operations in Colorado.

tech operations center for the Wattenberg field. A well-publicized factsheet authorized by John Christiansen for the operations center boasted that Anadarko could remotely monitor and control all of its wells in the Wattenberg field – thus reassuring investors and residents that Anadarko's wells were modern, safe, and centrally controlled. But the claim was false. Even by the end of 2016, half of the wells Anadarko acquired in the Land Swap, or nearly 800 wells, were not equipped for *any* sort of remote interaction, and were completely excluded from the operations center's purview, either because of age or incompatibility with Anadarko's systems. And these old, decrepit wells were precisely the wells most likely to be dangerous.

19.     These issues only worsened after the oil price collapse. In March 2016, Anadarko laid off 20-30% of its workforce. Colorado was hit particularly hard, as this and subsequent layoffs cut its workforce from 1,500 to 1,000 employees.

20.     Anadarko determined that the remaining employees were not sufficient to perform operations safely in the DJ Basin, particularly as Anadarko increased drilling in late 2016. Anadarko determined that a 28,000 gallon oil spill in January 2017 near Denver had been caused by lack of trained personnel. Then, at an internal meeting in February 2017 attended by a senior Colorado-based Anadarko executive, Anadarko knowingly misled Colorado regulators about the cause of the spill. When a senior public relations employee present at the meeting raised concerns, Christiansen told her to stop complaining as her job was to "shovel s**t and clean up the messes that [Anadarko's employees] make."

21.     On April 17, 2017, a home located near an Anadarko-owned well in Firestone, Colorado exploded (the "Firestone Well"). The explosion killed Mark Martinez and his brother-in-law, Joseph Irwin III. Mr. Martinez's wife, Erin Martinez, suffered severe

injuries, and she and their son were taken to the hospital. Ms. Martinez remained in the hospital for a month and a half. The son, aged 11, escaped serious injuries by jumping out of his bedroom window as the house exploded.

22.    The Firestone Well was drilled in 1993. Anadarko acquired it in the Land Swap, but never remediated it. Defendants did not immediately disclose the Firestone Well's role in the explosion.

23.    On April 26, 2017, after close of trading, Anadarko announced that it owned a nearby well that may have been involved in the explosion. Anadarko also announced that it was shutting down 3,000 similar vertical wells in Colorado.

24.    The following day, April 27, 2017, Anadarko's stock price fell by 4.7%, damaging investors.

25.    On May 2, 2017, the Firestone-Frederick Fire Department announced that the Firestone Explosion had been linked to a well owned by Anadarko. A flowline connected to the Firestone Well had been abandoned but never sealed, in violation of the Commission's Rule 1103.

26.    The Firestone Well had been turned on, but Anadarko's measurements did not report any methane production through the meter, a physical impossibility. Though Anadarko had sent a work crew to inspect this anomalous result, the overworked employees had not found the problem. The flowline had leaked methane into the home, which exploded when the homeowner tried to install a heater.

27.    On May 3, 2017, Anadarko's stock price fell by 7.7%, damaging investors.

28.    Following the explosion, Anadarko admitted that 2,400 of its flowlines had been abandoned, but not sealed, in violation of Commission Rule 1103. Anadarko also

added an additional 400 wells to the list of wells it needed to plug and abandon, more than doubling the number of wells on that list.

29.    Following the explosion, Anadarko publicly expressed sympathy. Internally, however, Anadarko executives admitted that they were not concerned with the incident in which their reckless behavior caused two deaths.

30.    Anadarko's senior executives, including Defendants, callously disregarded known, widespread violations of the Commission's rules that endangered the Colorado communities in which Anadarko did business. They lied about it to the Commission. They lied about it to investors. They violated the securities laws.

## II.    JURISDICTION AND VENUE

31.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78b-1 and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

32.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

33.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Defendants maintain their principal executive offices in this District and many of the acts, practices and transactions complained of herein occurred in substantial part in this District.

34.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

III.    PARTIES

35.    Court-appointed Lead Plaintiff Philadelphia Iron Workers administers benefits for over 4,900 members in the Philadelphia area, managing assets with a market value of more than $300 million.  As set out in its PSLRA Certification, which was previously filed with the Court and is incorporated by reference, Philadelphia Iron Workers purchased Anadarko common stock during the Class Period and was damaged thereby.

36.    Defendant Anadarko Petroleum Corp. is an oil and gas exploration and production company. Anadarko focuses its operations on the DJ Basin in Colorado, the Delaware Basin in Texas, and the Gulf of Mexico. Headquartered in The Woodlands, Texas. Anadarko's stock was actively traded on the NYSE during the Class Period under ticker symbol APC. At all relevant times, about a quarter of Anadarko's employees worked out of its Colorado offices.

37.    Defendant R. A. Walker has been Anadarko's Chairman since May 14, 2013, and has served as its Chief Executive Officer since May 15, 2012 and President since February 2010. He previously served as Anadarko's Chief Operating Officer from March 1, 2009 to May 15, 2012. Walker first joined Anadarko on September 6, 2005 as Senior Vice President of Finance and Chief Financial Officer, and served in those roles until March 2009.  He has been a director of Anadarko since May 2012. Defendant Walker sat on Anadarko's Executive Committee.

38.    Defendant David J. McBride served as Anadarko's Vice President of Health, Safety & Environment from May 2013 through July 2018. McBride oversaw Anadarko's global Health, Safety & Environment programs. McBride joined Anadarko in August 2005. McBride works in The Woodlands.

39.    Defendant John M. Christiansen has served as Anadarko's Vice President -

Corporate Communications since October 2015. Throughout the Class Period, Christiansen was "responsible for overseeing [Anadarko's] media relations, public affairs, internal communications, [and] external communications including the company's website and digital communications platforms [...]" Christiansen works in The Woodlands.

40.     Together, Walker, McBride, and Christiansen are the "Individual Defendants."

## IV.    ANADARKO EMPLOYEES AND CONTRACTORS

41.     Bradley J. Holly served as Anadarko's Senior Vice President of Operations - Rockies from November 2014 through August 2016. The Senior Vice President of Operations - Rockies is responsible for Anadarko's operations in Colorado, Wyoming, and Utah, and works out of Denver. In August 2016, he was promoted to Senior Vice President of U.S. Onshore Exploration & Production, an officer position at Anadarko responsible for all upstream activities in the U.S. other than offshore operations, working out of The Woodlands. In May 2017, he was promoted to Executive Vice President of U.S. Onshore Exploration & Production. He was let go in a corporate reshuffling on October 4, 2017.

42.     Craig Walters served as Anadarko's Vice President - DJ Basin from 2013 through May 2017, overseeing all of Anadarko's activities in the DJ Basin. He reported to Holly until August 2016. In May 2017, he was promoted to the position of Vice President - Rockies. Walters works in Denver.

43.     Korby Bracken has been Anadarko's Health Safety and Environment Director since June 2013. Bracken works in Colorado and reports to McBride.

44.     Former Employee 1 ("FE 1")[2] was initially hired as Anadarko's Regional Director

_____

[2] This Complaint does not list the former employees' names to protect their privacy. However, confidentiality was neither promised nor requested. Their names, will be provided to Defendants upon request and on the same terms as the Court's December 18, 2017 Order (dkt. # 41).

of Government Relations for the Rockies Region in August 2007. In March 2015, he was promoted to Director of Engagement and Strategy for the Rockies Region. He reported to Holly. He managed all government relations, social investment, and stakeholder relations teams, and managed Anadarko's public affairs group. He attended regular leadership team meetings headed by Holly. Also attending regular leadership team meetings were Anadarko's General Manager for the Wattenberg Asset, General Manager for the Wyoming Asset, General Manager for the Utah Asset, General Manager for Field Operations, General Manager for Drilling Operations, and General Manager for Completion. Korby Bracken, Anadarko's Director of Environment, Health & Safety, U.S. Onshore E&P, also attended. FE 1 left Anadarko in November 2016.

45.     Former Employee 2 ("FE 2") was Anadarko's Government and Public Affairs Manager from July 2012 to March 2017. She reported to FE 1 and then, after his promotion, Defendant John Christiansen, Vice President of Corporate Communications. FE 2 was responsible for handling crisis communications, *i.e.* media relations, whenever Anadarko was involved in any safety or hazard controversies, such as oil spills, injuries, and fires. She stated that there were "a lot of them."

46.     Former Employee 3 ("FE 3") was a Health, Safety & Environment ("HSE")[3] Representative for the Southern Region of Onshore Drilling between July 2014 and April 2016. FE 3 worked in Anadarko's The Woodlands headquarters, and reported to Anadarko's Health, Safety, and Environment Manager for the Delaware Basin.

47.     Former Employee 4 ("FE 4") was an Anadarko Senior International Health, Safety & Environment Representative, between September 2014 and March 2016, working out of The Woodlands. FE 4 reported to Jeff Ostmeyer, Anadarko's Environment, Health & Safety

---

[3] "HSE" was referred to interchangeably with "EHS" ("Environment, Health & Safety").

Inspector, Phillis Schlagel, Anadarko's Director of Health, Safety & Environment Services, and Greg Hamilton, Anadarko's Health, Safety & Environment audit manager. Ostmeyer, Schlagel, and Hamilton all reported to Defendant David McBride, Anadarko's Vice-President, Global Health, Safety & Environment, an officer position. FE 4's responsibilities included auditing Anadarko's contractors to make sure they were up-to-date with regulations, such as Occupational Safety & Health Administration ("OSHA") regulations.

48.     Former Employee 5 ("FE 5") was employed by Anadarko as a contract safety inspector between October 2013 and February 2015. FE 5 worked out of Weld County, Colorado. As a safety inspector, FE 5 would inspect individual wells, as well as review remediation efforts.

49.     Former Employee 6 ("FE 6") was employed by Anadarko as a contract Environmental Specialist from July 2015 to September 2016. FE 6 worked in Weld County, Colorado.

50.     Former Employee 7 ("FE 7") was employed by Anadarko in various positions between 2006 and March 2018. From 2014 through 2016, FE 7 served as Anadarko's Colorado Superintendent for Gas Gathering, one of the five Superintendents who are responsible for the entirety of Anadarko's Colorado operations. There, he was responsible for Anadarko's operations in getting gas to the plants and compressing that gas, managing about 120 Anadarko employees and 120 Anadarko contractors. From 2016 through March 2018, FE 7 served as Superintendent of well servicing. In this position, he was responsible for all vertical well prep, including the maintenance, plugging and abandonment of wells, managing approximately 5 Anadarko employees and 300 contractors. During his tenure as a Production Superintendent, FE 7 reported successively to Beth Bosworth, Nathan Leonard, Paul Wages, and Jeff Dufresne, all

of whom reported to Holly. FE 7 worked out of Anadarko's Colorado offices.

51. Former Employee 8 ("FE 8") worked as a consultant to Anadarko between the second half of 2008 and the end of 2011, when he became an Anadarko employee. From the end of 2011 until March 2016, FE 8 worked as a Spatial Data Analyst reporting to Mary Mondragon. FE 8's group was tasked with developing a system to address problems with data gathering and inaccurate plats of its wells. Anadarko ignored FE 8's group's urgent request that Anadarko conduct an as-built survey of its flowlines. FE 8 worked out of The Woodlands.

52. Former Employee 9 ("FE 9") worked as an Administrative Assistant in Anadarko's Colorado Regulatory Group from August 2014 through December 2015, providing administrative assistance to the Regulatory Group General Manager. Between December 2015 and December 2016, FE 9 was Holly's administrative assistant.

53. Contractor Employee 1 ("CE 1") was a Safety Inspector for Gulf Interstate Engineering Co., a third party that had contracts for all of the Anadarko wells in the Permian Basin. CE 1 worked exclusively on Anadarko wells from 2014 through 2015.

54. Contractor Employee 2 ("CE 2") worked for a Colorado-based company that provided HSE services to Anadarko until about early 2016. CE 2's employer chose not to renew its contract with Anadarko because Anadarko pervasively ignored advice about remedying dangerous wells.

### Respondeat Superior

55. Anadarko is liable for the acts of the Individual Defendants, as well as of Holly, Walters, Bracken, and its other employees and agents under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

56.     The scienter of the Individual Defendants, as well as of Holly, Walters, Bracken, and other employees and agents of Anadarko is similarly imputed to Anadarko under *respondeat superior* and agency principles.

## V.     BACKGROUND

### A.     Glossary

57.     "BBL" means barrels of oil. One barrel is equivalent to 42 U.S. gallons.

58.     "BOE" means barrel of oil equivalent, a unit of energy based on the approximate energy released by burning one barrel of crude oil. BOE is used by oil and gas companies in their financial statements as a way of combining oil and natural gas reserves and production into a single uniform measure, although this energy equivalence does not take into account the lower financial value of energy in the form of gas. Six thousand cubic feet (6 MCF) of natural gas is equal to one barrel of oil.

  a.   MBOE - One thousand barrels of oil equivalent.

  b.   MMBOE - One million barrels of oil equivalent.

  c.   BBOE - One billion barrels of oil equivalent.

59.     "Downstream" is the sector of the oil and gas industry that involves the refining of petroleum crude oil and the processing and purifying of raw natural gas, as well as the marketing and distribution of products derived from crude oil and natural gas.

60.     A "flowline" is a surface or subsurface pipe through which oil or gas travels from a well to processing equipment or storage.

61.     A "horizontal well" is a well that is turned horizontally at depth, providing access to oil and gas reserves at a wide range of angles. Horizontal wells became technically feasible during the 1980s, as natural gas and oil exploration sought ways to produce more hydrocarbons

than were available from less productive vertical wells. Horizontal wells are much more technologically advanced and expensive to drill than vertical wells.

62.     "Midstream" is the sector of the oil and gas industry that involves the transportation, storage, and wholesale marketing of crude or refined petroleum products. Pipelines and other transport systems can be used to move crude oil from production sites to refineries and deliver the various refined products to downstream distributors. Natural gas pipeline networks aggregate gas from natural gas purification plants and deliver it to downstream customers, such as local utilities.

63.     A "return line" is a flowline used to transport natural gas to power a separator near the well that separates the raw mixture of oil, natural gas, and water.

64.     "Upstream" is the segment of the oil and gas industry that refers to searching for potential underground or underwater crude oil and natural gas fields, drilling exploratory wells, and drilling and operating the wells that recover and bring the crude oil or raw natural gas to the surface.

65.     A "vertical well" is a well that is not turned horizontally at depth, allowing access to oil and gas reserves located directly beneath the surface access point. Historically, natural gas and oil exploration involved the use of vertical wells because directional drilling technology was not understood, and was expensive and complicated.

66.     A "wellhead" is the component at the surface of an oil or gas well that provides the structural and pressure-containing interface for the drilling and production equipment.

**B.      Anadarko Boasts of its Operations in the Wattenberg Field in Colorado**

67.     Anadarko was incorporated in 1959 as a subsidiary of Panhandle Eastern Corporation Pipe Line Company, and spun off in 1986.

68.     In 2006, Anadarko acquired a troubled oil and gas company, Kerr-McGee Corporation.

69.     Through the acquisition of Kerr-McGee and another company, Western Gas Partners, LP, Anadarko acquired substantial oil and gas interests in the DJ Basin. As of the end of 2006, the DJ Basin accounted for 38% of Anadarko's proved onshore lower 48 oil and gas onshore reserves.

70.     By the end of 2015, Anadarko had focused its efforts on three areas: the DJ Basin, the Delaware Basin, and Gulf of Mexico - Deepwater. These three areas, which Anadarko referred to as the "three Ds," were expected to receive more than 60% of Anadarko's 2016 capital expenditures. Of the total budget of $2.6-2.8 billion, $700 million was budgeted for the Gulf of Mexico Deepwater, $500 million for the Delaware Basin, and $500 million for the DJ Basin.

71.     The Wattenberg field, located in the DJ Basin in Colorado just north of Denver, is not a new oil field. Operators have been drilling in the Wattenberg field since 1970.

72.     By 2014, operators had built up an inventory of 25,000 oil and gas wells in the DJ Basin. 24,000 of these were located in Weld County. *See* Chelsea R. Thompson et al, Influence of oil and gas emissions on ambient atmospheric non-methane hydrocarbons in residential areas of Northeastern Colorado, Elementa: Science of the Anthropocene, 2014 Volume 2, at 1.

73.     Much of the drilling in the Wattenberg field took place from the 1950's through the 1970's.

74.     During the mid to late 2000s, the Wattenberg field languished. Operators there were late to join the horizontal drilling revolution that accounted for the resurgence of the U.S. domestic oil and gas industry.

75.     But in 2009, the first horizontal well was drilled in the Wattenberg field, rejuvenating operators' interest in the field. From then on, the Wattenberg field showed far more drilling activity than any other part of the DJ Basin.

76.     As of the end of 2015, Anadarko operated approximately 5,000 vertical wells and 1,000 horizontal wells in the Wattenberg field. In 2013, the Wattenberg field accounted for 17.6% of Anadarko's worldwide oil production, and 10.5% of its worldwide natural gas production. By 2015, these numbers had risen to 30.1% and 20.7%, respectively.

77.     Anadarko had many advantages over its competitors in the Wattenberg field. Unlike other producers, Anadarko owned much of the acreage outright. Indeed, Anadarko CFO Robert G. Gwin boasted at the May 20, 2015 UBS Global Oil & Gas conference that approximately 40% of Anadarko's operations in the Wattenberg were on mineral acres that Anadarko owned. For those operations, Anadarko did not have to pay any lease fees. Moreover, Anadarko, along with Noble Energy, Inc., was one of two players who dominated the Wattenberg field, and therefore had lower costs because of the size and scale of its operations and of its infrastructure. Moreover, Anadarko's subsidiary Western Gas Partners had more than 240 miles of pipeline and two massive gas processing treating plants in the Wattenberg field. Anadarko was thus able to drill, process, and transport oil from the Wattenberg field at rock-bottom prices. As a result, according to Anadarko's 10-K for the year ended December 31, 2015 (the "2015 10-K"), Anadarko's production costs in the Wattenberg field were only $7.64/BOE – against average worldwide production costs of $8.31/BOE.

78.     At the August 16, 2016 EnerCom Oil & Gas Conference, Holly noted that the breakeven point for Anadarko in the Wattenberg field was $30/barrel.  If the price of oil were $30/barrel, Anadarko would break even in the Wattenberg field. It would make a profit if the

price of oil was higher.

79.     Anadarko actively expanded operations in the Wattenberg field following the Land Swap. It completed 487 horizontal wells in the Rockies in 2014, and 390 in 2015, in both years focusing mostly on the Wattenberg field. In 2016, it completed 220 horizontal wells in the DJ Basin alone, again focusing on the Wattenberg field.

80.     Anadarko officials repeatedly boasted to investors and the public of the quality of the Wattenberg field. For example, at the May 20, 2015 UBS Global Oil & Gas Conference, Gwin touted that the cost of drilling a horizontal well there had fallen to $3.5 million. And at the September 17, 2015 UBS Houston Energy Tour, Gwin explained that Anadarko's U.S. onshore activity would be "primarily" in the Wattenberg field, chiefly because of the returns it was earning even with low oil prices. At the June 28, 2016 JP Morgan Energy Equity Investor Conference, Gwin said that Anadarko's operation in the Wattenberg field was "just about the best unconventional asset in the world" and "competes economically with anything that's out there." At the November 29, 2016 Jefferies Energy Conference, Gwin stated that the DJ Basin "is, I think, maybe arguably, but in our opinion, this is about the most attractive basin in North America from an economic standpoint for Anadarko. Quite frankly, economically, even better than the Delaware." Gwin added that the DJ Basin's "economics are phenomenal."

81.     Indeed, at the November 29, 2016 conference, Gwin noted that Anadarko had five rigs drilling horizontal wells in the DJ Basin, and that it would add more the next year unless oil prices fell. Gwin also noted at the same time that on average each rig took 4 days to drill a horizontal well.

82.     And Anadarko also repeatedly boasted that the Wattenberg field was massive, and that it had identified 4,000 locations to drill horizontal wells with total reserves of 1.5 billion

barrels. This included Holly's representation at the August 16, 2016 EnerCom Oil & Gas Conference.

83.     An outsize number of Anadarko employees worked in Colorado. As of the end of 2015, Anadarko had about 5,800 employees; 1,500 of them, or more than a quarter, worked in Colorado.

C.      **The Price of Oil Collapses**

84.     The closing price of New York Mercantile Exchange ("NYMEX") West Texas Intermediate crude ("WTI") fell from $95.83/barrel on September 1, 2014, to $54.56/barrel on January 1, 2015. More than three and a half years later, the price has not recovered, trading at approximately $70/barrel.

85.     The price collapse had a devastating impact on Anadarko.

| In million USD | Revenues | Operating Profit (Loss) – giving effect to Kerr-McGee and Deepwater Horizon fines and settlements | Net Income (Loss) – giving effect to Kerr-McGee and Deepwater Horizon fines and settlements |
|---|---|---|---|
| 2011 | 13,967 | (1,870)[4] | (2,568) |
| 2012 | 13,411 | 3,727 | 2,445 |
| 2013 | 14,581 | 3,333 | 941[5] |
| 2014 | 18,470 | 5,403 | (1,563)[6] |
| 2015 | 8,698 | (8,809)[7] | (9,689) |
| 2016 | 7,869 | (2,599)[8] | (2,808) |

86.     Community relations, safety, and remediation budgets were cut across the board. According to FE 4, when the price of oil fell, Anadarko's attitude to safety completely changed.

87.     According to FE 1, the level at which a decision is made in Anadarko depended significantly on the impact of the decision on Anadarko's profit margins. A given dollar expense had a much smaller impact on Anadarko's margins when oil trades at $100/barrel than when it trades at $30/barrel. Accordingly, as the price of oil fell in September 2014, decisions regarding safety were pushed up the chain of command. According to FE 1, this meant senior Anadako

[4] Anadarko owned a 25% interest in the Macondo well. Following the Deepwater Horizon explosion, Anadarko paid $4,000 million to BP as Anadarko's share of any private liabilities. Anadarko's 2011 operating loss reflects a $3,930 million charge for the BP settlement.

[5] Over its nearly 80 years of existence, Kerr-McGee Corp., had accumulated massive environmental liabilities through its environmental misconduct. To evade these liabilities, shortly before the Kerr-McGee acquisition, they were placed in a company that Kerr-McGee spun off, Tronox Inc. Faced with massive liabilities and no way to pay for them, by design, Tronox quickly filed for bankruptcy. The Department of Justice sued Anadarko under a fraudulent conveyance theory, and Anadarko eventually settled with the Department of Justice for $5.15 billion, the largest environmental contamination settlement in U.S. history. Anadarko's 2013 net income reflects an $850 million contingent loss related to the Tronox litigation.

[6] Reflects a $4,360 million contingent loss related to the Tronox settlement.

[7] Reflects a $5,075 million impairment in connection with the collapse of oil prices.

[8] Reflects a $159.5 million penalty paid to the Justice Department in connection with the Deepwater Horizon explosion.

executives were more directly involved in Anadarko's operations.

## VI.   ANADARKO SYSTEMATICALLY VIOLATED COMMISSION RULES

88.   The Commission is the state body with jurisdiction over oil & gas operators in Colorado.

89.   The Commission has enacted a series of regulations to govern oil & gas operations in Colorado. The regulations the Commission enacted include the 1100 series, regulating all pipelines and flowlines.

90.   Anadarko routinely violated five of the Commission's regulations:

   a.   Rule 1102 a. (2) provided during the entirety of the Class Period that "[w]henever an operator discovers any condition that could adversely affect the safe and proper operation of its pipeline, it shall correct it within a reasonable time."

   b.   Rule 1101 a. provided during the entirety of the Class Period that "[m]aterials for pipe and other components of pipelines shall be [] [l]ocatable by a tracer line or location device placed adjacent to or in the trench of all buried nonmetallic pipelines to facilitate the location of such pipelines."

   c.   Rule 1102 d. required operators during the entirety of the Class Period to register their flowline and pipeline locations with the Utility Notification Center, CO 811. CO 811 operates a hotline for information about the location of flowlines that utilities companies and the general public can call before digging to ensure they do not rupture flowlines.

   d.   Rule 1101 e. (1) provided during the entirety of the Class Period that *every* year, Anadarko must pressure test *all* of its flowlines to their maximum

21

anticipated operating pressure.

e. Rule 1103 provided during the entirety of the Class Period that "[e]ach pipeline abandoned in place shall be disconnected from all sources and supplies of natural gas and petroleum […] and cut off […] and sealed at the ends." Rule 1103 continued that "[n]otice of such abandonment shall be filed with the Commission and with the local governmental designee or local governmental jurisdiction." Rule 1103 applies even if a flowline is not located near a building.

## A.   Anadarko Violated Rule 1102 a. Because it Ignored Known Safety Hazards

(i)   Anadarko Acquires More Than 1,500 Decrepit Wells From Noble

91.   On October 21, 2013, Anadarko and its chief competitor in the Wattenberg field, Noble, announced that they had exchanged ownership of approximately 100,000 acres of land in the Wattenberg field in Colorado – the Land Swap. The Land Swap was effective retroactively to January 1, 2013, pursuant to an Assignment dated October 18, 2013.

92.   The purpose of the Land Swap was to consolidate each company's holdings in the Wattenberg field and to consolidate operating areas.

93.   The land Anadarko transferred to Noble was located in the North-East portion of the Wattenberg Field, a sparsely inhabited corner of Colorado. In contrast, the land Anadarko received from Noble was in the South-West part of the Wattenberg field, just north of Denver. Due to Denver's expansion, the land Anadarko acquired included housing complexes, schools, and more densely populated areas.

94.   Through the Land Swap, Anadarko acquired not only the right to drill wells, but also, according to records filed with the Commission, more than 1,550 existing wells. The wells

Anadarko acquired had been drilled up to 50 years before on land that was, at the time, rural. Yet in the 1990's through to the present, as Denver expanded, many suburban developments were built in Weld County's southwestern portion. Indeed, the 2010 census reported that Weld County's population was 252,825, up from 131,821 in 1990.[9] Accordingly, many of the acres and wells Anadarko acquired in the Land Swap were located in residential areas or close to schools. The wells Anadarko received in the Land Swap included the Firestone Well, which was drilled in 1993.

---

[9] The census bureau estimates that as of July 1, 2016, Weld County's population was 294,243.

95.     While the Commission imposed setback rules prohibiting drilling wells close to houses,[10] it did not prohibit developers from building houses close to wells. Many developers in

---

[10] The Commission passed new setback rules for oil and gas facilities in February 2013 with the purpose of decreasing the "potential adverse health and safety risks to the public and the environment, including spills, odors, noise, dust, and lighting." Prior rules permitted drilling within 150 feet of occupied buildings in rural areas and within 350 feet in urban areas. The 2013 regulations increased the minimum setback distance to 500 feet, added a 350-foot setback from outdoor recreational areas such as playgrounds or sports fields, and added a 1,000-foot setback from high occupancy buildings such as schools or hospitals. It also included 1,000-foot buffer distances from these outdoor areas and buildings, where facilities are permitted but only with increased on-site mitigation to prevent air, noise, and water pollution. These rules took effect on August 1, 2013.

fact did build houses close to wells.

96.     Moreover, the Commission did not impose any setback rules on the flowlines that transported oil and gas and waste from the wells. Nor did it require companies to disclose to the public or to developers the location of oil and gas lines. As a matter of practice, Anadarko did not disclose the location of its oil and gas lines. Accordingly, in many cases, developers were simply not aware of the location of flowlines. This created a hazard that in building a house, developers might sever a flowline without even knowing they had done so. Whenever a well was turned on, that flowline would then spew dangerous gases into a residential neighborhood.

97.     According to FE 1, because of the sheer number of wells exchanged in the Land Swap (more than 1,550), Anadarko did not inspect anything more than a tiny proportion of the wells it was acquiring from Noble. Instead, Anadarko and Noble each contributed a reserve into an escrow account to deal with any safety or environment problem that arose.

98.     According to FE 1, the problems with the wells Anadarko received in the Land Swap were far greater than what it was expecting. The wells it received had predominantly been drilled 30 or 40 years before. In the meantime, Colorado had tightened its safety and emissions rules. The Noble Wells did not comply with current air quality and other standards. In particular, the wells did not have methane emissions controls on them at all, which were not required at the time they were drilled. And instead of pressurizing the gas emitted and placing it back into the system, the wells simply vented the gas into the air. Moreover, the wells' piping and oil storage tanks had never been upgraded. Beyond that, the wells had become dangerous with age. For example, many of the cellars and cement pits that prevent liquids from going into the ground or groundwater had completely deteriorated.

99.     According to FE 5, the problems were compounded by catastrophic flooding in

Colorado in 2013, which damaged "most" of the Noble Wells. "There [were] always issues [...] Some of the batteries washed away. None of them were in tip-top shape when [Anadarko] inherited them."

100.    According to FE 1, Anadarko's top management, including Defendant Walker, well understood these problems within at most six months after the Land Swap closed in October 2013.[11] The problems were a frequent topic of conversation in Anadarko according to FE 1.

101.    According to FE 1, Anadarko's Colorado Health, Safety & Environment staff put together a ranked excel spreadsheet of risky and problematic wells (the "Dangerous Wells List"). There were up to several hundred wells listed on the Dangerous Wells List. The Health, Safety & Environment staff regularly updated and presented the list to Anadarko's Colorado senior leadership team. FE 1 attended the presentations.

102.    Anadarko leased 60% of the land on which it conducted its Wattenberg operations. According to FE 1, the lease terms generally included a provision requiring Anadarko to actually operate the wells in order to maintain its lease. If Anadarko lost a lease, it would have to renegotiate it with the owner of the mineral rights.

103.    The leases were often signed decades earlier, when there was considerably less interest in the Wattenberg field from an economic perspective. Accordingly, the terms for operating on these lands were far more advantageous than what Anadarko could secure by renegotiating lease terms today.

104.    According to FE 1, maintaining these old leases was a high priority for Anadarko. To maintain these lucrative leases, Anadarko had to turn on and produce with many of the wells it received from Noble in the Land Swap, even if these wells were in desperate need of repairs.

---

[11] FE 7 confirms that Anadarko had discovered the problems within six months of the Land Swap.

105.    According to FE 1 and FE 7, Defendant McBride prepared a budget to repair, or plug and abandon, the Noble Wells. FE 1 believes the budget was in the low tens of millions of dollars.

106.    Because Defendant McBride does not have authority to authorize a budget of tens of millions of dollars, he had to obtain approval from Anadarko's Executive Committee. The Executive Committee approved the remediation budget for the Noble Wells some time before September 2014. Defendant McBride presented the budget to repair or plug the Noble Wells to the Executive Committee.

107.    Defendant McBride was responsible for oversight of the Executive Committee-approved remediation budget.

       (ii)     After the September 2014 Oil Price Collapse, Anadarko Eviscerates the Remediation Budget

108.    At first, Anadarko prepared to actually spend the budget on remediation. However, with the collapse of oil prices in Fall 2014, Anadarko drastically reduced the remediation budget. Thereafter, Anadarko dedicated only a trickle of resources to remediation. When FE 1 left in November 2016, Anadarko had done very little remediation work.

109.    According to FE 1, Anadarko put together its budgets based on estimates of various oil price levels. While remediation was important in its budgets if the price of oil reached $100/barrel, according to FE 1, who saw the budgets, "remediation and repair of old wells was very rarely a significant percentage of the capital allocation in a lower commodity price environment [of $40-50/barrel]."

110.    According to FE 6, Anadarko was notorious for being "stingy" on environmental issues, such as remediation. FE 6 added that because of its stinginess, "[i]n my industry, not a lot

of people like to work for them. It's a money thing, mostly. They're tough to work for, as far as environmental consultants. They were a little stingy with that."

111.    According to FE 1, the Executive Committee, including Walker, received periodic status reports on efforts to remediate the Noble Wells.

112.    According to FE 7, Defendant McBride was responsible for originating and overseeing the remediation budget. McBride was also responsible for drafting and presenting the status reports to the Executive Committee as well.

113.    Compounding the problem, in March 2016, according to FE 1 and FE 2, Anadarko laid off 20-30% of its staff in every division. This included 30% of the Field Operations Personnel who were responsible for well remediation, as well as 30% of the Health, Safety & Environment Division.

114.    As stated on Anadarko's website, Colorado was hit particularly hard by the layoffs, going from 1,500 employees at the beginning of 2016 to 1,100 employees by November to 1,000 employees by the middle of 2017.

115.    According to FE 2 and FE 6, in late 2016 and early 2017, Anadarko "ramped up" its activity levels in Colorado. Indeed, Anadarko increased its count of well-drilling rigs in Colorado from 1 in August 2016 to 5 in November 2016. Yet Anadarko did not hire employees to do the additional work – leaving 1,100 employees to do *more* work than had been done by 1,500.

116.    The layoffs and deprioritization of remediation left Anadarko with a skeleton staff for well remediation, or more broadly for Health, Safety, & Environmental initiatives. According to FE 2, Anadarko simply did not have the labor force and skill set to ramp up its oil production in Colorado. Indeed, according to FE 2, a single employee was responsible for checking the

safety of *all* of Anadarko's flow lines in the Wattenberg field in Weld County. There should have been twelve to twenty employees.

117.    FE 2 brought up the issue of inadequate staffing with her superior, Defendant Christiansen, approximately 12 times between late 2016 and March 2017, when she quit in disgust. FE 2 also raised her concerns with Walters, Shane Fross, an engineer and Anadarko's General Manager of Completion for the Rockies, and Paul Schneider, the Health, Safety & Environment Manager for the DJ Basin.

118.    Similarly, CE 1 reported that even before the March 2016 layoffs, for the entire Permian Basin (of which the Delaware Basin is a part), Anadarko had only two Health, Safety & Environment inspectors. These inspectors were responsible for inspecting between 400 and 500 wells. According to CE 1, "there was no way they could do it."

119.    According to FE 4, Anadarko only paid "lip service" to safety. FE 4 reports that a host of Anadarko's contractors did not comply with safety regulations, including OSHA regulations. FE 4 reports that many contractors did not have the proper training to do the work that they were hired to do. When he discovered that contractors did not comply with safety regulations, he sent a formal email to the contractors, copying "everyone and their brother" within Anadarko, including Ostmeyer, Schlagel, and Hamilton. He never received responses, and Anadarko continued to hire the infringing contractors.

120.    Internally, Anadarko attributed safety incidents to personnel issues. But externally, Anadarko made sure to shift the blame. For example, on January 20, 2017, Anadarko spilled 28,000 gallons of oil in Weld County, Colorado. Anadarko held an internal meeting in early February 2017 to prepare for a hearing before the Commission to discuss the spill. The meeting was attended by, among others, FE 2, Fross, Schneider, and Walters. During the

meeting, Anadarko officials noted that the cause of the accident was that Anadarko did not have "skilled staff". Rather than disclose the true cause, though, Fross stated "[d]on't say that during the [Commission] hearing." Anadarko did in fact conceal that the cause of the spill was inadequate staffing at the Commission hearing.

121.    Moreover, Anadarko had learned that there was oil stuck in the pipe even before the well spilled on January 20, 2017. Anadarko determined that if it attempted a quick fix of the well, there was a 50-60% chance that the well would explode. Yet instead of filling in the well and drilling another, Anadarko chose to proceed with the fix, endangering its employees and others. FE 2 was present for the meetings at which this was discussed. This also was not disclosed to the Commission.

122.    In connection with the January 20, 2017 incident, FE 2 voiced concerns about Anadarko's safety practices and lack of skilled staff. Instead of addressing the concerns, Defendant Christiansen told her to "keep quiet" as her job "was to shovel s**t, and to clean up the messes that [Anadarko's employees] make." FE 2 warned Christiansen that there would be future major problems in Colorado if Anadarko didn't expend the necessary resources on Health, Safety & Environment matters.

(iii)    Anadarko Diverts the Remediation Budget to Boost Drilling

123.    While the Health, Safety & Environment Division had prepared and ranked the Dangerous Wells List, the final decision was in the hands of Anadarko's Field Operations division. According to FE 1, the Field Operations division spent what little remediation resources there were on supporting production and, to a lesser extent, avoiding fines. The well priorities were based solely on production capacity and economics.  A well's potential safety risks, and whether it was located in a residential area or near a school, played no part in whether it was

chosen for remediation. According to FE 1, "Operations had the veto power, drilling wells was the priority. Operations trumped everything else within the company."

124.    For production, Anadarko remediated wells if they either produced a great deal of oil or if their poor condition or regulatory violations interfered with Anadarko's drilling schedule.

125.    When it was drilling new horizontal wells, Anadarko would cross-reference the location against the location of the lease-maintaining assets. Anadarko would then perform mechanical integrity tests on older wells to ensure they could withstand the pressures of the nearby horizontal frack. If the old well did not pass these tests, Anadarko would plug and abandon the well to install a new horizontal well. In that way, Anadarko used the remediation budget to ensure "the machine of the horizontal drilling program did not get slowed down," rather than to address the actual health and safety risks of the wells.

126.    As to fines, federal and state law imposed penalties for methane emissions. Anadarko was aware that Colorado State Department of Health and Environmental Protection Agency inspectors were traveling in the field with infrared cameras to observe emissions from older wells. Potential fines were calculated by the amount of tons of methane released into the air, and could reach hundreds of thousands of dollars. Because it was easy to detect violations of methane emissions laws, Anadarko took into consideration whether the well was venting a large amount of methane. Anadarko remediated wells that vented a lot of methane.

127.    But Anadarko did not take into consideration health and safety risks, including whether the well was located near a residential area or a school. According to FE 1, the scheduled remediation of wells had "nothing to do with the probability of the wells, or flowlines, creating environmental or safety hazards. The company prioritized either the decommissioning

of a well, the upgrade or a repair of the well, based on where the drilling schedule was." Nor did Anadarko consider whether a well violated laws or regulations if violations were difficult to detect. Indeed, according to FE 1, Anadarko did not consider whether wells or lines "were known to leak or have had a prior incident" in determining which wells to remediate.

128. FE 7 confirms FE 1's account. According to FE 1, the decision of whether to plug or abandon wells, with very few exceptions, was based on one factor alone: the well's economics. And even the few exceptions, accounting for about 5-10% of total wells plugged, had nothing to do with safety. Instead, they arose when a neighbor complained that a well was too loud, smelled bad, or caused too much traffic, and Anadarko determined that it was less expensive to plug the well than to fix the issue.

129. According to FE 7, about 25% of the Noble Wells that he plugged were "unsafe to operate." "We would go to a location and [couldn't] believe it produced like that" because of safety risks. The proportions of Noble Wells that FE 7's group took offline that were unsafe to operate did not change over time. This means that Anadarko made no efforts to prioritize unsafe wells; otherwise, as Anadarko plugged unsafe wells, the pool of unsafe wells would diminish, and FE 7's group would be plugging a smaller percentage of dangerous wells. Indeed, FE 7 stated that Anadarko treated the fact that the wells were unsafe a "low priority" because the wells were not producing a lot of oil and not worth spending money on.

130. According to FE 7, the Anadarko contractors (called pumpers) whose job it was to check on Anadarko's wells were low-skilled, poorly paid and on an hourly basis, and very junior. Each pumper had about 120 wells per week to inspect. Anadarko was aware that these workers sometimes missed wells entirely. FE 7 estimated that about 3-5% of all of Anadarko's wells were simply never inspected because the pumper, who was undertrained and overworked, had

overlooked them. FE 7 stated that this amounts to several hundred wells that were never inspected. If these wells were never inspected, as FE 7 notes, then Anadarko could not plug and abandon them as required by law, because it would not realize that the wells were not producing any oil and gas. Further, if these wells were never inspected, then Anadarko could not detect any safety problems that arose.

131.   Even where Anadarko's pumpers did inspect a well, they were so overworked that the inspection was dangerously hasty. According to FE 7, the pumpers showed up to the well, looked to see if anything was visibly wrong, listened to determine if there were any worrying noises, and sniffed to see if there were any unusual smells. The whole inspection was over in five minutes.

132.   The cursory inspections Anadarko conducted were wildly inadequate to deal with the Noble Wells' severe safety risks. For example, methane and many other dangerous gases are odorless. Thus, according FE 7, the visual inspections Anadarko employees conducted could never detect it. And because Anadarko did not know the location of many of its flowlines, if one ruptured or was cut, it was highly unlikely that the cursory inspections could ever detect the leak.

133.   Anadarko could not count on residents to identify any problems, either, as they were not equipped or trained to do so. Instead, residents only ever raised three problems – sounds, smells, and traffic.

134.   Defendants Walker, McBride and Christiansen were well aware of these safety problems. Anadarko held biannual meetings of senior management (the "Biannual Meetings"). The Biannual Meetings consisted of two separate two-hour meetings on the same day, with the same people present at both meetings.  FE 7 reports that Defendant Christiansen personally attended the majority of the Biannual Meetings and that, whenever he could not attend, he sent a

representative. FE 7 estimates that Defendant Walker personally attended 25%, and Defendant McBride 50%, of the Biannual Meetings. Holly, Walters, and Bracken personally attended all of the Biannual Meetings.

135.   The purpose of the Biannual Meetings was to have Anadarko's five Colorado Production Superintendents update Anadarko's senior executives on developments in the field. FE 7 attended all of the meetings, unless he was on vacation or other time off. As a result, FE 7 attended the vast majority of the Biannual Meetings.

136.   At the Biannual Meetings, Production Superintendents presented PowerPoint slides. Each of Anadarko's five Colorado Production Superintendents were required to identify the 3-5 most important facts about their division, whether positive or negative. They were instructed to identify only issues requiring immediate attention. The Production Superintendents would then make a presentation at the Biannual Meeting, using the PowerPoint slides to discuss the problems.

137.   FE 7 was told by his superiors, including Paul Wages, that the PowerPoint presentations would be disseminated "up the chain" to the "highest levels" of the company, including to Defendant Walker. FE 7's superiors also were regularly unavailable following the Biannual Meetings, telling him when he asked that it was because they would then go to The Woodlands to present the matters discussed at the Biannual Meetings (specifically the information in the PowerPoint presentations) to Anadarko senior executives, including Defendant Walker.

138.   During one or two of the Biannual Meetings between 2014 and the March 2016 layoffs, participants discussed the problem, appearing in a PowerPoint presentation, that 3-5% of wells were never inspected because the pumpers were overworked and undertrained. The

34

Colorado Production Superintendents requested additional resources to hire more pumpers and train them better. But Anadarko's senior executives told the Colorado Superintendents that they would have to resolve the issue on a local level. The Anadarko senior executives then slashed the Colorado Superintendents' resources and budgets in connection with the March 2016 layoffs.

139.    Thus, Anadarko's senior executives, including the Individual Defendants, were aware of the safety problems but did not care enough to resolve them.

140.    Anadarko's Colorado-based senior executives were also aware that Anadarko's poor remediation efforts created or failed to remediate grave dangers. Anadarko convened several meetings of its senior Colorado staff, including FE 1, Walters, Bracken, and three or four others, specifically to discuss how diverting funds away from remediation efforts to drilling operations could lead to environmental, safety, and health hazards.  Moreover, the dangers of prioritizing remediation funds to instead support drilling efforts was discussed at the team leadership meetings referenced ¶44, above.

141.    Anadarko ignored safety concerns raised by other employees. Bracken regularly attended the meetings referenced in ¶44, above. According to FE 1, Bracken regularly raised health and safety concerns at these meetings, along with suggested remediation efforts. Mr. Bracken's concerns were then repeatedly pushed aside in favor of other issues such as timing and location.

142.    In late April or early May 2018, *The Colorado Independent* spoke with a former Colorado-based Anadarko safety manager who now works for a company that does business with Anadarko.[12] The safety manager told *The Colorado Independent* that he frequently thinks of reaching out to Erin Martinez, wife and sister of Mark Martinez and Joseph Irwin III, the two

---

[12] Susan Greene, Former Anadarko brass slam company for safety risks, callousness, *The Colorado Independent*, May 8, 2018.

people killed in the Firestone explosion. But *The Colorado Independent* quotes the safety manager as saying "But what could I say? What would I tell [her]? That those tightwads in corporate couldn't give a s**t about the guys who worked on those wells or the people who lived near them?" The safety manager added that his current employer is "better" and urged *The Colorado Independent* to not "make it sound like all these companies are like Anadarko."

143. *The Colorado Independent* also spoke with FE 1 on-the-record and for attribution. In the interview, FE 1 confirmed that the safety concerns were not concealed at all within Anadarko. He was quoted as saying that:

> It wasn't just me. There were a number of people who knew what the right answer was on safety, but were told it's not a priority right now. It was a precarious situation for all of us. You may be telling your boss or the person who manages your budget or the person who [gives] you day-to-day direction that you don't agree with him or that the decisions being made are not the right decisions. We all expressed our opinions. We made our concerns known. And then we sort of lived with the outcome.

## B. Anadarko Violated Rules 1101 a. and 1102 d. Because It Did Not Know Where Its Flowlines Were

144. FE 7 reports that it was a regular occurrence that when he was asked to plug and abandon a well, Anadarko did not know the location of the well's flowlines (the "Unknown Flowline Wells").

145. According to FE 7, the cause of a majority of the Unknown Flowline Wells is that Anadarko simply did not have any plats (maps) of the wells and their flowlines. In the remainder of instances, the plats were inaccurate. The wells did not have tracers or location devices, in violation of Rule 1101 a., and were impossible to locate without digging up the entire area around the well.

146. Rule 1102 d. requires operators to register their flowlines with Colorado's 811 line locator number. Perversely, to attempt to locate Anadarko's own flowlines, Anadarko

employees frequently themselves called the 811 line locator number. The 811 line is intended to assist utilities and the general public to find flowlines before they dig underground. The 811 line is intended to *rely on* the oil and gas operator's information, not *supply* the operator with information. Unsurprisingly, these calls were not successful, with 811 telling Anadarko that 811 had no record of flowlines in the area. Accordingly, Anadarko violated Rule 1102 d.

147. To find the flowlines of an Unknown Flowline Well, FE 7's team had to dig up the entire area around the well – a process that could take a team and a rig up to 3 weeks.

148. Based on his work plugging and abandoning Anadarko's wells, as well as his attendance at the Biannual Meetings, FE 7 estimates that Unknown Flowline Wells made up about 10% of all of Anadarko's Colorado wells (including the Noble Wells). FE 7 estimates that a larger percentage of the Noble Wells, 20-30%, were Unknown Flowline Wells.

149. In some instances, Anadarko did not even know the location of the Noble Wells.

150. According to FE 7, Anadarko frequently operated wells even if they were Unknown Flowline Wells. According to FE 7, the percentage of wells he was asked to plug and abandon that were Unknown Flowline Wells did not change over time. Because wells must be plugged or abandoned if they have not been operated for 12 months, this means that Anadarko was not considering whether a well was an Unknown Flowline Well in determining whether to operate it.

151. According to FE 7, the Unknown Flowline Wells problem was regularly discussed within Anadarko.

152. For example, FE 7 recalls that the Unknown Flowline Well problem was raised in at least one of the Biannual Meetings taking place before 2016. At the meetings, Colorado Production Superintendents specifically stated that 10% of Anadarko's wells were Unknown

Flowline Wells. FE 7 remembers that Defendant McBride was present for at least one of the Biannual Meetings when the Unknown Flowline Wells problem was raised and discussed. At the meetings, the Unknown Flowline Wells problem was flagged as needing immediate attention. At the Biannual Meetings, the Colorado Production Superintendents sought additional resources from senior Anadarko executives to address the problem.

153.    According to FE 7, each time the Unknown Flowline Well problem was identified as one of the 3-5 facts in the Biannual Meetings, it was also identified in a PowerPoint slide for that meeting. There never was a solution presented, and Anadarko's senior management and executives did not offer a solution, or take or direct any action to resolve the problem, or offer any additional resources. Instead, Anadarko senior executives instructed the Production Superintendents to take care of the problem at the local level. But there never was a presentation at any Biannual Meeting FE 7 attended where anyone stated that the problem had been resolved. Indeed, the problem was "never downgraded."

154.    According to FE 5, Anadarko found lines that did not appear on internal maps "all the time." FE 5 blamed a variety of factors, including incomplete information from Noble, and failure to exercise sufficient due diligence.

155.    This was not an isolated phenomenon. According to CE 1, Anadarko had no idea where many lines were located in the Permian basin, either. When CE 1 was sent out on a job, it was common to "find a line that was not even on the map." CE 1 thought the situation was "scary."

**C.    Anadarko Violated Rule 1101 e. Because It Only Ever Pressure-Tested 20% of Its Wells**

156.    In 2013, Colorado enacted a law that, among other things, directed the

Commission to develop and employ a risk-based strategy to inspect oil and gas facilities. The strategy was intended to prioritize for inspections the phases of oil and gas operations that are most likely to experience spills, excess emissions, and other types of violations.

157.    Pursuant to the newly-enacted law, in February 2014, the Commission produced a report for the Colorado Joint Budget Committee Titled Risk-Based Inspections – Strategies to Address Environmental Risk Associated with Oil and Gas Operations (the "Report").

158.    The Report made eight findings. One of these was that flowlines were a significant source of spills and releases. Report, at 31. The Report reminded operators that the Commission's Rules required "integrity testing of flowlines is required by Commission Rule [...] on an annual basis." Report, at 36.

159.    The Report observed that the Commission presently did not audit operators' pressure testing program. Report, at 36. The Report noted that the failure to audit compliance created significant risk, because annual pressure tests were extremely important. Report, at 31. To reduce the risks, the Report recommended, and the Commission enacted, regulations requiring the Commission to conduct annual audits of operators' compliance with Rule 1101 e. These annual audits were set to begin in 2016.

160.    The Commission thus made very clear to operators from at least 2014 that the annual pressure tests were a key requirement of Colorado law.

161.    Yet. according to FE 7, and contrary to Rule 1101 e.'s explicit command, Anadarko refused to pressure test all of its wells every year. Instead, until the Firestone explosion, Anadarko pressure-tested only 10% of its wells every year.

162.    During FE 7's tenure (until the Firestone explosion), Anadarko first triaged wells into those located in high risk locations, which it would test, and all others. High risk locations

were wetlands and those where, to Anadarko's knowledge, the flowlines extended below houses or schools. Since 20-30% of the Noble Wells were Unknown Flowline Wells, Anadarko had flowlines running below houses or schools which it did not pressure test in violation of Colorado law. This includes the Firestone Well.

163.    Anadarko classified only about 20% of its wells as located in a high risk location. Thus, prior to the Firestone explosion, it ***never tested*** the flowlines for 80% of its wells in direct violation of Colorado law.

164.    Anadarko did not consider whether a well was likely to leak when it decided whether to pressure test.

165.    The 20% of wells that Anadarko actually tested were only tested every other year. Thus, prior to the Firestone explosion, Anadarko only tested 10% of its flowlines every year. Because Rule 1101 e. required Anadarko to test ***every*** flowline ***every*** year, Anadarko violated Rule 1101 e.

166.    Anadarako's practice of only testing flowlines in high risk locations and doing so on a biennial cycle was documented in its Colorado Standard Operating Procedures. According to FE 7, these Standard Operating Procedures were approved by an HSE representative, subject to Defendant McBride's review. Defendant Walker also received a list of Anadarko's Standard Operating Procedures and a description of each.

167.    According to FE 7, a pressure test of the Firestone Well would have revealed that it was leaking.

### D.    Anadarko Violated Rule 1103 Because It Did Not Plug Abandoned Wells

168.    Rule 1103 requires that any abandoned well be plugged or flowline sealed. By definition, any well that has not been in operation for a year is abandoned. Commission Rule

100, Definition of "Inactive Well."

169.    During FE 7's tenure, Anadarko prepared and continuously maintained a list of wells to abandon on an excel spreadsheet referred to internally as the "Plug & Abandonment List," or "P&A List."

170.    FE 7 provided information about the P&A List that was included in weekly reports called the DJ Basin (or Wattenberg) Weekly Operating Reports (the "Weekly Operating Reports"). FE 7 had to submit his information by Thursday COB so that it could be included in weekly Monday 8 a.m. calls. The information FE 7 submitted included the number of wells that had been plugged and abandoned as well as the number of wells remaining on the P&A List. FE 7 knows that the information was actually included in the Weekly Operating Reports because whenever he did not timely provide the information, he would receive an email or call from Holly's administrative assistant asking that he immediately provide the information.

171.    The Weekly Operating Reports had a header for FE 7's group and contained space for him to include three to five bullet points. FE 7 was told by his superior Paul Wages that the Weekly Operating Report would be seen by Anadarko's Executive Committee, including Defendant Walker. He was instructed to keep in mind the fact that the Weekly Operating Report would be reviewed by the Executive Committee in drafting his portion of it.

172.    According to FE 9, Anadarko held a weekly Monday 8 a.m. call to update senior executives about Anadarko's activities. The calls lasted about one hour. Defendant McBride was an invitee who "occasionally" participated, while Holly and Walters always did. FE 1 also occasionally attended.

173.    FE 9 was tasked with contacting Anadarko senior managers, including Superintendents like FE 7, to obtain reports to be presented at the weekly calls. She then put

together the individual reports into a global 20-page report which she printed and labeled. The reports formed the basis of discussions at the weekly calls. FE 9 confirms that the Weekly Operating Reports were provided to all participants in the call, and perhaps others. FE 1 received all Weekly Operating Reports, whether or not he attended, and was encouraged to share the Weekly Operating Reports with his team. That the Weekly Operating Reports were distributed to FE 1, an occasional participant, shows that they were not only distributed to actual participants – suggesting that Defendant McBride, an occasional participant, also received the Weekly Operating Reports.

174.    According to FE 1, the reports prominently featured detailed information concerning the Rockies Region.

175.    According to FE 9, the discussion topics frequently included compliance and safety.

176.    Additionally, according to FE 9, Defendant Walker and other Anadarko senior executives would visit Anadarko's Colorado offices every quarter. Holly would meet them in an 18th floor conference room located right outside the executive suite.

177.    During FE 7's tenure at Anadarko, the P&A List consistently had 200-350 wells on it.

178.    According to FE 7, because the Anadarko contractors who inspected Anadarko's wells were unskilled and overworked, their cursory inspections frequently failed even to determine whether a well ***was operating***.

179.    Moreover, because Anadarko could not timely seal abandoned wells it identified as inoperative, the Company built up a substantial backlog on the P&A List.

180.    Thus, according to FE 7, at any given time, approximately 3-5% of Anadarko's

6,500 wells that Anadarko accounted for internally as operating were never inspected and many were inactive wells, which were not plugged as required by law.   These uninspected wells amounted to several hundred wells.

181.   According to FE 7, sometimes the Commission identified Anadarko wells that were inoperative that Anadarko had missed. According to FE 7, "if the state knew about a well not being in compliance, we moved it up our priority list."

182.   According to FE 7, HSE "typically didn't monitor [wells for compliance with state regulations] unless it was flagged by the state."

183.   Following the Firestone Explosion, Anadarko sealed 2,400 abandoned flowlines, flowlines that Anadarko had abandoned and left unsealed in violation of Rule 1103.

## VII.   ANADARKO IGNORED INFORMATION PROVIDED BY ITS OWN HSE PROFESSIONALS

184.   According to several former Anadarko compliance and HSE professionals, Anadarko used compliance and HSE professionals as a smokescreen to create the appearance of attempting to comply with safety regulations.

185.   FE 8 was part of the "Spatial Data Standards & Processing Group," formed in 2011 under Anadarko's then CEO James T. Hackett to develop a comprehensive "as built survey" of Anadarko's assets. FE 8 was told by Clay Bretches, an Anadarko VP of Marketing, that Anadarko's "higher-ups" saw that Anadarko had "potential problems" with data gathering and inaccurate plats of its assets. Bretches added that the project to solve these potential problems came "from the highest levels of the company."

186.   According to FE 8, his group's work actually became a "bulls**t formality."

187.   Prior to a pipeline being placed in the ground, a preliminary plat is sketched out.

According to FE 7, Anadarko did not have plats for 20-30% of the Noble Wells, which is why it did not know where its flowlines and pipelines were.

188.    But according to FE 8, even when Anadarko had plats, it still did not know exactly where its flowlines and pipelines were. After the preliminary plat is drafted, a contract surveyor reviews the area. Based on the contract surveyor's review, changes are "frequently" made to the plat. The well's flowlines and pipelines are then installed in accordance with the contract surveyor's instructions, rather than the original plat. When such changes were made, the plats were not updated, nor did Anadarko necessarily receive notice that there had been changes in the plats. As a result, many of Anadarko's plats inaccurately mapped Anadarko's wells flowlines and pipelines. Thus, even when it had plats, they were frequently inaccurate and did not show the location of flowlines.

189.    FE 8 and his group tried to convince Anadarko's "asset managers," senior Anadarko employees in charge of a discipline (such as geology manager) for a particular oilfield (such as the DJ Basin), that "as built" surveys were needed by showing them several instances where a plat showed gas lines 500 feet away from their actual location.

190.    Citing budget concerns, Anadarko's asset managers refused to take any action. The only reason for not conducting an as-built survey these asset managers provided was that Anadarko had contractors or employees with personal knowledge of where the pipe was located because they installed them. This "solution" was obviously no solution at all, because if the contractors or employees changed jobs or retired, Anadarko would have no way of determining where the flowlines and pipelines were actually located.

191.    According to CE 2, both he and other Anadarko employees and contractors would bring safety or code infractions to Anadarko's attention. Many were simply never addressed.

Indeed, when CE 2 raised issues with Anadarko's Operations staff, they would "shrug it off [and say] 'it's fine.'"  According to CE 2, "that's something I noticed about Anadarko, in particular, that was kind of unique. Anadarko is kind of the one that really seemed heavy in operations and light in other areas that probably could have used some help."

192.    Indeed, according to CE 2, "there's been times that we have identified things that are violations of hazardous-area classifications or setback requirements and not everything was followed."

193.    CE 2 reported that Anadarko officials were concerned simply with having the proper paperwork in the file, rather than complying with regulations or genuinely addressing safety issues. For example, CE 2 was tasked with producing drawings of older facilities in order to enable Anadarko to draw maps. But once presented with drawings, Anadarko would ignore the safety issues the drawings directly identified. "The people that would directly receive the drawings, in some cases, would not implement changes or take the data for its intended purpose, and rather file the document." As CE 2 added, Anadarko "just want[s] to say we have a drawing. It was created by Operations just to check a box."

194.    Because Anadarko ignored the concerns CE 2 and other safety inspectors raised, CE 2's employer decided not to renew its profitable contract with Anadarko.

## VIII.  THE FIRESTONE WELL EXPLOSION EXPOSES ANADARKO'S DANGEROUS OPERATIONS

195.    In January 2017, Anadarko turned on the Firestone Well, in order to maintain Anadarko's favorable lease provisions.

196.    According to FE 1, the data from the well was "not lining up." Specifically, the Firestone Well did not have a compressor which would dispose of methane. Thus, when it was

turned on, it should have begun to emit methane. Yet it did not.

197.   During the two first weeks of April 2017, Anadarko sent two crews to the Firestone well to inspect it. They could not explain how and why the well was not emitting methane. Yet Anadarko did not shut off the well.

198.   FE 1 learned these facts from discussions with former colleagues still employed by Anadarko at the time of the conversations.

199.   According to FE 2, because Anadarko was short-staffed, no one checked the flowlines of the Firestone Well after turning it on to ensure that they were not leaking. Even if they had decided to check the flowlines, it wouldn't have helped. Anadarko was unaware of even the existence of the line that was leaking.

200.   On April 17, 2017, a house located approximately 200 feet away from the Firestone Well exploded, killing Mark Martinez and his brother-in-law, Joseph Irwin III. Mr. Martinez's wife, Erin Martinez, suffered severe injuries, and she and their son were taken to the hospital. Ms. Martinez remained in the hospital for a month and a half. The son, aged 11, escaped serious injuries by jumping out of his bedroom window as the house exploded.

201.   On April 26, 2017, after close of trading, Anadarko announced that it had operated a well located 200 feet from the explosion site (i.e. the Firestone Well), and that authorities were investigating whether the explosion was linked to the well. Anadarko also announced that it was shutting down 3,000 vertical wells in North East Colorado, or all of the wells of the same vintage that it operated. These wells had previously been producing 13,000 barrels of oil per day, or about 1.6% of Anadarko's total worldwide production.

202.   On April 27, 2017, Anadarko's stock price fell by $2.84 from its previous closing price of $59.96 to close at $57.12, or 4.7%, damaging investors.

203.    Prior to the Firestone Explosion, the Plug & Abandonment List had 350 wells. According to FE 7, within two weeks of the Firestone Explosion, Anadarko had expanded its P&A List to 700 wells. The additional wells were added because, following "quick analysis," Anadarko determined that the costs of bringing the added 350 wells into compliance would exceed the expected benefit.

204.    On May 2, 2017, after close of trading, the Frederick-Firestone fire department announced that a 1-inch return line connected to the Anadarko-operated Firestone Well had been abandoned, but not disconnected from the wellhead and sealed (a violation of Colorado law). The line later leaked methane into the Martinez' home's drains, which exploded when Mr. Martinez and Mr. Irwin attempted to install a hot water heater.

205.    In a notice to oil & gas operators dated May 2, 2017 (the "Notice to Operators"), Colorado Governor John Hickenlooper ordered inspections and tests of all active and abandoned gas pipelines within 1,000 feet of occupied buildings. The Notice to Operators also reminded operators like Anadarko of Rule 1103's requirements that abandoned flowlines be cut and sealed. The Notice to Operators gave operators until June 30, 2017 to ensure that any abandoned flowlines located within 1,000 feet of occupied buildings were taken out of service pursuant to Rule 1103 ("Phase II").

206.    On May 3, 2017, Anadarko's stock price fell $4.32 from its previous closing price of $56.15 to close at $51.83, or 7.7%, damaging investors.

207.    On May 2, 2017, Anadarko published a statement, attributed to its CEO, Defendant Walker that "[o]ur thoughts and prayers remain with the Martinez and Irwin families as they continue to mourn the loss of their loved ones", adding that "[t]he safety of our employees and the people who live and work in the communities in which we operate is our

number one priority."

208.    According to FE 2, who discussed the issue with friends who were at the time employed by Anadarko, at the next Anadarko town hall meeting, Holly did not mention the Firestone explosion. Discussion of the Firestone explosion only came up when Defendant Walker mentioned that Anadarko was not too concerned with it. After hearing Walker's statement, several Anadarko employees walked out of the Town Hall in disgust.

209.    On May 10, 2017, the Denver Post reported that the National Transportation Safety Board ("NTSB") had joined the local investigation into the Firestone Explosion. The Denver Post reported that NTSB spokesman Keith Holloway said in an email that the NTSB was probing whether there were any safety issues that could have a national policy impact.

210.    On May 17, 2017, the International Business Times reported that Anadarko had successfully lobbied Colorado lawmakers to block legislation that would have required operators to disclose the location of lines located near homes. Anadarko-friendly legislators used a filibuster to defeat the legislation. Since Anadarko did not know the location of a significant portion of its lines, it would have been unable to provide the information required by the statute, and would have incurred enormous expenses to discover the information.

211.    On May 24, 2017, Anadarko and the Commission reported that a new methane cloud had been discovered west of the Firestone explosion site, with methane levels even higher than those at the site of the explosion.

212.    On May 25, 2017, a fire occurred at an Anadarko oil storage container in Weld County, Colorado, killing one worker and injuring three, one of them seriously.

213.    On June 30, 2017, Anadarko announced that in response to the Notice to Operators, it cut and sealed ***more than 2,400*** abandoned flowlines located within 1,000 feet of

buildings. Every one of those flowlines had been in violation of Rule 1103, which required that abandoned flowlines be cut and sealed. In addition, Anadarko disconnected, plugged, and abandoned 3,600 1-inch return lines associated with its vertical wells.

214.   On December 13, 2017, the Durango Herald quoted Defendant Christiansen as saying that:

> "No one really foresaw this as a potential issue," Christiansen said of the chain of events that are suspected to be linked to the blast. "And I think going forward, there is no question there is a heightened degree of awareness around it and a need to do better."[13]

215.   Christiansen was lying. In fact, Anadarko's Unknown Flowline Wells and its untrained staff were brought up at Biannual Meetings Christiansen and other executives attended, while its decision to violate the law and not pressure-test every flowline every year was codified in its Standard Operating Procedures.  Instead, Christiansen dealt with important safety problems by telling FE 2 to "shovel s**t".

## IX.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS

216.   On February 8, 2016, and continuing throughout the Class Period, a Factsheet purporting to describe Anadarko's Wattenberg Integrated Operations Center (the "Operations Factsheet" and the "Operations Center") appeared on Anadarko's website. The Operations Factsheet included Anadarko's NYSE ticker at the top of the page, and stated in its introduction that "Anadarko Petroleum Corporation's mission is to deliver a competitive and sustainable rate of return to shareholders." A later version of the Operations Factsheet cautioned readers to "view the forward-looking statement and cautionary note to investors under the terms of use page at www.anadarko.com." The Operations Factsheet's intended audience thus included Anadarko's investors.

---

[13] Lori Jane Gliha, The Durango Herald, December 13, 2017.

217.    The Operations Factsheet provided that Anadarko operates "more than 6,000 wells in Weld County." Likewise, Anadarko's 2015, 2016, and 2017 10-Ks report, respectively, that Anadarko operated 6,000, 6,440, and 6,000 wells in the DJ Basin in Colorado.

218.    The Operations Factsheet stated that the Operating Center "[p]rovides real-time remote-monitoring capabilities for 6,800+ wells." That is to say, the Operations Factsheet represents that Anadarko has real-time remote-monitoring capabilities for *all* of its wells in the DJ Basin in Colorado. Likewise, the Operations Factsheet claimed that using these high-tech tools, the Operations Center "[e]nables employees to shut-in [i.e., turn off] wells remotely".

219.    The foregoing was false and misleading because the Operations Factsheet stated, as posted during the entire Class Period, that all of Anadarko's Colorado wells could be remotely monitored or deactivated when, in fact, Anadarko could not remotely monitor or deactivate about 800 of its 6,800 wells. Moreover, these wells were the decrepit Noble Wells – that is, the most dangerous wells Anadarko operated in the DJ Basin.

220.    At the time of the Land Swap, *none* of the more than 1,550 Noble Wells could be monitored or turned off remotely.

221.    According to FE 7, many of the wells were simply too old to have had any remote-monitoring or deactivation capabilities installed. Those that might have some remote capabilities had capabilities that were incompatible with Anadarko's systems and had to be completely retooled.

222.    Anadarko immediately began to incorporate remote-monitoring and deactivation capabilities for the Noble Wells.  The process, however, was slow. According to FE 7, by the end of 2016, only about half of the Noble Wells could be monitored or deactivated from the Operations Center. According to FE 7, this was because equipping the Noble Wells for remote

monitoring or deactivation was extremely time-consuming and expensive.

223.    According to FE 7, the Operations Factsheet was approved by Defendant Christiansen. In fact, according to FE 7, Christiansen had to approve all external communications. Likewise, Christiansen's Anadarko biography reports that he is responsible for overseeing Anadarko's external communications.

224.    The fact that only half of the Noble Wells had remote monitoring and control capabilities was described in PowerPoint slides for, and discussed at, one or two of the Biannual Meetings held before 2016. FE 7 recalled that Company executives told the Production Superintendents "put it in your budget and we will see if we can get it approved." It was not approved.

225.    On February 16, 2016, Anadarko filed its 10-K for the year ending December 31, 2015. Defendant Walker signed the 2015 10-K.

226.    The 2015 10-K provided that:

Anadarko's business operations are subject to numerous international, provincial, federal, regional, state, tribal, local, and foreign environmental and occupational health and safety laws and regulations.

                *              *              *              *              *              *

Many states where the Company operates also have, or are developing, similar environmental laws and regulations governing many of these same types of activities. In addition, many foreign countries where the Company is conducting business also have, or may be developing, regulatory initiatives or analogous controls that regulate Anadarko's environmental-related activities. While the legal requirements imposed under state or foreign law may be similar in form to U.S. laws and regulations, in some cases the actual implementation of these requirements may impose additional, or more stringent, conditions or controls that can significantly alter or delay the permitting, development or expansion of a project or substantially increase the cost of doing business. In addition, environmental laws and regulations, including new or amended legal requirements that may arise in the future to address potential environmental concerns such as air and water impacts, are expected to continue to have an increasing impact on the Company's operations.

                *              *              *              *              *              *

**The Company believes that it is in material compliance with existing environmental and occupational health and safety regulations.** Further, the Company believes that the

cost of maintaining compliance with these existing laws and regulations will not have a material adverse effect on its business, financial condition, results of operations, or cash flows, but new or more stringently applied existing laws and regulations could increase the cost of doing business, and such increases could be material.

(Emphasis added).

227.    The foregoing emphasized statement were false and misleading because (a) Defendants Walker, McBride, and Christiansen attended and/or received PowerPoint slides of Biannual Meetings at which Anadarko's Colorado Production Superintendents disclosed that Anadarko did not know where 10% of its flowlines were, in violation of Rules 1101 a. and 1102 d.; (b) Defendant McBride presented and Walker received a presentation demonstrating that hundreds of the Noble Wells were unsafe and had to be plugged or remediated, recognized as much by authorizing (Walker) or requesting (McBride) a budget, and then slashed the budget, leaving the wells unremediated or unplugged, in violation of Rule 1102 a. (2); (c) Anadarko only pressure-tested 10% of its wells every year, and never pressure-tested 80% of its wells, in violation of Rule 1101 e., a fact enshrined in Anadarko's Standard Operating Procedures approved by McBride and provided to and summarized for Walker; (d) Defendants Walker, McBride, and Christiansen attended and/or received PowerPoint slides of Biannual Meetings at which Anadarko's Colorado Production Superintendents reported that Anadarko's overworked and undertrained pumpers failed to inspect 3-5% of its wells such that a proportion of Anadarko's wells would be abandoned but not sealed in violation of Rule 1103; and (e) Anadarko's Colorado Production Superintendents stated that they needed immediate additional funds to remedy the problems set out in (a) and (d) above at the Biannual Meetings, but Anadarko's senior executives refused to provide the additional funds.

228.    On or before March 12, 2016, Anadarko published its Health, Safety, Environment and Sustainability Overview 2015 (the "2015 Safety Report"). The 2015 Safety

Report was signed by Defendants Walker and McBride. It was made available on Anadarko's website until publication of the 2016 Safety Report (defined below).

229.     The 2015 Safety Report represented that:

Oil and natural gas upstream and midstream operations are subject to laws and regulations in every country in which Anadarko operates. ***Anadarko operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations.***

(Emphasis added).

230.     The foregoing emphasized statement were false and misleading because (a) Defendants Walker, McBride, and Christiansen attended and/or received PowerPoint slides of Biannual Meetings at which Anadarko's Colorado Production Superintendents disclosed that Anadarko did not know where 10% of its flowlines were, in violation of Rules 1101 a. and 1102 d.; (b) Defendant McBride presented and Walker received a presentation demonstrating that hundreds of the Noble Wells were unsafe and had to be plugged or remediated, recognized as much by authorizing (Walker) or requesting (McBride) a budget, and then slashed the budget, leaving the wells unremediated or unplugged, in violation of Rule 1102 a. (2); (c) Anadarko only pressure-tested 10% of its wells every year, and never pressure-tested 80% of its wells, in violation of Rule 1101 e., a fact enshrined in Anadarko's Standard Operating Procedures approved by McBride and provided to and summarized for Walker; (d) Defendants Walker, McBride, and Christiansen attended and/or received PowerPoint slides of Biannual Meetings at which Anadarko's Colorado Production Superintendents reported that Anadarko's overworked and undertrained pumpers failed to inspect 3-5% of its wells such that a proportion of Anadarko's wells would be abandoned but not sealed in violation of Rule 1103; and (e) Anadarko's Colorado Production Superintendents stated that they needed immediate additional

funds to remedy the problems set out in (a) and (d) above at the Biannual Meetings, but Anadarko's senior executives refused to provide the additional funds. Moreover, Defendants knew that Anadarko did not have enough skilled employees to prevent frequent serious accidents threatening lives and the environment in Colorado, with Defendant Christiansen telling FE 2 that instead of providing these funds, she should "shovel s**t and clean up the messes that [Anadarko's employees] make." Further, Defendants did not attempt to hire sufficient employees, choosing instead not to take steps to prevent calamities when the costs of doing nothing were expected to be less than the costs of remediation (as in the case of the 28,000 gallon January 2017 spill), and to address the aftermath of calamities through public relations strategies.

231.    On August 12, 2016, Anadarko filed a Registration Statement on Form S-3 (the "Registration Statement"), which incorporated by reference the 2015 10-K. On September 12, 2016, Anadarko sold 40,537,500 shares, raising net proceeds of $2.2 billion at an offering price of $54.50/share. By dollar amount, this was the largest stock offering in Anadarko's history.

232.    On September 14, 2016, Anadarko publicly filed with the SEC an Underwriting Agreement dated September 12, 2016 (the "Underwriting Agreement"). The Underwriting Agreement's Section 1. provided:

> *Representations and Warranties of [Anadarko].* [Anadarko] represents and warrants to the Underwriter as follows:
>        *        *        *        *        *        *
>  (q) Except as disclosed in the Disclosure Package and the Prospectus and except for matters that would not, individually or in the aggregate, have a Material Adverse Effect: (i) the Company and its subsidiaries and their respective properties and operations are and, during the relevant time periods specified in all applicable statutes of limitations, ***have been in compliance with all applicable federal, state, local and foreign laws, rules, regulations, ordinances, codes, orders, and other legally enforceable requirements relating to the prevention of pollution, the preservation of environmental quality, the protection of natural resources, or the remediation of environmental contamination*** [...]

(Second emphasis added)

233.    The foregoing emphasized statement were false and misleading because (a) Defendants Walker, McBride, and Christiansen attended and/or received PowerPoint slides of Biannual Meetings at which Anadarko's Colorado Production Superintendents disclosed that Anadarko did not know where 10% of its flowlines were, in violation of Rules 1101 a. and 1102 d.; (b) Defendant McBride presented and Walker received a presentation demonstrating that hundreds of the Noble Wells were unsafe and had to be plugged or remediated, recognized as much by authorizing (Walker) or requesting (McBride) a budget, and then slashed the budget, leaving the wells unremediated or unplugged, in violation of Rule 1102 a. (2); (c) Anadarko only pressure-tested 10% of its wells every year, and never pressure-tested 80% of its wells, in violation of Rule 1101 e., a fact enshrined in Anadarko's Standard Operating Procedures approved by McBride and provided to and summarized for Walker; (d) Defendants Walker, McBride, and Christiansen attended and/or received PowerPoint slides of Biannual Meetings at which Anadarko's Colorado Production Superintendents reported that Anadarko's overworked and undertrained pumpers failed to inspect 3-5% of its wells such that a proportion of Anadarko's wells would be abandoned but not sealed in violation of Rule 1103; and (e) Anadarko's Colorado Production Superintendents stated that they needed immediate additional funds to remedy the problems set out in (a) and (d) above at the Biannual Meetings, but Anadarko's senior executives refused to provide the additional funds.

234.    On or before March 3, 2017, Anadarko published its Health, Safety, Environment and Sustainability Overview 2016 (the "2016 Safety Report"). The Report was signed by Defendant Walker, as well as by Defendant McBride. It was made available on Anadarko's website for the remainder of the Class Period.

235.    The 2016 Safety Report represented:

Oil and natural gas upstream and midstream operations are subject to laws and regulations in every country in which Anadarko operates. ***Anadarko operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations.***

(Emphasis added).

236.    foregoing emphasized statement were false and misleading because (a) Defendants Walker, McBride, and Christiansen attended and/or received PowerPoint slides of Biannual Meetings at which Anadarko's Colorado Production Superintendents disclosed that Anadarko did not know where 10% of its flowlines were, in violation of Rules 1101 a. and 1102 d.; (b) Defendant McBride presented and Walker received a presentation demonstrating that hundreds of the Noble Wells were unsafe and had to be plugged or remediated, recognized as much by authorizing (Walker) or requesting (McBride) a budget, and then slashed the budget, leaving the wells unremediated or unplugged, in violation of Rule 1102 a. (2); (c) Anadarko only pressure-tested 10% of its wells every year, and never pressure-tested 80% of its wells, in violation of Rule 1101 e., a fact enshrined in Anadarko's Standard Operating Procedures approved by McBride and provided to and summarized for Walker; (d) Defendants Walker, McBride, and Christiansen attended and/or received PowerPoint slides of Biannual Meetings at which Anadarko's Colorado Production Superintendents reported that Anadarko's overworked and undertrained pumpers failed to inspect 3-5% of its wells such that a proportion of Anadarko's wells would be abandoned but not sealed in violation of Rule 1103; and (e) Anadarko's Colorado Production Superintendents stated that they needed immediate additional funds to remedy the problems set out in (a) and (d) above at the Biannual Meetings, but Anadarko's senior executives refused to provide the additional funds. Moreover, Defendants knew that Anadarko did not have enough skilled employees to prevent frequent serious accidents

threatening lives and the environment in Colorado, with Defendant Christiansen telling FE 2 that instead of providing these funds, she should "shovel s**t and clean up the messes that [Anadarko's employees] make." Further, Defendants did not attempt to hire sufficient employees, choosing instead not to take steps to prevent calamities when the costs of doing nothing were expected to be less than the costs of remediation (as in the case of the 28,000 gallon January 2017 spill), and to address the aftermath of calamities through public relations strategies.

## X.   UNDER WALKER, ANADARKO DEALT WITH SAFETY HAZARDS AS A PUBLIC RELATIONS RISK

237.   According to FE 1, Anadarko spent $50 million on public relations in Colorado in total in 2013, 2014, and 2015.

238.   In 2013, Anadarko and Noble created an industry public-relations front called Coloradans for Responsible Energy Development, known in Colorado as CRED. FE 1 was instrumental in creating CRED. In its first four years of operations, CRED received $38 million in funding, primarily from Anadarko and Noble.

239.   CRED's mission was to combat ballot initiatives that would negatively impact oil industry profits.

240.   In late April or early May 2018, FE 1 made statements for attribution during an on-the-record interview with *The Colorado Independent*. *The Colorado Independent* quoted FE 1 as saying that "[Anadarko] spent a lot of time and energy and money and reputations of people like me purchasing a social license to operate in Colorado. That social license helped us to beat ballot measures, defeat issues in the legislature, [and] win support from people and communities throughout Colorado."

241.    According to FE 1, because of the Firestone Explosion, Anadarko "don't have the standing to say we deserve that social license. That bank account is largely dry."

242.    FE 1 told *The Colorado Independent* that while Anadarko was led by former chairman and CEO Jim Hackett, "[t]he core values they ingrained in us were remarkable." But after Defendant Walker replaced Hackett, "you saw a transition away from those values. That loyalty, that commitment, those core values exist no more." *The Colorado Independent* paraphrases FE 1 as having stated that under Defendant Walker the core values "gave way to a hard drive for profits, alarming safety risks, and a sense of disinterest in the communities where Anadarko operates."

243.    FE 1 told *The Colorado Independent* that "it was a different company when I left than when I started, and not one that I wanted to continue risking my personal reputation representing."

## XI.    CLASS ACTION ALLEGATIONS

244.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased or otherwise acquired Anadarko securities traded on the NYSE during the Class Period (the "Class"). Excluded from the Class are Defendants herein, current and former officers and directors of Anadarko, and members of their immediate families; any entity in which Defendants have or had a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

245.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, there were approximately 560 million shares of Anadarko outstanding and actively traded on the NYSE. While the exact number of Class

members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class who are geographically dispersed. Record owners and other members of the Class may be identified from records maintained by Anadarko or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

246.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

247.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

248.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.  whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.  whether statements made by Defendants to the investing public during the Class Period misrepresented material facts or omitted to state material information about the business, operations, and management of Anadarko;

c.  whether Defendants caused Anadarko to issue false and misleading financial statements during the Class Period;

d.  whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e.  whether the prices of Anadarko securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein;

f.  whether Defendants acted with the requisite level of scienter;

g.  whether the Executive Committee Defendants were controlling persons of the Company;

h.  whether reliance may be presumed; and

i.  whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, what is the proper measure of damages.

249.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

250.   Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

251.   In addition, Plaintiff and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory, because Anadarko's securities traded in an efficient market during the Class Period, as

follows:

   a.  Throughout the Class Period, Anadarko's securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market. Anadarko's securities were highly liquid during the Class Period, with an average daily volume of 5,228,786 shares;

   b.  As a regulated issuer, Anadarko filed periodic public reports with the SEC and the NYSE;

   c.  The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

   d.  The market reacted promptly to public information disseminated by the Company, as new, Company-specific information was rapidly reflected in the price of Anadarko's securities;

   e.  Anadarko's securities were covered by more than twenty securities analysts employed by major brokerage firms who wrote reports about the Company during the Class Period, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

   f.  On average, 4.6% of Anadarko's securities were traded weekly, permitting a very strong presumption that its shares traded on an efficient market;

   g.  7 specialist firms made a market in Anadarko's securities; and

h.    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Anadarko's securities.

252.    Therefore, the market for Anadarko's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in Anadarko's share price. Under these circumstances, all purchasers of Anadarko securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices and a presumption of reliance applies.

## COUNT I

### Violation of § 10(b) of the Exchange Act and Rule 10b-5

### (against All Defendants)

253.    Plaintiff repeats and realleges the allegations set out above as if fully set forth herein.

254.    This Count is asserted against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

255.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon the Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and

other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Anadarko securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Anadarko securities and options at artificially inflated prices.

256.   By virtue of their positions at Anadarko, the Individual Defendants, Walters, Holly, and Bracken had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Anadarko, Individual Defendants, Walters, Holly, and Bracken. In addition to the facts alleged herein demonstrating a strong inference of scienter, certain information showing that Anadarko, Individual Defendants, Walters, Holly, and Bracken acted knowingly or with reckless disregard for the truth is peculiarly within these Defendants' and/or senior executives' knowledge and control.   As the senior managers of Anadarko, Individual Defendants, Walters, Holly, and Bracken had knowledge of the details of Anadarko's internal affairs, including the deficiencies in the Company's regulatory compliance and safety programs.

257.   As officers and/or directors of a publicly-held company, Individual Defendants, Walters, Holly, and Bracken had a duty to disseminate timely, accurate, full and truthful information regarding Anadarko's business, operations, and financial controls.   As a result of the dissemination of the aforementioned false and misleading reports and filings, the market price of Anadarko securities was artificially inflated throughout the Class Period.

258.   In ignorance of the adverse facts concerning Anadarko's operations that were concealed by the misrepresentations and omissions alleged herein, Plaintiff and the other

members of the Class purchased or otherwise acquired Anadarko securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Anadarko and were damaged upon the disclosure of the wrongdoing described herein.

259.    During the Class Period, Anadarko securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, directly relying on the materially false and misleading statements described herein, and/or relying upon the integrity of the market, purchased or otherwise acquired shares of Anadarko securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Anadarko securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Anadarko securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

260.    By reason of the conduct alleged herein, Defendants knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

261.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period upon the disclosures alleged herein.  Defendants are liable for damages in connection with these losses under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**

## Violation of § 20(a) of the Exchange Act

## (against Walker only)

262.   Plaintiff repeats and realleges the foregoing allegations as though fully set forth herein.

263.   During the Class Period, Walker participated in the operation and management of Anadarko, and conducted and participated, directly and indirectly, in the conduct of Anadarko's business affairs.  Because of his senior position, he knew the adverse non-public information about Anadarko's operations, including adverse facts about Anadarko's regulatory compliance and safety programs.

264.   As an officer of a publicly owned company, Walker had a duty to disseminate accurate and truthful information with respect to Anadarko's reports and filings and to correct promptly any public statements issued by Anadarko which had become materially false or misleading.

265.   Because of his position of control and authority as a senior officer, Walker was able to, and did, control the contents of the reports and public filings that Anadarko disseminated in the marketplace during the Class Period concerning Anadarko's regulatory compliance and safety programs. Throughout the Class Period, Walker exercised his power and authority to cause Anadarko to engage in the wrongful acts complained of herein.

266.   As a control persons, Walker is liable pursuant to Section 20(a) of the Exchange Act for the primary violations of the Exchange Act committed by Anadarko as set forth in Count I.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of itself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 3, 2018                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence Rosen
Laurence Rosen, Esq. (pro hac vice)
Phillip Kim, Esq. (pro hac vice)
Jonathan Horne (pro hac vice)
275 Madison Avenue, 34th Floor
New York, NY 10116
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

*Lead Counsel for Plaintiff and the Class*

MOTLEY RICE LLC
Marlon E. Kimpson
Joshua C. Littlejohn
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Phone: (843) 216-9000
Fax: (843) 216-9450
Email: mkimpson@motleyrice.com
Email: jlittlejohn@motleyrice.com

*Additional Counsel for Plaintiff and the Class*

-and-

**STECKLER GRESHAM COCHRAN PLLC**

R. Dean Gresham
Texas Bar No. 24027215
Bruce W. Steckler
Texas Bar No. 00785039
dean@stecklerlaw.com
L. Kirstine Rogers
Texas Bar No. 24033009
krogers@stecklerlaw.com
12720 Hillcrest Road, Suite 1045
Dallas, TX 75230
Telephone: 972-387-4040
Facsimile: 972-387-4041

*Liaison Counsel for Plaintiff and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this August 3, 2018, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.


_____/s/ Laurence Rosen_____