**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| ROBERT EDGAR, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ANADARKO PETROLEUM CORPORATION, R. A. WALKER, and ROBERT G. GWIN,<br><br>Defendants | Case No. 4:17-CV-1372 |

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**THE SECOND AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.   INTRODUCTION...................................................................................... 8

II.  NATURE AND STAGE OF PROCEEDINGS............................................. 10

III. STATEMENT OF THE ISSUES ............................................................... 11

IV.  SUMMARY OF ARGUMENT ................................................................. 11

V.   FACTS .................................................................................................. 11

   A.  The DJ Basin and Wattenberg Field Were Vital to Anadarko ...................... 11

   B.  Anadarko's Dangerous Operations Imperiled Coloradans............................. 13

   C.  The Firestone Well Explodes, Killing Two .................................................. 15

   D.  The Revelation of Anadarko's Unsafe and Unlawful Practices Damages Investors ..... 16

VI.  ARGUMENT ......................................................................................... 17

   A.  The Complaint Adequately Pleads That Defendants Recklessly Violated Colorado
       Rules and Regulations ............................................................................... 17

      1.  The Court has Held that Defendants' Statements of Legal Compliance are Actionable
          ...................................................................................................... 18

      2.  The Complaint Adequately Pleads that Defendants Recklessly Ignored that Anadarko
          Violated Commission Rules and Regulations ........................................... 19

         a.  The Complaint Adequately Pleads that Defendants Recklessly Ignored that
             Anadarko Violated Commission Rules 1103......................................... 22

         b.  The Complaint Adequately Pleads that Defendants Recklessly Ignored that
             Anadarko Violated Commission Rules 1101 e....................................... 23

         c.  The Complaint Adequately Pleads that Defendants Recklessly Ignored that
             Anadarko Violated Commission Rules 1101 a. and 1102 d. ................. 25

         d.  The Complaint Adequately Pleads that Defendants Ignored that Anadarko
             Recklessly Violated Commission Rule 1102 a.(2) ................................ 32

      3.  Defendants Had a Motive to Commit Fraud ............................................. 34

      4.  Defendants Boilerplate Cautionary Statements Do Not Immunize Their False
          Statements of Present and Past Fact from Liability.................................... 35

   B.  Defendants Misleadingly Stated they Believed Anadarko Complied with Environmental
       Regulations............................................................................................... 38

   C.  Anadarko's Statements in the Underwriting Agreement that it Complied With All
       Regulations Are Actionable ....................................................................... 39

D.   Defendants' Statement That the Operating Center "Provides Real-Time Monitoring Capabilities for 6,800+ Wells" Is Actionable ................................................................ 41

   1.   The Statement is Misleading .................................................................... 41

   2.   Christiansen "Made" the Statements in the Operations Factsheet and His Scienter Can Be Imputed to Anadarko............................................................................. 43

   3.   Christiansen Made the Statement With Scienter ........................................... 43

E.   The Complaint Adequately Alleges a Section 20(A) Claim ........................................ 44

**VII.   CONCLUSION** .......................................................................................... 45

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk,*
   291 F.3d 336 (5th Cir. 2002) .................................................................. 27

*Abrams v. Baker Hughes Inc.,*
   292 F.3d 424 (5th Cir. 2002) .................................................................. 27

*Barrie v. Intervoice-Brite, Inc.,*
   397 F.3d 249 (5th Cir. 2005) .................................................................. 16

*Coleman v. Dretke,*
   409 F.3d 665 (5th Cir. 2005) .................................................................. 23

*Collmer v. U.S. Liquids, Inc.,*
   268 F. Supp. 2d 718 (S.D. Tex. 2001) ..................................................... 33

*Cosmas v. Hassett,*
   886 F.2d 8 (2d Cir. 1989) ................................................................. 18, 19

*Glazer Capital Mgmt., LP v. Magistri,*
   549 F.3d 736 (9th Cir. 2008) .................................................................. 37

*In re Anadarko Petroleum Corp. Class Action Litig.,*
   957 F. Supp. 2d 806 (S.D. Tex. 2013) .............................................. 18, 19

*In re BP p.l.c. Sec. Litig.,*
   843 F. Supp. 2d 712 (S.D. Tex. 2012) .............................................. 19, 34

*In re BP p.l.c. Securities Litigation,*
   922 F. Supp. 2d ...................................................................................... 41

*In re Campbell Soup Co. Sec. Litig.,*
   145 F. Supp. 2d 574 (D.N.J. 2001) .................................................. 28, 29

*In re Computer Scis. Corp. Sec. Litig.,*
   890 F. Supp. 2d 650 (E.D. Va. 2012) ...................................................... 22

4

*In re Fleming Companies Inc. Sec. & Derivative Litig.*,
   No. CIVA503MD1530TJW, 2004 WL 5278716 (E.D. Tex. June 16, 2004) ........................... 27

*In re LDK Solar Sec. Litig.*,
   584 F. Supp. 2d 1230 (N.D. Cal. 2008) .................................................................... 26

*In re Mylan N.V. Sec. Litig.*,
   No. 16-CV-7926 (JPO), 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ................................. 18

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
   245 F. Supp. 3d 870 (S.D. Tex. 2017) ..................................................................... 27

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
   307 F. Supp. 3d 583 (S.D. Tex. 2018) ............................................................ 22, 25, 37, 39

*In re Quality Systems, Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ............................................................................... 34

*In re Sec. Litig. BMC Software, Inc.*,
   183 F. Supp. 2d 860 (S.D. Tex. 2001) ...................................................................... 34

*In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*,
   694 F. Supp. 2d 1192 (W.D. Wash. 2009) .............................................................. 25, 26

In *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*,
   75 F.3d 801 (2d Cir. 1996) .................................................................................. 36

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ............................................................................. 17, 19

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ................................................................................ 30

*Krim v. BancTexas Grp., Inc.*,
   989 F.2d 1435 (5th Cir. 1993) ............................................................................... 36

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ..................................................................... 16, 17, 35, 40

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
  876 F.3d 541 (4th Cir. 2017) ......................................................................... 19, 20, 22

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) ................................................................................ 34, 35

*Nathenson v. Zonagen Inc.*,
  267 F.3d 400 (5th Cir. 2001) ............................................................................... 15, 16

*Nibur v. SandRidge Mississippian Tr. I*,
  No. CIV-15-634-M, 2017 WL 3996421 (W.D. Okla. Sept. 11, 2017) .............................. 25, 27

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ................................................................................ 17, 18

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015) ..................................................................................... 36, 37

*Owens v. Jastrow*,
  789 F.3d 529 (5th Cir. 2015) ..................................................................................... 32

*Quicksilver Res., Inc. v. Eagle Drilling, LLC*,
  No. CIV.A. H-08-868, 2008 WL 3165745 (S.D. Tex. Aug. 4, 2008) ...................................... 17

*Ramirez v. Exxon Mobil Corp.*,
  No. 3:16-CV-3111-K, 2018 WL 3862083 (N.D. Tex. Aug. 14, 2018) ..................................... 33

*Rittgers v. United States*,
  131 F. Supp. 3d 644 (S.D. Tex. 2015) ........................................................................... 17

*Rolf v. Blyth, Eastman Dillon & Co., Inc.*,
  570 F.2d. 38 (2d Cir. 1978) ..................................................................................... 17

*S.E.C. v. Evolution Capital Advisors, LLC*,
  866 F. Supp. 2d 661 (S.D. Tex. 2011) ........................................................................... 42

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
  365 F.3d 353 (5th Cir. 2004) ..................................................................................... 38

*Stephens v. Uranium Energy Corp.*, Civil Action,
No. H-15-1862, 2016 WL 3855860 (S.D. Tex. July 15, 2016)................................................ 15

*Stone v. Life Partners Holdings, Inc.*,
26 F. Supp. 3d 575 (W.D. Tex. 2014)........................................................................ 15, 23, 27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ........................................................................................ 15, 16, 26, 27

*United States v. Meyer*,
733 F.2d 362 (5th Cir. 1984)............................................................................................ 42

*Villella v. Chem. & Mining Co. of Chile Inc.*,
No. 15 CIV. 2106 (ER), 2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017).................................... 37

*Wolfe v. Aspenbio Pharma, Inc.*,
587 F. App'x 493 (10th Cir. 2014) ...................................................................................... 19

*Young v. Well Fargo Bank, N.A.*,
No. 3:15-CV-2289-L, 2017 WL 3722148 (N.D. Tx. August 29, 2017) ............................. 23, 24

**Statutes**

Colo. Rev. Stat. § 9-1.5-105(3)...................................................................................23, 24, 27, 29

Colo. Rev. Stat. § 9-1.5-105(d)................................................................................................. 24

Colo. Rev. Stat. §9-1.5-101, C.R.S........................................................................................... 28

## I.      INTRODUCTION

On April 17, 2017, a house in Colorado near Anadarko Petroleum Corp.'s ("Anadarko" or "Company") abandoned "Firestone Well" exploded, killing and maiming its occupants. As investors learned that Anadarko had caused the Firestone Well explosion and that it operated a host of Colorado wells unsafely, investors bid the price of Anadarko stock down by over 12% on relatively enormous trading volume. As a direct and proximate result of Defendants' fraud, Plaintiffs and the Class suffered damages.

This Court has already held as actionably false Defendants'[1] Class Period[2] statements that the Company "operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations." Op.29.[3] That is, Plaintiff has "sufficiently alleged that Anadarko was not in compliance with all laws and regulations." *Id*. The Court dismissed the complaint, however, for Plaintiff's failure adequately to plead that either Defendant Walker or Defendant McBride acted with requisite fraudulent intent.

The Second Amended Class Action Complaint[4] sufficiently pleads Defendants' scienter, including additional allegations supporting a strong inference that Defendants Walker and McBride acted with fraudulent intent. Indeed, during the Class Period, the Complaint now alleges, Defendants knew that Anadarko did not know the location of 10% of its Colorado wells' flowlines. Defendants attended biannual meetings during which desperate heads of local operations

---

[1] "Defendants" are Anadarko, Defendant R.A. Walker ("Walker"), Anadarko's Chief Executive Officer since May 15, 2012, ¶37, Defendant David J. McBride ("McBride"), Anadarko's Vice President of Health, Safety & Environment from May 2013 through July 2018, ¶38, and Defendant John M. Christiansen ("Christiansen"), Anadarko's Vice President – Corporate Communications since October 2015. ¶39.

[2] The Class Period is February 8, 2016 through May 2, 2017, both dates included.

[3] Plaintiff refers to this Court's Order Granting Motion to Dismiss, without Prejudice, Dkt. # 53, as "Opinion" and cites to it as "Op.__."

[4] Plaintiffs refer to the Second Amended Class Action Complaint, Dkt. # 57, as "Complaint" and cite to it as "¶__." Plaintiff cites to Defendants' Motion to Dismiss the Second Amended Class Action Complaint as "Memo. __."

("Production Superintendents") informed them of material safety issues, and implored them to provide more money to ensure the safety of Anadarko's Colorado operations. The Production Superintendents' repeated pleas for additional, critical funds to address the known safety concerns were denied. Then, in March 2016, ignoring the safety concerns of which Production Superintendents made them aware, Defendants actually cut the funds available for remediation and monitoring. Still further, Defendants knew that Colorado law required operators and owners to test all flowlines annually. Defendants also knew, however, that Anadarko's pressure-tested only 10% of its flowlines annually. Notwithstanding what they knew, throughout the Class Period, Defendants reassured investors that they monitored all of their Colorado wells and that they complied with all laws and regulations.

Had Anadarko actually inventoried its wells' flowlines, as several Colorado rules and regulations required, it would have known that one of the Firestone Well's flowlines had been severed and was leaking methane. Had it conducted Commission[5]-required annual pressure tests, it would have found the leak. The Firestone Well exploded because Anadarko violated Commission rules and regulations.

In their second motion to dismiss, notwithstanding high-profile, public state guidance about registering, monitoring flowlines, and pressure testing flowlines, Defendants assert that they did not know of Colorado's applicable safety and monitoring rules and that even if they did, they did not violate them. Given the importance of the Company's Colorado operations, their duty to know and comply with applicable regulations, and their attendance at biannual meetings with supervisors on the ground at which Defendants Walker and McBride learned of problems and

---

[5] "Commission" refers to the Colorado Oil & Gas Conservation Commission. The Commission "foster[s] the responsible development of Colorado's oil and gas natural resources in a manner consistent with the protection of public health, safety, and welfare, including the environment and wildlife resources." https://cogcc.state.co.us/#/home.

violations, the Complaint now adequately alleges that Defendants at least recklessly disregarded the falsity of their public statements about legal compliance in Colorado. Plaintiff need not show that Defendants knew of the specific regulations Anadarko violated in Colorado. Before they advised investors, without qualifications, that Anadarko complied with all laws and regulations that governed its operations, Defendants had an obligation to determine whether the unsafe operations they were aware of also violated Colorado law. Thus, the Court should deny Defendants' Motion to Dismiss.

## II.    NATURE AND STAGE OF PROCEEDINGS

This is a class action, alleging that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder. On June 19, 2018, the Court dismissed Plaintiff's First Amended Complaint, with leave to amend, for failing to adequately allege that Defendants knew or were reckless in not knowing that Anadarko violated Colorado law when they told investors that Anadarko complied with all laws and regulations to which it was subject. Op.27-30. On August 3, Plaintiff filed the Complaint. The Complaint adds allegations that Colorado employees told Defendants that Anadarko violated Commission rules and regulations at meetings taking place before the Class Period. The Complaint also alleges that Defendant McBride personally directed the approval of and reviewed Standard Operating Procedures, establishing as Anadarko's standard procedure a regime of pressure-tests that expressly conflicted with Colorado Rules and Regulations. Finally, the Complaint alleges that Defendant Christiansen approved a fact sheet boasting that Anadarko remotely monitored all of its wells, though he knew it could not monitor more than 750 old, decrepit wells. The Complaint thus adds sufficient allegations indicating that Defendants knew or recklessly disregarded that Anadarko violated Colorado law even as they told investors they complied.

10

### III.    STATEMENT OF THE ISSUES

1. Because the Court held that Defendants' statements of legal compliance were actionably false, does the Complaint adequately allege Defendants' scienter with respect to those statements?

2. Based on the new allegations, does the Complaint adequately plead falsity and scienter for the remaining statements the Complaint alleges as actionable?

3. Because the Complaint adequately pleads a cause of action for violation of Section 10(b) of the Exchange Act and Rule 10b-5, does it adequately plead a claim for control person liability under Section 20(a) of the Exchange Act?

### IV.    SUMMARY OF ARGUMENT

The Court held that the first complaint adequately pleaded the material falsity of Defendants' two statements that Anadarko was "in compliance with the applicable laws and associated regulations." Op.28-29. The Complaint includes new allegations, including descriptions of PowerPoint presentations and Weekly Operating Reports in which Production Superintendents at Anadarko's Colorado operations conveyed material, dangerous operating conditions on a regular basis to Defendants Walker and McBride. As such, Defendants knew or were reckless in not knowing of the underlying conditions that constituted material violations of Commission rules and Colorado law, rendering false Anadarko's statements that it was in compliance with those laws and regulations. For the following reasons, therefore, this Court should deny Defendants' Motion to Dismiss.

### V.    FACTS

#### A.    The DJ Basin and Wattenberg Field Were Vital to Anadarko

Anadarko is a publicly traded oil and gas exploration and production company. ¶36. Anadarko consistently touted to investors that its most critical assets were the "three Ds"— Deepwater Gulf of Mexico, the Delaware Basin, and Colorado's Denver-Julesburg ("DJ") Basin. ¶70. The largest and most profitable of these was the DJ Basin and, within that, its Wattenberg

11

Field. ¶80. In 2013, the Wattenberg Field alone accounted for 17.6% of Anadarko's worldwide oil production and 10.5% of its worldwide natural gas production. By 2015, those proportions rose to 30.1% and 20.7%, respectively. ¶76. Anadarko's DJ Basin operations were also very profitable. Because Anadarko owned much of its DJ Basin acreage outright, its leases were at rock-bottom prices, and it had substantial infrastructure in place. ¶77. Anadarko would earn a profit on its DJ Basin operations unless the price of oil fell below $30/barrel, or 40% below existing prices. ¶78. As a result, in 2015, Anadarko's production costs were $7.64/BOE[6] in the DJ Basin, a discount to Anadarko's worldwide costs of $8.31/BOE. *Id.*

Developing the DJ Basin was central to Anadarko's business plans. In September 2015, Anadarko explained that it would focus its onshore activity "primarily" in the Wattenberg Field because it would earn high returns even if oil prices were low. ¶80. In June 2016, the Company claimed that the DJ Basin "is . . . in our opinion the most attractive basin in North America from an economic standpoint for Anadarko," adding that the "economics are phenomenal." *Id.*

Anadarko increased its focus on the DJ Basin during the Class Period. In November 2016, Anadarko noted that it already had five rigs drilling horizontal wells in the DJ Basin, and would add even more rigs the next year unless oil prices fell. ¶81. Indeed, Anadarko boasted that it had identified 4,000 locations to drill horizontal wells in the DJ Basin. ¶82. Anadarko was the largest operator in the DJ Basin, operating slightly less than a quarter of all wells there. ¶¶72, 76. Defendants knew that Anadarko could not continue to operate in Colorado if Coloradans believed Anadarko put their health and safety at risk. Indeed, according to the Company's director of engagement and strategy for the Rockies Region ("FE1")[7], in 2013-2015, Anadarko spent a total

---

[6] "BOE" is a barrel of oil equivalent.

[7] FE1 joined Anadarko as its regional director of government relations in August 2007 and was promoted to his role as director of engagement and strategy for the Rockies Region in March 2015.

of $50 million on public relations in Colorado, alone. ¶237. As FE1 told *The Colorado Independent*, Anadarko used this money and "time and energy [] and reputations of people like me purchasing a social license to operate in Colorado." ¶240.

### B.    Anadarko's Dangerous Operations Imperiled Coloradans

According to Defendant Christiansen, Anadarko's strategy was to ignore safety and compliance and instead use public relations executive to "shovel shit and clean up the messes" that its compliance failures caused. ¶20. Anadarko stood out from other operators in Colorado because its "tightwads in corporate couldn't give a shit about the guys who worked on [its] wells or the people who lived near them." ¶142. Compliance and safety were not "a priority," funding for them was "precarious," and Defendants ignored even senior executives like FE1 who raised compliance and safety failures. ¶143.

In October 2013, Anadarko acquired 1,550 aging wells in southwest Weld County, just north of Denver ("Old Wells"). ¶91. The Old Wells were drilled no later than the 1980s, when Weld County was rural and sparsely populated. *Id.* Since then, Weld County's population had more than doubled, with most of the growth occurring right alongside the Old Wells. ¶93. While the Commission prohibited drilling wells close to houses, it did not prohibit developers from building houses close to wells. ¶95. Thus, many of the Old Wells, including the Firestone Well, were in residential areas or close to schools. ¶94.

Defendants knew that the Old Wells did not comply with Commission rules and regulations and yet did nothing to remediate the material violations. According to FE1, high-ranking management frequently discussed the danger from the underlying conditions of the Old Wells, and Defendant Walker was aware of them. ¶100. In fact, Anadarko's Colorado staff in the Company's Health, Safety & Environment Division ("HSE Division") compiled an Excel spreadsheet ranking

the risky and problematic wells acquired in the Land Swap, which listed up to several hundred wells ("Dangerous Well Spreadsheet"). ¶101.

Defendant McBride prepared a budget in the low tens of millions of dollars to repair or to plug and abandon certain of the Old Wells. ¶106. McBride then presented the budget to Anadarko's Executive Committee, which Walker led, and which approved the budget before September 2014. *Id.* McBride also oversaw the spending of the remediation budget. ¶107. Though they prepared a budget to remediate the Old Wells, Defendants knew that Anadarko spent and accomplished little to remediate the Old Wells. After oil prices collapsed in early 2015, Anadarko's Executive Committee slashed its remediation budget. ¶108. Compounding the funding problem, by November 2016 Anadarko slashed its Colorado workforce from 1,500 to 1,100 employees. ¶113. After these layoffs Anadarko fielded insufficient staff to remediate the Old Wells and to render them compliant with Commission Rules and Regulations. ¶115. Anadarko assigned only a single employee to monitor the safety of its flow lines in the Wattenberg Field, ignoring industry standards that called for 12-20 safety inspectors. ¶16.

Although the HSE Division compiled the Dangerous Wells Spreadsheet, the Field Operations Division determined when to remediate. ¶123. Choosing profits over community and environmental safety, however, the Field Operations Division ignored safety and environmental violations, remediating wells on the basis of which produced the most oil or which could slow down Anadarko's new well drilling schedule if not fixed, and not on the basis of health and safety risks. ¶¶124, 125, 127.

Anadarko convened several meetings of its senior Colorado-based staff, including FE1, Craig Walters, Anadarko Vice President, DJ Basin, and three or four others, specifically to discuss how prioritizing remediation funds to support drilling as opposed to preventing environment,

safety, and health hazards could lead to disaster. ¶111. FE1 attended regularly-scheduled Colorado team leadership meetings at which at least eight other Anadarko executives discussed the Company's prioritizing profits over environmental and community safety. ¶112.

Throughout the Class Period, "pumpers," the Anadarko contractors who inspected Anadarko's wells were unskilled, junior, poorly paid, and so overworked that they had only about five minutes to inspect each well. ¶¶130-31. All the pumpers had time to do was to see if anything was visibly wrong, listen to whether there were any worrying noises, and sniff for unusual smells, which would not detect odorless methane or natural gas leaks. ¶¶131-32. The pumpers were so overworked that they simply forgot about 3-5% of Anadarko's Colorado wells, or several hundred wells. ¶131. And Anadarko could not count on residents to identify any problems, either, as they were not equipped or trained to do so. Instead, residents only ever raised three problems – sounds, smells, and traffic. ¶133. Anadarko's Colorado operations lacked the guardrails that Commission rules and regulations require to ensure that leaks would be detected.

### C.    The Firestone Well Explodes, Killing Two

In January 2017, Anadarko turned on the Firestone Well, an Old Well, in order to maintain its lease.[8] Following peculiar readings, Anadarko employees analyzed the well, and found that the data did not "lin[e] up." ¶196. The Firestone Well did not have a compressor which would dispose of methane. Thus, when Anadarko turned it on, it should have emitted methane, but Anadarko did not detect any methane. *Id.*

---

[8] Anadarko leased 60% of the land on which it conducted its Wattenberg operations. According to FE1, the lease terms generally included a provision requiring Anadarko to actually operate the wells in order to maintain its lease. If Anadarko lost a lease, it would have to renegotiate it with the owner of the mineral rights. ¶102. The leases were signed decades earlier when there was significantly less interest in the Wattenberg Field. Therefore, Anadarko's terms were far more advantageous than what Anadarko would be able to secure in a renegotiation. *Id.*

Anadarko did not shut off the well when it received these disturbing results. Instead, three months later, Anadarko sent two crews to the Firestone Well to inspect it. ¶197. These crews, too, could not determine why the results showed no methane emissions. *Id.* Despite the obvious safety hazards such results presented, Anadarko kept the well open to maintain its lease.

On April 17, 2017, a house located approximately 200 feet away from the Firestone Well exploded, killing Mark Martinez and his brother-in-law, Joseph Irwin III. ¶200. Erin Martinez, Mr. Martinez' wife, suffered severe injuries, and she and their son were hospitalized. Mrs. Martinez stayed in the hospital for a month and a half. *Id.*

### D.   The Revelation of Anadarko's Unsafe and Unlawful Practices Damages Investors

On April 26, 2017 after close of trading, Anadarko announced that it had operated the Firestone Well and that authorities were investigating whether the explosion was linked to the well. ¶201. Anadarko further announced that it would shut down 3,000 vertical wells in the DJ Basin, or all of the wells of the same vintage that it operated. *Id.* On April 27, 2017, Anadarko's stock price fell from its previous close of $59.86/share by $2.84/share to close at $47.12/share, down 4.7%. ¶202.

Within two weeks of the Firestone Explosion, Anadarko decided that ***350*** of its Colorado wells were so far from complying with the Commission's rules that it would cost more to bring them into compliance than Anadarko could earn from them. ¶203.

On May 2, 2017, after close of trading, the Frederick-Firestone fire department announced that a 1-inch return line connected to the Anadarko-operated Firestone Well had been abandoned but not disconnected from the wellhead and sealed, in violation of Commission Rule 1103. ¶204. That same day Colorado Governor John Hickenlooper issued a notice to oil and gas operators ordering inspections and tests of all active and abandoned oil and gas lines within 1,000 feet of

occupied buildings. ¶205. The notice also reminded operators that Commission Rule 1103 required that abandoned flowlines be cut and sealed.[9] ¶205. On May 3, 2017, Anadarko's stock price fell from its previous closing price of $56.15 to close at $51.83, or 7.7%, damaging investors. ¶206.

On June 30, 2017, Anadarko announced that in response to the notice, it cut and sealed ***more than 2,400 abandoned flowlines*** located within 1,000 feet of buildings. These flowlines violated Rule 1103, which requires that all abandoned flowlines be cut and sealed. ¶138. Anadarko also disconnected, plugged, and abandoned 3,600 1-inch return lines associated with its vertical wells. *Id.*

According to FE1, after the Firestone Explosion revealed Anadarko's dangerous practices, Anadarko "do[esn't] have the standing to say we deserve that social license [to operate]. That bank account is largely dry." ¶241.

## VI.    ARGUMENT

### A.    The Complaint Adequately Pleads That Defendants Recklessly Violated Colorado Rules and Regulations

The Court will take all well-pleaded facts as true, drawing all reasonable inferences in Plaintiff's favor. *Stephens v. Uranium Energy Corp.*, Civil Action No. H-15-1862, 2016 WL 3855860 *11 (S.D. Tex. July 15, 2016) (Rosenthal, J.) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). With respect to the scienter allegations,[10] the Court will

---

[9] Also on May 2, 2017, Anadarko published a statement attributed to its CEO Walker that "[o]ur thoughts and prayers remain with the Martinez and Irwin families as they continue to mourn the loss of their loved ones," adding that "[t]he safety of our employees and the people who live and work in the communities in which we operate is our number one priority." ¶207. At the next Anadarko town hall meeting, Defendant Holly did not mention the Firestone explosion. Discussion of the Firestone explosion only arose when Defendant Walker mentioned that Anadarko was "not too concerned with it," causing several Anadarko employees to walk out of the meeting in disgust. ¶208.

[10] To plead scienter, the Complaint need not establish actual knowledge. "Rather, conduct that is severely reckless satisfies the scienter requirement under section 10(b)." *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 599 (W.D. Tex. 2014) (citing *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001) (defining recklessness as "extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.")).

consider plausible inferences supporting and opposing an inference of scienter, *id.* (citing *Tellabs*, 551 U.S. at 323), evaluating the Complaint's allegations holistically. *Id.* (citing *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 260 (5th Cir. 2005)). A strong inference of scienter "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id.* (citing *Tellabs*, 551 U.S. at 324) (quotation marks omitted). Rather, the Court will deny Defendants' motion if the inference of Defendants' scienter from the Complaint allegations is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (citing *Tellabs*, 551 U.S. at 324); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 266 n.33 (5th Cir. 2009). ("A tie favors the plaintiff").

Because the Complaint adds adequate allegations, supporting that Defendants Walker and McBride knew or were severely reckless in not knowing that Anadarko's Colorado operations were materially unsafe and were, therefore, non-compliant with Colorado rules and regulations, this Court will deny Defendants' Motions to Dismiss.

## 1.     The Court has Held that Defendants' Statements of Legal Compliance are Actionable

This Court held as actionably false statements in Anadarko's 2015 and 2016 Safety Reports that Defendants Walker and McBride signed, asserting that "Anadarko operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations." Op.30.[11] The Court found that these statements are "specific, [] not limited, and [] not [] opinion[s]," and further that Defendants failed to include "qualifying language." Op.28. The Court further found with respect to these statements of compliance that Plaintiff had "sufficiently alleged that Anadarko was not in compliance with all laws and regulations." *Id.* Thus, finding material

---

[11] The actionably false statements about legal compliance appear at ¶¶229, 235.

falsity, the Court held that Defendants' statements of compliance were "actionable misstatement[s], . . . that a reasonable investor would consider important in making an investment decision." *Id.*

The Court's holding is the law of the case. *Quicksilver Res., Inc. v. Eagle Drilling, LLC*, No. CIV.A. H-08-868, 2008 WL 3165745, at *5 (S.D. Tex. Aug. 4, 2008) (internal quotations omitted) (absent "extraordinary circumstances" like a "clearly erroneous" ruling, courts avoid rehearing issues they have already decided); *see also Rittgers v. United States*, 131 F. Supp. 3d 644, 648 n.1 (S.D. Tex. 2015) (similar). As the Court's holding is neither clearly erroneous nor manifestly unjust, it should reaffirm its holding with respect to the Complaint's pleading of material falsity. The Court's ruling is not clearly erroneous because it based its holding of material falsity on the existence of Defendants' admission that Anadarko was not compliant with Rule 1103, "***at least***." Op.28 (emphasis added). Because the Complaint adequately pleads that Defendants recklessly violated Commission rules and regulations, therefore, the Court should deny Defendants' motion to dismiss.

> **2.      The Complaint Adequately Pleads that Defendants Recklessly Ignored that Anadarko Violated Commission Rules and Regulations**

Defendants claim that the Complaint insufficiently alleges that they knew the precise Colorado laws Anadarko systematically violated. Even if true, when Defendants stated unreservedly that Anadarko complied with all the laws and regulations, at best, they "failed to [] check information that they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). Under this standard, courts have found scienter adequately stated when defendants made representations without checking whether they were true. *Id.* at 309 (citing *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d. 38, 47 (2d Cir. 1978); *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009). Indeed, allegations supporting that a defendant made a statement

without knowing whether it was true suffice to allege recklessness adequately. *In re Anadarko Petroleum Corp. Class Action Litig.*, 957 F. Supp. 2d 806, 835 (S.D. Tex. 2013) (Ellison, J.).

Defendants knew all the facts constituting material violations of Colorado rules and regulations governing Anadarko's operations. Defendants knew Colorado was critical to Anadarko's profitability. They knew Anadarko's practices were unsafe. Anadarko will never know if its flowlines leak if it never pressure-tests them, and cannot ensure excavators will not sever its flowlines if it does not know where they are. Anadarko acknowledged that the Old Wells were dangerous by fixing an 8-figure budget to remedy them, then decided not to do anything about them by slashing the remediation budget, ensuring that Anadarko would remain non-compliant with Commission regulations. Courts have held a defendant's knowledge of the underlying facts is sufficient to state a claim under the Exchange Act, even where the complaint does not plead the ultimate legal violation. In *In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at *17 (S.D.N.Y. Mar. 28, 2018), the court held that plaintiffs had, among other things, stated a Section 10(b) violation with respect to allegations of anticompetitive behavior by defendants in the generic drug market. While the complaint did not contain direct evidence of a collusive agreement between Mylan and other drug makers, the court found that the existence of facts tending to show collusive behavior, together with evidence that top executives controlled pricing decisions, was sufficient to allege that defendants knew, or were reckless in not knowing, that their actions constituted illegal price fixing. *Id. Cosmas v. Hassett*, 886 F.2d 8, 12-13 (2d Cir. 1989), cited with approval by the Second Circuit in *Novak*, is also on point. In *Cosmas*, the court held that plaintiffs had sufficiently alleged falsity and scienter where defendants made or authorized statements that sales to China would be "an important new source of revenue" when they knew or should have known that Chinese import restrictions in place at the time would

severely limit such sales. The court further held that since sales to China were to represent a significant source of the company's future revenue, it could infer that defendants "had knowledge of the PRC import restrictions, since the restrictions apparently eliminated a potentially significant source of income for the company." *Id.* at 13. In other words, regardless of whether the complaint directly alleged the defendants' knowledge of the PRC regulations, the *Cosmas* court found a strong inference of scienter given defendants' knowledge of the underlying facts and circumstances.

Before making their unequivocal statement that Anadarko complied with all laws, Defendants had a duty to check whether the widespread unsafe Anadarko practices Defendants knew about were prohibited by Colorado law or Commission rules. Either they did, and learned that the practices were prohibited, and nevertheless knowingly falsely asserted that Anadarko complied with all laws it was subject to, or they did not, and were reckless for failing to do so. *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 783 (S.D. Tex. 2012) (failure to check safety processes while touting improvements was reckless). The possibility that Defendants never checked whether Anadarko's unsafe Colorado practices violated Commission rules is not exculpatory. *Anadarko*, 957 F. Supp. 2d at 835 (holding that Anadarko executive was reckless for claiming Anadarko was not involved with Macondo well without first determining whether it was); *Avaya*, 564 F.3d at 270. Thus, even if the Court accepts the Defendants' assertion that they did not actually know of the Commission regulations Anadarko violated, it should find that they were reckless for *not knowing* the Commission regulations Anadarko violated, especially given their knowledge of the conditions underlying Anadarko's violations. [12]

---

[12] Defendants' citations to *Wolfe v. Aspenbio Pharma, Inc.*, 587 F. App'x 493, 498 (10th Cir. 2014) and *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541 (4th Cir. 2017) are unavailing. In *Wolfe*, the plaintiffs did not plead that the defendants were ever aware of the underlying facts showing their statements were false. *Wolfe*, 587 F. App'x at 498. The *Maguire* court, contrary to the Fifth Circuit, required that the plaintiffs show not merely that the defendants

a.      **The Complaint Adequately Pleads that Defendants Recklessly**
**Ignored that Anadarko Violated Commission Rules 1103**

The Complaint's well-pleaded allegations plainly contradict Defendants' argument that this Court should its reverse its ruling that falsity was adequately alleged with respect to Rule 1103 and abandoned flowlines because Plaintiff "borrowed" a definition of "abandoned." Mem. 18. The Complaint pleads that the Frederick-Firestone Fire Protection District, investigating the deadly explosion, concluded in a May 2, 2017 release that the gas line that caused the explosion was abandoned, but not disconnected and sealed. ¶¶25, 204. Defendants themselves later admitted, in response to a directive from the Colorado governor, that they had thousands of abandoned gas lines. ¶213. Plaintiff borrows nothing; it simply cites to the investigator's conclusions and Defendants' admission.

The May 2, 2017 Frederick-Firestone Fire Protection District, investigating the deadly explosion, concluded in a May 2, 2017 "Results of Investigation" release, that the explosion was "due to a cut, abandoned gas flow line attached to an oil and gas well in the vicinity that, while abandoned, had not been disconnected from the well head and capped."[13]

Further, also on May 2, 2017, Colorado Governor John Hickenlooper ordered inspections of all active and abandoned gas lines within 1,000 feet of occupied buildings, and reminded operators that abandoned flowlines needed to be cut and sealed. ¶205. The governor specifically differentiated the treatments to be given to lines that "are not in use" from "abandoned lines." The May 2, 2017 official government directive required oil and gas operators to "ensure all abandoned lines are cut below the surface and sealed," while "lines not in use" needed to be "properly marked

---

knew their statements were false but that they intended to mislead, and in any case, the plaintiff there alleged merely that the defendant made statements that were technically incorrect, as all the defendants did was characterize what was technically a new contract with an existing customer as a contract "renewal." *Maguire*, 876 F.3d at 545, 548.

[13] *See* Horne Decl., Ex. D.

and capped."[14] Subsequently, on June 30, 2017, Anadarko admitted that it had failed to properly seal thousands of abandoned flowlines, announcing that it had cut and sealed more than 2,400 abandoned flowlines since the Governor's May 2, 2017 directive. ¶213. As such, whether Anadarko had "abandoned" these lines well in advance of the explosion is a question of fact unsuitable for resolution at the pleading stage.

More, the Complaint adequately pleads Defendants' knowledge that abandoned wells were not plugged. FE7 provided the "Plug & Abandonment List" for use in Weekly Operating Reports that Walker and McBride received. ¶¶168-173. The list had a substantial backlog, ¶179, and its sheer length indicated to defendants there was a material problem. Defendants, therefore, knew of but failed to remediate the existence of the unplugged, abandoned wells and the safety hazard they presented. The Court's holding that the prior complaint had adequately pleaded falsity based on Defendants' Rule 1103 violations was correct, and the Complaint adds particularized facts, establishing scienter.

### b. The Complaint Adequately Pleads that Defendants Recklessly Ignored that Anadarko Violated Commission Rules 1101 e.

Rule 1101 e. (1) required Anadarko to pressure test all of its flowlines[15] annually, testing for the very type of leak that caused the Firestone Explosion. Anadarko, however, began pressure testing all of its flowlines only after the Firestone Explosion. ¶162. During the Class Period and when Defendants claimed Anadarko complied with its legal obligations, in direct and material violation of this Rule, Anadarko pressure-tested the flowlines for only about 20% of its wells, all located in a high risk-location, and, for those, only every other year. ¶¶13, 163, 165 (*never*

---

[14] *See* Horne Decl., Ex. E.

[15] Contrary to Defendants' assertion, the Complaint makes clear that Anadarko failed to pressure test flowlines. ¶¶13, 163 (referring to flowline testing). No fair reading of the Complaint suggests otherwise.

pressure-tested 80% of its wells' flowlines). The Complaint alleges with requisite particularity that it was Anadarko's own Standard Operating Procedures that flouted Rule 1101 e. (1), mandating that the Company test only 20% of flowlines every other year.[16]

In a legislatively-mandated 2014 Report issued before the Class Period but during both McBride and Walker's tenure, the Commission reiterated that its rules already required annual integrity (i.e., pressure) testing of flowlines. ¶¶157-58, 160. The 2014 Report noted that flowlines imperiled Coloradans because they caused numerous spills and releases. ¶158. The Commission requested to implement, and later implemented, regulations requiring it to audit operators to ensure they conducted these annual integrity tests. ¶159. Thus, the Commission itself told Defendants that to operate safely in Colorado they must annually pressure test all of their flowlines.

Defendant McBride's division authorized and Defendant McBride, himself, reviewed each of the Standard Operating Procedures. ¶166. Company staff also prepared a summary of the Standard Operating Procedures for Walker. *Id.* As such, Defendants McBride, Walker, and Anadarko were at a minimum reckless in not knowing that their flowline inspection policy and practice, of which they had actual knowledge, violated Rule 1101 e. (1). *See In re Computer Scis. Corp. Sec. Litig.*, 890 F. Supp. 2d 650, 657 (E.D. Va. 2012) (knowledge of facts giving rise to violation supports scienter).[17]

Citing Anadarko's claim that it had a remote monitoring system for some of its wells Defendants argue that Anadarko *may* have complied with Rule 1101 e. (1) by installing a

---

[16] The Court should reject Defendants' attempt to create an alternate universe of facts. FE7, who described the Standard Operating Procedures under which the Company operated during his tenure, left Anadarko in March, 2018. ¶50. As such, the Court should reject Defendants' assertion that the Company *may* have adopted the Standard Operating Procedures after May 2018.

[17] The complaint in *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583 (S.D. Tex. 2018) failed to allege that any defendant saw the PIPES report. *Plains II*, 307 F. Supp. 3d at 608, 640. Here, however, the Complaint alleges with specificity that McBride not only saw but approved the Standard Operating Procedures that, on their face, violated Rule 1101 e. (1). ¶166.

continuous monitoring system. Defendants' assertion has no place at this stage of the proceedings and must not cloud the Court's analysis of the Complaint's well-pleaded allegations that it will take as true. *Stone*, 26 F. Supp. 3d at 583 (citations omitted).

More and critically, as Defendants and their counsel well-know and as the Commission's website confirms, Anadarko has not applied for approval of its monitoring systems as a continuous monitoring system and the Commission has not approved them as a continuous monitoring system. *See* http://cogcc.state.co.us/#/home.[18] A search of the Commission's website for operators that have monitoring systems shows no record for Anadarko, confirming that the Commission has neither received an application for approval nor approved a continuous monitoring system for Anadarko.[19] As such, the Court will reject Defendants' attempt to paper over their failure to comply with Rule 1101 e. (1) by inserting the possibility of a continuous monitoring system. The Complaint sufficiently alleges that Anadarko could not and did not comply with Rule 1101 e. (1).[20]

### c.   The Complaint Adequately Pleads that Defendants Recklessly Ignored that Anadarko Violated Commission Rules 1101 a. and 1102 d.

Defendants recklessly ignored Anadarko's violations of Rules 1101 a. and 1102 d. Commission Rule 1101 a. required the Company to affix a metallic tracer line to every nonmetallic pipe, allowing for surface-level detection with a metal detector. Since at least 2002, Colo. Rev.

---

[18] The Court may take judicial notice of the Commission website. *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (taking judicial notice of factual information on a government website); *Young v. Well Fargo Bank, N.A.*, No. 3:15-CV-2289-L, 2017 WL 3722148, at *2 (N.D. Tx. August 29, 2017) (taking judicial notice of information on government website concerning private companies).

[19] *See* Horne Decl. Ex. C.

[20] Defendants argue that neither Defendant Walker nor Defendant McBride had any actual responsibility for Colorado's operations, claiming the Production Superintendents were Anadarko's unsupervised, independent actors in Colorado. While the Complaint alleges that the Production Superintendents were responsible for Anadarko's Colorado operations, ¶16, n.1, they themselves reported to their own superiors, e.g. ¶50 (FE reported to Paul Wages). Anadarko's senior executives, including Defendants' Walker and McBride, cannot dodge ultimate responsibility for Anadarko's Colorado operations.

Stat. § 9-1.5-105(3), the statute creating CO 811[21] has required Anadarko to provide "**all** of the locations of **any**" flowline that it owns or operates to the notification association. Colo. Rev. Stat. § 9-1.5-105(3).[22] The Commission further codified the registration requirement in Rule 1102 d. These rules mandated that operators know the locations of their flowlines so that contractors do not sever them when digging for development in rapidly urbanizing environments like Weld County.

Anadarko, however, was materially non-compliant with these rules. From before and throughout the Class Period, in violation of Rule 1101 a., Anadarko did not know the locations of the flowlines of approximately 10% of its total wells, and 20-30% of the Old Wells. ¶¶146-147.[23] In most cases, Anadarko did not have plats (maps) of the wells and their flowlines. Other times, the plats were wrong. ¶145.[24] Sometimes, moreover, Anadarko did not even know where the wells themselves were, much less their flowlines. ¶149. From before the Class Period, in violation of Rule 1102 d., Anadarko failed to register flowlines with CO 811 because it did not know where 10% of its wells' flowlines were located.[25] ¶148.

---

[21] CO 811 is a notification association, operating a public hotline that developers and others must call before they dig so they can locate and avoid underground facilities such as flowlines. Anadarko is a Tier 1 Member of CO 811.

[22] Attached as Ex. A to the Declaration of Jonathan Horne In Support of Plaintiff's Opposition to Defendants' Motion to Dismiss ("Horne Decl.") is the version of Colo. Rev. Stat. § 9-1.5-105(d) that was in effect from May, 2000 through August, 2018. Well prior to the Class Period, this provision, itself, required Anadarko to register its flowlines, stating, "each member of the notification association shall provide all of the locations of any underground facilities which such member owns or operates to the notification association." Thus, the Complaint accurately pleads that Colorado law and Rule 1102 d. required Anadarko to register its flowlines with CO 811. ¶146.

[23] The lack of tracer devices required plug teams to dig up the area around the well, a task often taking up to three weeks. ¶147.

[24] FE5 confirms that Anadarko found lines that did not appear on internal maps "all the time." ¶154.

[25] Anadarko tasked FE7 and his team with plugging abandoned wells when Anadarko did not know the locations of the flowlines. ¶144. Ironically, FE7's teams frequently attempted to locate lost flowlines by calling CO 811. ¶146. CO 811 was unable to assist, because Anadarko had not registered its flowlines with CO 811 in violation of Rule 1102 d. *Id.*

Defendants knew that Anadarko did not know the locations of 10% of its wells' flowlines.[26] During FE7's tenure, Anadarko's Colorado office held biannual, 4-hour meetings of its senior management ("Biannual Meetings"), specifically to apprise Anadarko's senior executives of the status and developments in Anadarko's Colorado operations. ¶134. Before each Biannual Meeting, each of Anadarko's Production Superintendents prepared for discussion during the meeting a PowerPoint presentation, identifying the 3-5 most important issues requiring immediate attention. ¶136.[27] *Nibur v. SandRidge Mississippian Tr. I*, No. CIV-15-634-M, 2017 WL 3996421, at *4 (W.D. Okla. Sept. 11, 2017) (scienter sufficiently stated where plaintiffs alleged that executives attended meeting at which they were exposed to information contradicting their public statements); *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1209 (W.D. Wash. 2009) (scienter sufficiently alleged where reports advised executives of facts showing their statements were false).

According to FE7, Anadarko distributed the PowerPoint presentations to Anadarko's "highest levels," including specifically to Defendant Walker. ¶137. While, according to FE7 who himself attended, Defendant Walker attended 25% of the Biannual Meetings while Defendant McBride attended 50% of the meetings, following each Biannual Meeting FE7's superiors flew to

---

[26] Ignoring the Complaint's allegations, Anadarko argues that perhaps it had resolved the problem of wells with unknown flowlines at some point before 2016. The Complaint forecloses Anadarko's fanciful conjecture. FE7 reports that his teams kept finding such wells during the entirety of his tenure. Thus, Anadarko never complied with Rule 1101 a.

[27] Defendants' reference to *Plains All American* is unavailing, because there the PIPES reports were certified by the defendants' subordinates and the plaintiffs could not show the defendants had ever seen them. *Plains All American II*, 307 F. Supp. 3d at 640. Here, Production Superintendents with actual, detailed knowledge of the safety and environmental concerns Anadarko's Colorado operations faced prepared the PowerPoint slides specifically for Defendant Walker's benefit. More, both Defendant Walker and Defendant McBride regularly attended the meetings where they saw presentations from the PowerPoints. This supports a strong inference that Defendants received first-hand accounts of the problems facing Anadarko's operations and constituting violations of Colorado law.

The Woodlands to present the matters discussed at the Biannual Meetings to Anadarko's senior executives, including, in particular, Defendant Walker. *Id.*

At Biannual Meetings prior to 2016, one of the issues requiring immediate attention was Anadarko's failure to locate the flowlines of 10% of its wells. According to FE7, Defendant McBride attended the pre-2016 meeting at which Production Superintendents raised and discussed the Company's lost flowlines locations for 10% of its wells. ¶152.[28] When they raised the issue, the Production Superintendents sought additional resources. In Defendants' presence, Anadarko's senior executives shot down the Production Superintendents' plea, instructing Production Superintendents to solve the problems locally, then, at the beginning of the Class Period, slashed those same local units' remediation budgets. ¶¶138, 152-53.

Still further, Colorado operations transmitted information summarizing pressing issues, including detailed information about compliance and safety in the Rockies Region, for inclusion in "Weekly Operating Reports" for senior Anadarko executives, including Defendants Walker and McBride. ¶¶169-175.[29] FE7, who prepared and transmitted a weekly summary of his activities, was instructed to draft the weekly reports while keeping in mind that his information would be incorporated into Weekly Operating Reports for senior management, including Defendant Walker.

---

[28] Defendants argue that McBride did not attend a meeting taking place before 2016 because the paragraph alleging McBride's attendance does not specifically repeat, in every sentence, the opening sentence that the Biannual Meetings concerned took place before 2016. *See* ¶152. They posit that McBride might instead have attended a Biannual Meeting taking place after 2016, which the Complaint nowhere mentions. Defendants' word games amount to a request that the Court grant them unreasonable, implausible inferences. The PSLRA, however, only requires the Court to consider plausible competing inferences. *Tellabs*, 551 U.S. at 323; *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1260 (N.D. Cal. 2008) ("While exculpatory and inculpatory references must be considered at the pleading stage, the PLSRA in no way turns FRCP 12 into a trial-type, papers-only proceeding.").

[29] FE1 confirms that the Weekly Operating Reports prominently featured detailed information concerning the Rockies Region. ¶174.

¶171.[30] The Complaint further establishes that FE9[31] collected the summaries FE7 and others provided, incorporating them into a Weekly Operating Report. ¶173. According to FE9, senior management, including Walker and McBride, received the Weekly Operating Reports, discussing them weekly, during Monday morning conference calls that McBride occasionally attended. ¶172.[32] *Tellabs,* 551 U.S. at 323 (despite PSLRA, court must still give plaintiff benefit of plausible inferences). Because Production Superintendents conveyed the information that Defendants Walker and McBride saw weekly, including compliance and safety information. As such, Walker and McBride were minimally reckless in not knowing that Anadarko did not comply with Rules 1101 a. and 1102 d., 2017 WL 3996421, at *4.

Knowing that, during the Class Period, they violated both Colo. Rev. Stat. § 9-1.5-105(3) and Rules 1101 a. and 1102 d., Defendants attempt to self-exculpate by deceiving the Court. Citing ¶146, they argue that 1102 d. "did not require operators to register their flowlines." Memo. 15. The Complaint, however, refers expressly to registering flowlines with CO 811, a service that

---

[30] The Complaint includes adequate corroborating details about the Weekly Operating Reports on which it relies, providing contents, author(s), recipients, the dates the author(s) prepared them, and the dates defendants reviewed them. ¶¶170-175. *See Stone,* 26 F. Supp. 3d at 604 (court must take as true plaintiff's allegations referencing specific reports that were available at the time of the alleged misstatements where complaint explains the source of allegations, even where plaintiff fails to produce report); *Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 432 (5th Cir. 2002); *In re Plains All Am. Pipeline, L.P. Sec. Litig.,* 245 F. Supp. 3d 870, 908 (S.D. Tex. 2017) (reports suffice to support inferences when allegations include "the character of the reports, the author and contents, who received them, and when."). The Complaint need not include a list of facts from every report. *In re Fleming Companies Inc. Sec. & Derivative Litig.,* No. CIVA503MD1530TJW, 2004 WL 5278716, at *24 (E.D. Tex. June 16, 2004) (citing *ABC Arbitrage Plaintiffs Grp. v. Tchuruk,* 291 F.3d 336, 355 (5th Cir. 2002)).

[31] Defendants completely ignore FE9, executive assistant to the head of Anadarko's Colorado operations. ¶52.

[32] Defendants argue that it is speculative that Defendant McBride received the Weekly Operating Reports. The inference that Defendant McBride received the reports, summarizing issues relating to safety and compliance issues in Colorado, ¶175, is strong. FE1, an occasional Monday conference call attendee, always received the Weekly Operating Reports, regardless of whether he attended. ¶173. As the Weekly Operating Reports included compliance and safety matters, ¶175, and were important enough that Anadarko's CEO spent hours every week discussing them, the inference that McBride, who was Vice President of Health Safety & Environment, received the Reports is unassailable, as is the inference that Anadarko distributed Weekly Operating Reports to a mailing list of invitees, including McBride.

alerts excavators to the existence and location of flowlines. ¶146.[33] Defendants cite the 2018 Commission Summary of 2018 Flowline Rules ("2018 Summary"),[34] claiming that the Commission amended Rule *1102 d*. in 2018. Even a cursory glance at the 2018 Summary shows that the Commission referred to Rule 1101 and the new requirement that Anadarko register its lines *with the Commission* and not to its already-existing requirements to register all flowlines pursuant to CO 811. Indeed, the 2018 Summary at 2, states that *1101*'s registration requirement "focuse[s] on gaining increased information about specific types of pipeline," not about providing location information so that excavators could avoid death or dismemberment. The new 2018 Summary and the Commission's new registration requirement have nothing whatsoever to do with Rule 1102's then-standing requirement that Anadarko register its flowlines with CO 811.

Next, Defendants state that Rule 1102 d. required only that Anadarko become a member of CO 811 "and participate in Colorado's One Call notification system." Memo. 15-16 (quoting Rule 1102 d.). Defendants mislead the Court, failing to complete the quotation they cite or even to indicate with an ellipsis that it contains more text.[35] Again, even a cursory look at Rule 1102 d. shows additional, operative text. The full sentence concludes, mandating that members comply with "the requirements of which are established by §9-1.5-101, C.R.S. et seq."[36] That section of the Colorado Revised Statutes states unequivocally that Anadarko ". . . shall provide all of the

---

[33] Defendants incorrectly assert that the Complaint concedes that the Commission did not "require companies to disclose to the public or developers the location of oil and gas lines." Memo. 15. In fact, the Commission and CO 811 required that operators disclose the location to CO 811, which would then provide the information in response to requests from excavators.

[34] Defendants append the 2018 Summary to the Reed Decl. as Exhibit 9, referring to it as "COGA Summary of 2018 COGCC Flowlines Rules at 2-3." Memo. 15.

[35] As the late Judge Irenas wrote of another highly well-respected New York law firm when it misquoted precedent by omitting the critical part of the sentence, "[m]isquoting cases is not acceptable in the Southern District of New York nor is it acceptable in the District of New Jersey." *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 588, n. 1 (D.N.J. 2001). Misquoting applicable Rules by omitting critical text is not acceptable in either the Southern District of New York or the Southern District of Texas.

[36] Reed Decl., Ex. 3, at 3.

locations of any underground facilities which such member owns or operates to the notification association, and the association shall maintain such information on file for use by excavators." Colo. Rev. Stat. § 9-1.5-105(3). That is, from well before the Class Period, Anadarko was required to register all of its flowlines with CO 811. A member cannot, however, comply with Rule 1102 d. if it does not know the locations of a material number of its flow lines.[37]

Last, once again, Defendants attempt to mislead the Court, submitting a 2015 version of Commission Guidance and suggesting that the Commission only "encouraged" operators to develop an inventory of its flowlines, but did not require registration.[38] The section Defendants cite from the 2015 Guidance, however, expressly and plainly refers to the Commission's "Auditing of Operator Pressure Testing."[39] It is in that context, and that context only, that the Commission "encouraged" operators such as Anadarko to inventory their flowlines so the Commission could audit pressure testing. *Id.* This has nothing whatsoever to do with Anadarko's knowing where its flowlines are and registering them with CO 811—an operation separate from the Commission.[40] Indeed, the Commission updated its guidance in December, 2016.[41] In the 2016 Guidance, the Commission's "encourage[ing] operators to inventory flowlines" for "Auditing of Operator

---

[37] Defendants attempt to transmogrify the allegation that Anadarko's personnel called CO 811 to locate its own flowlines into a negative scienter inference. Memo. 16. The allegation, however, is that Anadarko personnel called CO 811 to find their own flowlines even as Anadarko had not ensured that it had registered those lines in the first place. ¶146. That is, Anadarko violated Rule 1102 d. and called CO 811 to attempt to find what it had not registered!

[38] Memo. 16 (citing Reed Decl. Ex. 10, COGCC Guidance at 8)

[39] Reed Decl., Ex. 10, at 8.

[40] Defendants assert that the Complaint alleges that the Commission did not "require companies to disclose to the public or to developers the location of oil and gas lines." Memo. 16 (citing ¶96). The information Colorado law and Commission Rule 1102 d. required Anadarko to register, however, was not "public." Rather, because of competitive concerns, the information CO 811 was not generally public. Rather, CO 811 responded to inquiries from potential excavators about specific locations, but not to general public inquiries about a list and locations of all operators' flowlines. The inaccessibility of the locations of all flowlines and wells in Colorado to any single caller preparing to dig has nothing whatsoever to do with Anadarko's obligation to register its oil and gas lines.

[41] Horne Decl. Ex. B, *COGCC Operator Guidance: Rules 1101 and 1102 and 1103: Flowline Guidance*, (December 20, 2016) ("2016 Guidance").

31

Pressure Testing," remains the same.[42] The 2016 Guidance, however, adds a separate section, six pages earlier and under a completely separate heading, "One Call (Call before you dig) Requirements."[43] Thus, the "encouraged" language Defendants attempt to leverage to assert that Rule 1102 d. did not require Anadarko to register with CO 811 is wholly irrelevant to this Court's determination and in no way whatsoever undermines Anadarko's material failure to register its flowlines in violation of Rule 1102 d. Defendants may not attempt to distort this Court's vision of the Complaint's well-pleaded allegations by submitting alternative facts that the Complaint does not reference or of which this Court may not take judicial notice for the truth of the matter.[44]

> **d. The Complaint Adequately Pleads that Defendants Ignored that Anadarko Recklessly Violated Commission Rule 1102 a.(2)**

Defendants recklessly ignored Anadarko's violations of Rule 1102 a.(2). During the Class Period, that Rule mandated that Anadarko correct any condition that could adversely affect the safe and proper operation of its pipeline within a reasonable time. Defendants concede the Complaint adequately alleges that Anadarko did not know the location of 10% of its wells' flowlines. ¶148. Similarly, Anadarko's overworked and undertrained pumpers had barely five minutes to inspect Anadarko's flowlines, permitting only a quick sniff that cannot detect odorless methane, and missing 3-5% of wells entirely. ¶131. Thus, Anadarko was simply unable to detect any leaks in its pipelines.

---

[42] *Compare* Reed Decl., Ex. 10, at 8 *with* Horne Decl., Ex. B, at 9.

[43] Horne Decl., Ex. B. at 3.

[44] *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–99 (9th Cir. 2018) ("[w] we note a concerning pattern in securities cases like this one: exploiting [incorporation by reference and judicial notice] improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage"). The *Orexigen* Court noted, "If defendants are permitted to present their own version of the facts at the pleading stage—and district courts accept those facts as uncontroverted and true—it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently "plausible" claim for relief. Such undermining of the usual pleading burdens is not the purpose of judicial notice or the incorporation-by-reference doctrine." *Id.* at 999.

Defendants declare without support that Rule 1102 a.(2) is only triggered by actual discovery of a leak. If the Commission intended Rule 1102 a.(2) only to fix known leaks, however, it would have said as much. Instead, it provided that operators should correct "any condition that ***could*** adversely affect the safe and proper operation of its pipeline." Rule 1102 a.(2) (emphasis added). Anadarko's ignorance of its flowlines' location, and therefore its inability to detect actual leaks in its pro forma inspections, are plainly "conditions" that "adversely affect the safe [] operation of its pipeline" and violate Rule 1202 a.(2).

According to FE7, Anadarko's Colorado Standard Operating Procedures, which McBride reviewed and approved and Walker received, formalized Anadarko's procedure of only pressure-testing 10% of its wells' flowlines each year. ¶166. The 2014 Report specifically drew Defendants' attention to the need to annually inspect all flowlines, especially as the Commission promised increased enforcement.

Anadarko maintained a Dangerous Wells List of Old Wells with serious environmental issues. Contrary to Defendants' assertion, the Complaint does not merely allege that these wells were in "desperate need of repairs," MTD 28. Rather, the Complaint specifically pleads that the wells were not up to code, did not have methane emissions control, needed upgraded piping and oil storage tanks, and had completely deteriorated cellar and cement pits. ¶98.

Both Defendants McBride and Walker concluded that the wells were dangerous and needed to be remediated. Defendant McBride supported, and Defendant Walker authorized, a remediation budget of tens of millions of dollars though Anadarko was having an unprofitable year. ¶85. Anadarko then slashed the budget. ¶108. Both McBride and Walker knew that almost no remediation was taking place, McBride because he administered the budget, and Walker because he received status reports on remediation McBride drafted. ¶¶111-12. Thus, Defendants knew that

33

Anadarko systematically and knowingly operated unsafely in Colorado and that it violated Commission rules.

Defendants characterize Anadarko's failures as inactionable belt-tightening, but they ignore that Defendants McBride and Walker actually recognized that Anadarko wells were dangerous wells and in need of remediation and actually knew that the Company had failed to allocate sufficient funds or timely to remediate known safety hazards. Indeed, they consciously slashed the remediation budget and then to slash it as Production Superintendents continued to report sub-standard, non-compliant remediation efforts. Defendants Walker's and McBride's actual knowledge of these safety issues renders them, at a minimum, reckless in stating, unqualifiedly, that Anadarko had complied with the law.

### 3. Defendants Had a Motive to Commit Fraud

Motive allegations are properly considered alongside other allegations in determining whether a complaint states a claim. *Owens v. Jastrow*, 789 F.3d 529, 540 (5th Cir. 2015). Here, though Defendants' motives do not suffice by themselves to show *scienter*, they contribute to the inference of *scienter*.

Anadarko accrued $9.15 billion in liabilities in two of the largest environmental scandals in recent American history: Tronox and the Deepwater Horizon disaster. ¶4. This prevented the Company from earning a profit in both 2011 and 2014. ¶85 & n.4-8. But for these liabilities, Anadarko would have earned about $8 billion in profits in 2011-2013. ¶5. The Company instead lost about $1 billion. *Id.* It is no exaggeration to say that the environment, health, and safety is the most important concerns of Anadarko investors. Anadarko's representations in its HSE Report that it complied with all laws and regulations that applied to it, and in its SEC filings that it was in material compliance, telegraphed to investors that Anadarko had turned the page from its past transgressions, and would not accrue additional enormous safety-related liabilities. Such

statements were critical to investors, as because of the earlier liabilities, cash-strapped Anadarko had been forced to conduct the largest offering in its history in September 2016, raising net proceeds of $2.2 billion. ¶231.

If investors learned that Anadarko was systematically violating safety regulations in its largest single market, while simultaneously instructing its public relations representative to "shovel s**t and clean up the [resulting] messes" because it had no intention of remediating safety issues, the stock's value would be damaged, and Anadarko would be unable to raise the capital it needed to continue its operations, or pay far more to raise the same amount of capital. Defendants' false assurances that Anadarko was operating safely and in compliance with regulations were allowed it to escape the cash crunch it suffered after accruing $9.15 billion for Tronox and Deepwater Horizon. Because Anadarko's compliance with environmental regulations was "uniquely important" given its history, its motive to make false statements to reassure investors to sell $2.2 billion of stock supports a finding of a strong showing of scienter. *Ramirez v. Exxon Mobil Corp.*, No. 3:16-CV-3111-K, 2018 WL 3862083, at *13 (N.D. Tex. Aug. 14, 2018) (Kinkeade, J.) (exception to rule that "scienter may not be footed solely on motives universal to corporate executives" exists "when a company is particularly motivated to maintain or improve its credit rating to receive crucial funds." (Citation omitted)).

### 4. Defendants Boilerplate Cautionary Statements Do Not Immunize Their False Statements of Present and Past Fact from Liability

Statements that Anadarko complies with laws and regulations are statements of present or historical fact that can be proved or disproved, *not* forward-looking statements entitled to the protection of the PSLRA's safe harbor. *Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 745 (S.D. Tex. 2001). Defendants' cautionary statements are immaterial as a matter of law. The Ninth Circuit recently considered whether cautionary statements could immunize a materially false non-

forward looking statement (as exists here) from liability, ruling that "virtually no cautionary language short of an outright admission that the non-forward-looking statements were materially false and misleading would have been adequate." *In re Quality Systems, Inc. Sec. Litig.*, 865 F.3d 1130, 1148 (9th Cir. 2017). Defendants here never made any "outright admission."

Further, even if relevant, the risk disclosures are not about Anadarko specifically, but about challenges faced by oil and gas companies generally, and would not alter the total mix of information about Anadarko. Defendants point to Anadarko's disclosure that it is subject to laws and regulations and that failure to comply with those laws and regulations may lead to fines. ***Every*** business is subject to laws, and ***every*** business may face fines or worse if it does not comply with the law. McBride also points to a disclosure that "[o]ur business is subject to all of the operating risks normally associated with" the oil and gas business, listing a few risks of oil and gas production that of which every investor is already aware. McBride MTD 6. These disclosures merely remind investors that Anadarko is an oil and gas company.[45] Courts ignore such anodyne cautionary statements, including in one of the cases McBride cites in support of his claim that the statements are meaningful. *In re BP p.l.c. Securities Litigation*, 843 F. Supp. 2d at 777; *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014).[46]

Even if Anadarko's cautionary statements were not immaterial both because they are anodyne boilerplate and they do not excuse failure to disclose facts on the ground, in the Fifth

---

[45] Defendants cite *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 888–89 (S.D. Tex. 2001), but there, the company disclosed that the integration of an acquired company was proving "challenging" – the exact fact the plaintiffs alleged it concealed. Here, Anadarko's disclosures told investors nothing about ***Anadarko***, but were instead at best statements about the oil and gas industry.

[46] McBride argues that risk disclosures are important. The blog post he cites in support, which is addressed to beginner investors, points to disclosures of concrete facts on the ground, not boilerplate, hypothetical risks. McBride at 5 n.3 (*citing* Joshua Kennon, https://www.thebalance.com/what-is-a-10-k-and-why-should-an-investor-read-it-357303).

Circuit adequate cautionary statements must actually touch on the reasons why the statement is false. *Lormand*, 565 F.3d at 247. The cautionary statements here either merely reminded investors that Anadarko was an oil and gas company without informing them of what in particular made Anadarko's operations risky, or addressed certain specific areas, such as greenhouse gas emissions and the risk of additional regulation unrelated to the Firestone Well explosion or the unsafe nature of the Colorado wells. "A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." *Meyer*, 761 F.3d at 251. Anadarko's boilerplate disclosures are inadequate as a matter of law.

Defendants challenge the Court's ruling that the statements in the 2015 and 2016 Safety Reports were false by pointing to even more anodyne "cautionary" statements. First, Defendants assert that the HSE Report was available from Anadarko's website. Upon visiting the website, had investors scrolled down to the very bottom left corner of the page, they would have found a link to its "Terms of Use" which, if they clicked it, would have taken them to a page making boilerplate disclaimers, including a disclaimer that Anadarko was not warranting that the information it provided was accurate. The logical conclusion of Defendants' position is that investors may not rely on *any* representations on Anadarko's website. The Company's statement about warranting the information on the website provides no context or other qualification to what this Court has already found is their unqualified statement of compliance. Op.28. Most commercial websites provide such disclaimers,[47] and even had they seen it reasonable investors would have ignored this boilerplate disclaimer.

---

[47] Including Defendants' counsel's website. *See* https://www.skadden.com/terms-and-conditions (last accessed December 10, 2018).

Defendants argue that statements in the HSE Reports claiming that Anadarko was "pursuing continuous improvement" and "achieving operational excellence" are implicit admissions that Anadarko violated the law. Defendants concede, however, that all they said was that "Anadarko cannot ensure **perfect** regulatory compliance," a far cry from disclosing that, no later than the beginning of the Class Period, Anadarko materially violated at least four safety-related Commission rules. Finally, Defendants point to disclosures that regulations were becoming stricter, but Anadarko's reckless actions that led to the Firestone Explosion violated **existing** law.[48] Defendants have given the Court no reason to change its ruling.

### B. Defendants Misleadingly Stated they Believed Anadarko Complied with Environmental Regulations

Anadarko's 2015 10-K claimed that "[t]he Company believes that it is in material compliance with existing environmental and occupational health and safety regulations" (the "Opinion Statement"). ¶226. Statements of opinion can mislead if the speaker does not believe the opinion or the speaker omits facts that conflict with what a reasonable investor would understand from the statement itself. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 (2015). In other words, to avoid liability, an opinion statement must "fairly align" with the information the speaker knows. *Id.* at 1329.

Annual reports are "formal documents" and "[i]nvestors do not, and are right not to, expect opinions in those [documents] to reflect baseless, off-the-cuff judgments." *Id.* at 1330. Investors reasonably expected that Defendants had carefully examined the laws that apply to Anadarko in

---

[48] Defendants' cases are distinguishable. In *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 811 (2d Cir. 1996), the internal documents the plaintiffs said contradicted the defendants' external statements were in fact consistent with them. In *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1448 (5th Cir. 1993), the information the plaintiffs alleged was withheld was actually disclosed.

its most important jurisdictions before claiming material compliance. *Id.* at 1328. Here, Defendants – at best – knew that Anadarko operated **unsafely**, and did not attempt to determine whether these unsafe operations were also **unlawful**. So Defendants' cavalier statement of material compliance "conflict[s] with what a reasonable investor would take from the statement itself." *Id.* at 1329. In any case, "in false statement of opinion cases [...] the falsity and scienter requirements are essentially identical" *Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 CIV. 2106 (ER), 2017 WL 1169629, at \*14 (S.D.N.Y. Mar. 28, 2017) (internal quotations omitted). Defendants made their statements with scienter.

### C. Anadarko's Statements in the Underwriting Agreement that it Complied With All Regulations Are Actionable

On September 14, 2016, Anadarko publicly filed an Underwriting Agreement, which among other things provided that Anadarko "ha[s] compli[ed] with all applicable [...] state [...] rules, regulations, ordinances, codes, orders, and other legally enforceable requirements relating to the prevention of pollution, the preservation of environmental quality, the protection of natural resources, or the remediation of environmental contamination." ¶232. These statements are "not surrounded by the hedges and qualifications that were in [other] SEC filings." *In re Plains All American Pipeline, L.P. Securities Litigation*, 307 F. Supp. 3d at 636.

This Court recently ruled that representations and warranties in underwriting documents are not material as a matter of law. *Id.* at 638. But the parties to that case did not present the Court with critical authority that might have led to a different result. Though not cited in the parties' briefs, courts have held that investors may rely on statements made in the "representations and warranties section of a private merger agreement directed solely to [a third party]." *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736 (9th Cir. 2008). In fact, the SEC has advised issuers that investors may rely on representations and warranties in SEC-filed material contracts with third

parties like underwriting agreements, and that statements in such agreements, if false, may give rise to liability under Section 10(b) of the Exchange Act. *Sec. & Exch. Comm'n Release Notice*, Release No. 51283, 2005 WL 1074830, at *2 (Mar. 1, 2005) (the "*Titan* Ruling"). The SEC reasoned that the issuer "cannot avoid its obligation" to disclose additional facts necessary to make its statements not misleading "simply because the information published was contained in an agreement or other document not prepared as a disclosure document." *Id.* Thus, an issuer will be liable to its investors "where specific additional material facts exist that are known to an issuer, or an issuer was reckless in not knowing them" and does not indicate that the representations and warranties are not true. *Id.* at *3.[49] The SEC has applied the *Titan* Ruling repeatedly to instruct companies to strike language disclaiming the accuracy of their representations and warranties from their disclosure documents because investors were allowed to rely on them.[50] Thus, both the SEC and courts ruled that investors could rely on representations and warranties made to third parties in SEC-filed materials.

Defendants' argument that that the Underwriting Agreement cannot be attributed to any person fails, because "the corporation itself may be treated as making [] public statements issued by authorized officers on its behalf." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004). Further, the individual defendants' *scienter* may be attributed to Anadarko if

---

[49] The case the Court cited ignored both the *Titan* Ruling and *Glazer*. *Jaroslawicz v. M&T Bank Corp.*, No. CV 15-897-RGA, 2017 WL 1197716, at *4 (D. Del. Mar. 30, 2017). Had the Court been presented with these authorities, it could have determined that *Jaroslawicz* was wrongly decided.

[50] *E.g.* Letter from SEC to VeriFone Systems Inc., dated January 7, 2011, at 2 (comments 3.-5.), *available at* <https://www.sec.gov/Archives/edgar/data/1312073/000000000011001604/filename1.pdf>; Letter from SEC to Equity Bancshares, Inc., dated September 20, 2016, at 2-3 (comment 7.), *available at* <https://www.sec.gov/Archives/edgar/data/1227500/000000000016093562/filename1.pdf>. Letter from SEC to IPC Healthcare, Inc., dated October 7, 2015, at 1 (comment 1.), *available at* <https://www.sec.gov/Archives/edgar/data/1410471/000000000015049024/filename1.pdf>.; Letter from SEC to Rite Aid Corporation, dated December 7, 2015, at 1 (comment 2.), *available at* <https://www.sec.gov/Archives/edgar/data/84129/000000000015058110/filename1.pdf>.

plaintiff either points to facts showing the defendant made or authorized the statement or if it is "the sort of statement that would require approval by corporate officers." *In re Plains All American Pipeline, L.P. Securities Litigation*, 307 F. Supp. 3d at 627, 628. Here, the Underwriting Agreement's terms required Defendant Walker to sign a lock-up agreement (Schedule IV), indemnified him from liability (Section 8 (b)), and mandated that an Anadarko executive officer represent to the Underwriters that the representations and warranties were true. Section 6 f.[51] Walker plainly would have been involved in negotiating and approving this document since it materially affected him personally. Moreover, the representations concerned what may be the most important problem facing Anadarko – its compliance with environmental laws and regulations. And the Underwriting Agreement was used to sell $2.2 billion of shares – the largest stock offering in Anadarko's history. These particularized allegations show that Anadarko's senior executives, including Walker and McBride, would have approved the statement's issuance.

Finally, Anadarko's widespread and systematic violation of Colorado law soured Coloradan's views on oil and gas drilling, imperiling Anadarko's most important market. That is the definition of a material adverse effect.

### D.    Defendants' Statement That the Operating Center "Provides Real-Time Monitoring Capabilities for 6,800+ Wells" Is Actionable

#### 1.    The Statement is Misleading

The Operations Factsheet was drafted to reassure investors, as well as Coloradans, that Anadarko's operations were safe because of its Operations Center. Reed Dec. Ex. 4 ("Anadarko utilizes leading-edge technology to advance safety, protect the environment, and enhance the compatibility of its operations.") In the Operations Factsheet, Defendants represented that the

---

[51] *See* Horne Decl., Ex. F.

Operating Center "[p]rovides real-time monitoring capabilities for 6,800+ wells." The plain, intuitive meaning of the statement is that 6,800+ of Anadarko's wells – or its entire inventory – were set up for remote monitoring. Anadarko concedes that the Complaint adequately alleges that even in 2016, about half of the Old Wells, or about 775 wells, were not set up for remote monitoring. . These were precisely the kinds of wells that posed the greatest danger.

Defendants argue that their statement merely meant that the Operating Center *could have* monitored 6,800+ wells, not that it actually *did so*. That is, the Defendants were boasting in the Operations Factsheet merely that Anadarko had purchased a lot of software for its Operations Center and had fast computers – not that it was actually using these assets to make its wells safe. Indeed, as Defendants read the statement, it would not be misleading even if none of Anadarko's wells could be remotely monitored.

"[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Lormand*, 565 F.3d at 248. Here, because the total number of wells that Anadarko claimed it remotely monitored was approximately the number of wells Anadarko actually operated in the DJ Basin, the statement conveyed that there were no wells that escaped the Operations Center. Defendants argue that a reasonable investor would have seen the 6,800+ number, turned to Anadarko's SEC filings, found that the Anadarko operated fewer than 6,800 wells in the DJ Basin, and concluded that 6,800+ could not refer to the number of wells Anadarko actually monitors. Even an investor who followed this lengthy trail would not reach the conclusion Anadarko suggested. First, the number of wells Anadarko operated in the DJ Basin fluctuated constantly, suggesting that 6,800

was the high-water mark.[52] Second, an investor would have assumed that the small gap between the total number of operating wells and 6,800 was filled with inactive or shut-in wells.

### 2. Christiansen "Made" the Statements in the Operations Factsheet and His Scienter Can Be Imputed to Anadarko

As head of Anadarko's corporate communications, Christiansen oversaw Anadarko's "media relations, public affairs [and] external communications including the company's website." ¶39. Christiansen personally approved the Operations Factsheet. ¶223. In contrast to the facts in *BP*, the Complaint links Christiansen to the very document at issue – the Operations Factsheet. *In re BP p.l.c. Securities Litigation*, 922 F. Supp. 2d at 631 (not enough that purported speakers were "responsible for reviewing for accuracy" of documents with a certain subject matter without allegations that the defendant personally reviewed the specific document at issue). Moreover, in *BP*, the relevant speakers were outside directors, who are not day-to-day managers, and thus unlikely to have detailed involvement in the company's affairs. *Id.* Here, approving external communications was Christiansen's day-to-day job.

### 3. Christiansen Made the Statement With Scienter

The fact that half of the Old Wells had no remote monitoring and control capabilities was included in PowerPoint slides that were presented and discussed at one or two of the Biannual Meetings held before 2016. ¶224. Christiansen valued the Biannual Meetings so highly that he either attended all of the Biannual Meetings, either in person or through a representative. ¶134. Even if the discussions were held on a date on which he sent a representative, the only reasonable inference from the fact that Christiansen sent a representative in his place is that Christiansen

---

[52] Anadarko's 2013 10-K stated that Anadarko operated 5,240 wells in the DJ Basin, its 2014 10-K 6,550, its 2015 10-K 6,000, its 2016 10-K 6,420, and its 2017 10-K 6,000.

would have, at a minimum, reviewed the PowerPoint slides and received a summary report from his representative.

Additional facts point to Christiansen's scienter. When FE2 told him that Anadarko's practices created unacceptable risks to Coloradans, Christiansen instructed her to "shovel s**t and clean up the [resulting] messes" – that is, to mislead the public about safety. After the Firestone Explosion, Christiansen told the Durango Herald that "[n]o one really foresaw this as a potential issue" (¶214), when in truth, Anadarko's Production Superintendents, in Christiansen's presence, implored Anadarko to address the very unsafe conditions that led to the Firestone Explosion. Christiansen's false exculpatory statement further supports his scienter. *United States v. Meyer*, 733 F.2d 362, 363 (5th Cir. 1984) (false exculpatory statements are substantive evidence tending to prove guilt).

### E.     The Complaint Adequately Alleges a Section 20(A) Claim

As the Complaint states a primary violation of Section 10(b) against Anadarko, and Defendants do not dispute that Defendants were "controlling persons" for the purposes of Section 20(a), the Court should sustain the Complaint's Section 20(a) allegations. *S.E.C. v. Evolution Capital Advisors, LLC*, 866 F. Supp. 2d 661, 679 n.1 (S.D. Tex. 2011).

## VII.    CONCLUSION

For the foregoing reasons, the Court should deny the motion to dismiss in its entirety.[53]

Dated: December 10, 2018                Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ *Laurence M. Rosen*
Laurence M. Rosen (*pro hac vice*)
Phillip Kim (*pro hac vice*)
275 Madison Avenue, 34th Floor
New York, NY 10116
Telephone: 212-686-1060
Facsimile:  212-202-3827
Emails:      lrosen@rosenlegal.com
                  pkim@rosenlegal.com

*Lead Counsel for Plaintiff and the Class*


**STECKLER GRESHAM COCHRAN PLLC**

/s/ *R. Dean Gresham*
R. Dean Gresham
Texas Bar No. 24027215
Bruce W. Steckler
Texas Bar No. 00785039
L. Kirstine Rogers
Texas Bar No. 24033009
12720 Hillcrest Road, Suite 1045
Dallas, TX 75230
Telephone: 972-387-4040
Facsimile:  972-387-4041
Emails:      dean@stecklerlaw.com
                  krogers@stecklerlaw.com

*Liaison Counsel for Plaintiff and the Class*

---

[53] To the extent the Court grants Defendants' Motion to Dismiss, Plaintiff respectfully requests leave to re-plead.

-and-

**MOTLEY RICE LLC**
Marlon E. Kimpson
Joshua C. Littlejohn
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: 843-216-9000
Facsimile:  843-216-9450
Emails:      mkimpson@motleyrice.com
                jlittlejohn@motleyrice.com

*Additional Counsel for Plaintiff and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 10, 2018, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

/s/ *Eduardo A. Texidor, Jr.*
Eduardo A Texidor, Jr.
