# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT EDGAR, Individually and On Behalf of All Others Similarly Situated, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No. 4:17-CV-1372 |
| ANADARKO PETROLEUM CORPORATION, R. A. WALKER, and ROBERT G. GWIN, | § § § § | |
| Defendants. | § § | |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR
## MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

Noelle M. Reed
Fed. Bar No.: 27139
Texas Bar No.: 24044211
Email: Noelle.Reed@Skadden.com
Skadden, Arps, Slate,
   Meagher & Flom LLP
1000 Louisiana Street, Suite 6800
Houston, Texas  77002
Tel:  (713) 655-5122
Fax:  (713) 483-9122

*Attorney-in-Charge for Defendants*
*Anadarko Petroleum Corporation, R. A.*
*Walker, and John M. Christiansen*

*Of Counsel:*
Jay B. Kasner
(*Admitted Pro Hac Vice*)
Email: Jay.Kasner@Skadden.com
Susan L. Saltzstein
(*Admitted Pro Hac Vice*)
Email: Susan.Saltzstein@Skadden.com
Skadden, Arps, Slate,
   Meagher & Flom LLP
4 Times Square
New York, New York  10036-6522
Tel:  (212) 735-3000
Fax:  (212) 735-2000

# TABLE OF CONTENTS

SUMMARY ............................................................................................................1

ARGUMENT .........................................................................................................4

I.  Plaintiff has not pled any material misrepresentation or omission. ....................4

    A.  This Court's ruling regarding a different complaint with different allegations is not the law of the case. ...........................................................4

    B.  Plaintiff cannot manufacture an *Omnicare* claim by ignoring the actual language in Anadarko's 10-K statements. ................................................6

    C.  A general statement in a brochure about the IOC's monitoring *capabilities* was not a representation that each well was *actually* being monitored at all times. ......................................................................................................7

    D.  Plaintiff has not pleaded facts suggesting that the challenged statements were false. ........................................................................................9

        1.  Rule 1102.a:  Anadarko's alleged failure to detect leaks during well inspections was not itself an unsafe "condition." ...........................10

        2.  Rules 1101.a and 1102.d:  Plaintiff cannot switch liability theories in its Opposition. .....................................................................................12

            (a)  1101.a:  Plaintiff failed to plead that nonmetallic pipelines lacked tracer lines. ...........................................................12

            (b)  1102.d:  Plaintiff cannot convert its unsupported regulatory violation into a statutory violation. ..................................12

        3.  Rule 1101.e:  Plaintiff cannot rewrite a rule that requires pressure testing for only *some* flowlines into one that requires it for *all* flowlines. .................................................................................................13

        4.  Rule 1103:  Inactive wells are not abandoned wells. ....................14

    E.  Investors do not rely on representations in underwriting agreements. ..................16

II.  Plaintiff has failed to plead a strong inference of scienter against any Defendant. ...........16

    A.  Vague references to documents that "would" have been shared with speakers do not show scienter. ..............................................................18

        1.  Plaintiff does not identify any document that actually mentioned or warned of regulatory violations. ............................................................18

i

        2.       Plaintiff's speculation that Defendants even received the documents is insufficient to plead scienter. ................................................19

    B.     Vague references to meetings that speakers may have attended at some unspecified time do not show scienter. ..................................................................20

        1.       Plaintiff has abandoned its theory that the speakers were told about regulatory violations at these meetings.....................................................20

        2.       Plaintiff does not place a single speaker at a single meeting before the alleged misrepresentations where alleged safety and budgeting issues were discussed. ................................................................22

    C.     Plaintiff's inability to explain when the speakers learned of the alleged operational issues further undercuts an inference of scienter. ...............................22

    D.     The securities laws did not require Anadarko's executives to confirm in advance that Anadarko had complied with every applicable law.........................24

    E.     Plaintiff fails to plead a speaker or allege scienter for the alleged IOC Factsheet statements..............................................................................................26

    F.     Plaintiff's new motive theory does not support any inference of scienter............27

III.    The Section 20(a) claim should be dismissed.................................................................28

CONCLUSION.............................................................................................................................28

## **TABLE OF AUTHORITIES**

### **CASES**

<u>Pages</u>

*Abrams v. Baker Hughes, Inc.*,
　292 F.3d 424 (5th Cir. 2002) ...............................................................24, 26, 28

*In re Anadarko Petroleum Corp. Class Action Litigation*,
　957 F. Supp. 2d 806 (S.D. Tex. 2013) ...............................................26

*Arizona v. California*,
　460 U.S. 605 (1983)..........................................................................5

*In re BP p.l.c. Securities Litigation*,
　843 F. Supp. 2d 712 (S.D. Tex. 2012) ...............................................25

*In re Capstead Mortgage Corp. Securities Litigation*,
　258 F. Supp. 2d 533 (N.D. Tex. 2003) ...............................................17

*Coach, Inc. v. Angela's Boutique*,
　No. H–10–1108, 2011 WL 2634776 (S.D. Tex. July 5, 2011)................ *passim*

*Conway v. Chemical Leaman Tank Lines, Inc.*,
　644 F.2d 1059 (5th Cir. 1981) ...........................................................4

*Cosmas v. Hassett*,
　886 F.2d 8 (2d Cir. 1989)...................................................................26

*Dawes v. Imperial Sugar Co.*,
　975 F. Supp. 2d 666 (S.D. Tex. 2013) ...............................................24

*Employees' Retirement Systems v. Whole Foods Market Inc.*,
　905 F.3d 802 (5th Cir. 2018) .............................................................9

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*,
　238 F. Supp. 3d 799 (S.D. Tex. 2017) ...............................................14

*Flaherty & Crumrine Preferred Income Fund v. TXU Corp.*,
　565 F. 3d 200 (5th Cir. 2009) ...........................................................17

*Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
　537 F.3d 527 (5th Cir. 2008) .............................................................3, 17

*Institutional Investors Group v. Avaya, Inc.*,
　564 F.3d 242 (3d Cir. 2009)...............................................................25

*ITT Educational Services, Inc. Securites Shareholder & Derivative Litigation*,
    859 F. Supp. 2d 572 (S.D.N.Y. 2012)..................................................................9

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ...........................................................................8

*In re Mylan N.V. Securities Litigation*,
    No. 16-CV-7926 (JPO), 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018)...........................26

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)...........................................................................25

*Oklahoma Firefighters Pension & Retirement System v. Capella Education Co.*,
    873 F. Supp. 2d 1070 (D. Minn. 2012)...............................................................9

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    135 S. Ct. 1318 (2015).............................................................................6, 7

*Owens v. Jastrow*,
    789 F.3d 529 (5th Cir. 2015) ........................................................................19

*In re Plains All American Pipeline, L.P. Securities Litigation (Plains I)*,
    245 F. Supp. 3d 870 (S.D. Tex. 2017) .......................................................16, 28

*In re Plains All American Pipeline, L.P. Securities Litigation (Plains II)*,
    307 F. Supp. 3d 583 (S.D. Tex. 2018) ............................................16, 19, 20, 23

*Quicksilver Resources, Inc. v. Eagle Drilling LLC*,
    No. CIV.A. H-08-868, 2008 WL 3165745 (S.D. Tex. Aug. 4, 2008) ................................5

*R2 Investments LDC v. Phillips*,
    401 F.3d 638 (5th Cir. 2005) ........................................................................20

*Retail Wholesale & Department Store Union Local 338 Retirement Fund v. Hewlett-Packard*,
    845 F.3d 1268 (9th Cir. 2017) ........................................................................6

*Rittgers v. United States*,
    131 F. Supp. 3d 644 (S.D. Tex. 2015) ................................................................5

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...............................................................................21, 23

## OTHER AUTHORITIES

Charles Alan Wright, et al., *Federal Practice and Procedure* § 4478.1 (2d ed. 2002)…………...5

## SUMMARY

Plaintiff's Opposition to Defendants' Motions to Dismiss abandons the core accusations of its Second Amended Complaint, and improperly replaces them with speculation and unsubstantiated theories that defy plausibility.[1]  For example, while the Second Amended Complaint based its primary argument regarding Anadarko's regulatory compliance on alleged issues with Anadarko "wells," the Opposition, unable to reconcile the discrepancy between these claims and the actual regulations, now tries to reframe these as issues with "flowlines."  But Plaintiff itself distinguished these terms in its "glossary," and the regulations distinguish them as well.  (SAC ¶¶ 60-61, 65.)  Plaintiff similarly retreats from its allegation in the Second Amended Complaint that Defendants "callously disregarded *known, widespread* violations."  (SAC ¶ 30 (emphasis added).)  Unable to identify any violation that was either "known" or "widespread," Plaintiff instead asks this Court to infer that Defendants acted "recklessly."  This change of tack—much like the shift in emphasis from "wells" to "flowlines"—ignores the Second Amended Complaint and invents new theories.  In each of its three attempts to plead a claim, the most Plaintiff and its confidential witnesses could claim was that the Individual Defendants *might* have attended certain meetings at which operational issues (not regulatory violations) *might* have been discussed.  The Opposition now unequivocally—and without any factual support—asserts that the Individual Defendants were present at such meetings.  But Plaintiff must defend the Second Amended Complaint it actually filed.  It cannot avoid dismissal with alleged facts and theories it was not able to, and did not, actually plead in its three attempts at drafting a complaint.

---

[1]    "Opposition" or "Opp." refers to the Corrected Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Amended Class Action Complaint (Docket No. 72).  "Motion" or "Mot." refers to Defendants' Motion to Dismiss the Second Amended Class Action Complaint (Docket No. 65).  Other defined terms have the same meaning as in the Motion.

Plaintiff's maneuvering cannot conceal the fundamental fact that the Second Amended Complaint fails to plead either a material misrepresentation or the required strong inference of scienter.  Working backward from the Firestone incident, Plaintiff attempts to reverse engineer a claim that Anadarko was operating in violation of multiple Colorado regulations.  But Plaintiff has not identified any government regulatory finding or notice of violation to Anadarko.  Instead, Plaintiff has tried to cobble together regulatory violations based on its *ex post facto* comparison of alleged operational issues—as purportedly identified by confidential witnesses who are not alleged to be responsible for Anadarko's regulatory compliance—with specific regulations.  But Plaintiff cannot fit its alleged facts into the actual language of those regulations.  For instance, Plaintiff now concedes, as it must, that Colorado Rule 1101.e does not apply to every flowline.  But the Second Amended Complaint assumed that it did, and premised the claimed violation of that regulation on that incorrect assumption.  (*Compare* Opp. at 17-18 *with* SAC ¶ 161.)  Nor does Plaintiff dispute in its Opposition that inactive wells are different from abandoned wells, although the Second Amended Complaint incorrectly assumes the terms mean the same thing.  These distinctions are dispositive, as the allegation that Anadarko failed to plug and seal thousands of abandoned flowlines collapses if the underlying assumptions—that wells are flowlines and that inactive means abandoned—are incorrect.  Likewise, Plaintiff's theory that the IOC Factsheet contained an actionable misstatement ignores what the Factsheet actually said.  The Factsheet described the IOC's monitoring *capabilities*, but Plaintiff's analysis proceeds as if the Factsheet described the actual monitoring of specific wells, ignoring the plain language of the Factsheet.

The Second Amended Complaint also fails to plead the required strong inference of scienter—which, in this case, hinges on the assumption that the Individual Defendants were able

to link vague safety and operational issues to specific Colorado regulations that even Plaintiff continues to confuse and mischaracterize.  Plaintiff does not allege that any Individual Defendant was ever told that Anadarko was violating any law or regulation.  Plaintiff instead contends that the Individual Defendants should have somehow divined from operational updates that Anadarko was violating several highly specific Colorado flowline regulations.  But Plaintiff does not, and cannot, explain how senior executives should have connected these dots.  Compounding Plaintiff's problem, the Second Amended Complaint alleges that when "operational issues" were discussed at unspecified meetings on unidentified dates, Anadarko's Colorado employees were instructed to resolve them on a local level.  Even under Plaintiff's highly tenuous theory, the more plausible inference is that the Individual Defendants believed that if there were any compliance issues, they were being addressed and resolved locally.

Plaintiff is left with the argument that the Individual Defendants *should have* undertaken an investigation to verify independently Anadarko's compliance with every applicable law.  That is, of course, both unreasonable and fundamentally inconsistent with the entire concept of scienter, which focuses on the information that was actually available to speakers, not on what they should have uncovered.  *See Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) (recklessness standard requires "'not merely simple or even inexcusable negligence,'" but rather "'an extreme departure from the standards of ordinary care'" (citations omitted)).  And even under Plaintiff's theory, every generic statement about compliance would be stale the moment after it is made.  Indeed, Plaintiff's Opposition never acknowledges that the compliance statement website actually warned that "WE CANNOT AND DO NOT WARRANT THE ACCURACY, COMPLETENESS OR TIMELINESS OF THE INFORMATION CONTAINED HEREIN" and specifically cautioned investors that it "MAY

CONTAIN ERRORS OR MAY HAVE BECOME OUT OF DATE."  (Mot. at Reed Decl. Exs. 5-6, Terms of Use.)   In addition, Anadarko specifically advised investors of the changing regulatory landscape where "laws and regulations around HSE and sustainability are becoming even more complex and stringent."  (Mot. at Reed Decl. Ex. 7, 2015 HSES Overview at 16.)

For these and the other reasons discussed below, this lawsuit should be dismissed.

## ARGUMENT

## I.      Plaintiff has not pled any material misrepresentation or omission.

Once the Opposition's conclusory statements and demonstrably incorrect assumptions are set aside, it is clear that Plaintiff has failed to identify a single material misrepresentation or omission.

### A.      This Court's ruling regarding a different complaint with different allegations is not the law of the case.

Plaintiff misconstrues the "law-of-the-case" doctrine when it argues that this Court should rely on portions of its prior decision dismissing a different complaint to decline to review Plaintiff's current claim that a statement in the HSES Overviews was false.  (Opp. at 11-12.)

The Second Amended Complaint does not provide the Plaintiff with the free pass it seeks.  The law-of-the-case doctrine serves to "preclude a reexamination of issues decided on appeal, either by the district court on remand or by the appellate court itself upon a subsequent appeal."  *Conway v. Chem. Leaman Tank Lines, Inc.*, 644 F.2d 1059, 1061 (5th Cir. 1981).  But no issue in this case has been decided on appeal or otherwise.  Plaintiff elected to replead its case after dismissal, including the factual allegations underlying its claim of falsity.  For example, Plaintiff now alleges that Anadarko violated a series of regulations that were never even mentioned in the prior complaint.  (SAC ¶ 90.)  Because the Second Amended Complaint contains new allegations, Defendants are entitled to a full and fair evaluation of those allegations

4

and their deficiencies.   And the Court is not considering the same issues as in the prior complaint, but is evaluating whether the new complaint states a claim.  Plaintiff does not explain why a ruling based on superseded allegations about the HSES Overviews should foreclose this Court's considered review of Plaintiff's new allegations regarding those statements.  (*See, e.g.*, SAC ¶¶ 228-31.)

In any event, the "amorphous" law-of-the-case doctrine is purely discretionary.  *Arizona v. California*, 460 U.S. 605, 618 (1983); *see also* Charles Alan Wright, et al., *Fed. Practice and Procedure* § 4478.1 (2d ed. 2002) (under the law-of-the-case doctrine, "[p]retrial rulings may be reconsidered . . . during continuing pretrial proceedings").  Plaintiff's authority does not suggest that this doctrine should apply when the Court is considering successive motions to dismiss.  *Quicksilver* applied the doctrine to end a venue dispute because "finality in venue disputes" promotes faster resolution of issues.  *Quicksilver Res., Inc. v. Eagle Drilling LLC*, CIV.A. No. H-08-868, 2008 WL 3165745, at *5 (S.D. Tex. Aug. 4, 2008).  *Rittgers* merely acknowledged that, once the court resolved one defendant's motion to dismiss, that ruling might affect the claims against another defendant that had not yet appeared.  *Rittgers v. United States*, 131 F. Supp. 3d 644, 647 n.1 (S.D. Tex. 2015).  Neither situation is present here.

Accordingly, this Court is free to consider whether Plaintiff has pleaded sufficiently that statements in the HSES Overviews about legal compliance were representations of absolute compliance.  As detailed in the Motion, reasonable investors would not have interpreted these statements as guarantees of perfect regulatory compliance.  (Mot. at 10-11.)  The Ninth Circuit has rejected a similar claim, holding that statements in a company's code of ethics that "we make ethical decisions," "maintain accurate business records," and "create business records that accurately reflect the truth of the underlying transaction or event" were aspirational statements

rather than material representations to the market.  *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1273, 1276-78 (9th Cir. 2017).  A contrary ruling was "simply untenable, as it could turn all corporate wrongdoing into securities fraud."  *Id.* at 1276.  Plaintiff offers no response to this point.  Likewise, this Court ought to consider whether Plaintiff has pleaded sufficiently that this representation (and the others cited in the Second Amended Complaint) were materially misleading.  As explained below, they were not.

**B.      Plaintiff cannot manufacture an *Omnicare* claim by ignoring the actual language in Anadarko's 10-K statements.**

Anadarko's 2015 10-K statement that "[t]he Company believes that it is in material compliance with existing environmental and occupational health and safety regulations" is a classic statement of opinion.  (SAC ¶ 226.)  Plaintiff cannot clear *Omnicare*'s high bar for challenging opinion statements.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1332 (2015).  Plaintiff barely addresses the *Omnicare* standard and makes no attempt to argue that the speaker, Mr. Walker, did not actually believe this statement of opinion.  (Opp. at 31-32.)[2]  In addition, Plaintiff fails to even allege that the Colorado regulatory violations would be considered "material" in the context of Anadarko's worldwide operations.  A "belief" of "material" compliance necessarily encompasses the possibility of noncompliance.  Plaintiff's claim fails for this reason alone.

Plaintiff argues in its Opposition—though this theory does not appear in the Second Amended Complaint—that Mr. Walker should have investigated the accuracy of this opinion before stating it.  But *Omnicare* requires *Plaintiff* to demonstrate that the statement "conflict[s]

---

[2]      Section II *infra* also demonstrates why the Second Amended Complaint fails to adequately plead that Mr. Walker did not subjectively believe this opinion.

with what a reasonable investor would take from the statement itself" when read in context.  *Id.* at 1329.  Plaintiff notes that, under *Omnicare*, an opinion statement must "fairly align" with the information the speaker knows (Opp. at 31), but ignores the Court's warning that a statement is not misleading when a speaker merely "knows, but fails to disclose, some fact cutting the other way."  *Omnicare*, 135 S. Ct. at 1329 ("Reasonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty.").  As the Motion explained, the language of the statement itself rendered this opinion not materially misleading under *Omnicare*—particularly in light of Plaintiff's failure to plead material compliance issues. (Mot. at 8-9.)  The Opposition offers no response to this, a fatal omission under the mandate of *Omnicare*.

> ### C.   A general statement in a brochure about the IOC's monitoring *capabilities* was not a representation that each well was *actually* being monitored at all times.

Plaintiff's interpretation of the IOC Factsheet's statements that the IOC "provides real-time monitoring capabilities for 6,800+ wells" and "enables employees to shut wells in remotely" relies on a distortion of those statements.  (Opp. at 34-35; Mot. at Reed Decl. Ex. 4, IOC Factsheet.)  Defendants never represented that all wells were being actively monitored at all times.  Instead, these statements described the *capabilities* of the IOC.  As this Court has concluded, "[t]he statement represents that Anadarko could instantaneously identify issues associated with field alerts and alarms, not that field alerts and alarms would go off if there was an issue in each of Anadarko's wells or lines."  (Order (Docket No. 53) at 25-26.)

Unable to dispute that this is what the IOC Factsheet actually says, Plaintiff tries to sidestep it.  First, Plaintiff sets up the strawman argument that, according to the Motion, Anadarko was boasting that it had purchased software and computers but was not using them.

(Opp. at 35.)  The Motion, of course, does not say this.  More to the point, however, the Second Amended Complaint acknowledges that the IOC was being used to monitor thousands of wells. (SAC ¶ 219.)

Second, Plaintiff contends that a reasonable investor somehow would have failed to consider the "literal truth" of the IOC Factsheet—in other words, Plaintiff's argument is premised on an assumption that a reasonable investor would have misread a relatively simple and straightforward statement.  (Opp. at 35.)  But the IOC Factsheet is entirely consistent with Anadarko's other statements.  Anadarko represented that it operated only 6,000 wells in the Wattenberg Field.  But the IOC Factsheet stated that the IOC had the capacity to monitor 6,800+ wells.  Any reasonable investor would have readily seen that the first was a statement about Anadarko's actual activity, while the second was a description of the IOC facilities' capacity. (Mot. at 9-10.)  Plaintiff's main response is that a reasonable investor would not have reviewed all of these statements.[3]  (Opp. at 35-36.)  But Plaintiff's own authority rejects Plaintiff's cherry-picking approach to liability:  courts must focus on "the 'total mix' of information made available" rather than on isolated statements taken out of context.  *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009) (quoting *Basic v. Levinson*, 485 U.S. 224, 231–32 (1988)). Indeed, a bedrock principle of the fraud on the market doctrine is that the market reflects "all publicly available information."  *Basic*, 485 U.S. at 245-46.

---

[3]    Plaintiff speculates that, because the number of wells that Anadarko operated fluctuated, the IOC's reference to 6,800 wells was merely a reference to the "high-water mark."  (Opp. at 35-36.)  But the IOC Factsheet and 2015 10-K (which stated that Anadarko was operating only 6,000 wells) were published within nine days of each other.  And none of the other 10-Ks stated that Anadarko operated more than 6,550 wells.  (Opp. at 36 n.52.) Plaintiff's conjecture that investors would have assumed that the discrepancy between the operated wells and the system's capacity must have referred to inactive or shut-in wells ignores the IOC Factsheet's focus on "managing Anadarko's operations."  (Mot. at Reed Decl. Ex. 4, IOC Factsheet at 1.)

**D.      Plaintiff has not pleaded facts suggesting that the challenged statements were false.**

The starting point for Plaintiff's claims based on Anadarko's statements about regulatory compliance must be allegations sufficient to show that the statements were false.  But the Second Amended Complaint does not make it out of this starting block.  It does not identify any government finding or citation of any regulatory violation.  As an initial matter, in the absence of a prior governmental finding, or at least notice, of noncompliance with Colorado regulations, Plaintiff cannot plead that Anadarko's compliance statement was false at the time it was made.[4] Instead, Plaintiff asks the Court to adopt a daisy chain of inferences to conclude that there "must have been" technical regulatory violations that rendered Anadarko's statements false.   In response to Defendants' Motion detailing the gaps in that chain, Plaintiff has now abandoned or transformed its theories of regulatory violations.   These maneuvers cannot save the Second Amended Complaint.  More importantly, they demonstrate that the securities laws are not the appropriate avenue to attempt to seek redress for alleged noncompliance with highly technical governmental laws and regulations when they have not alleged that the regulators charged with enforcing those laws have adopted or endorsed their interpretation of these regulations.

---

[4]      The Fifth Circuit's recent *Whole Foods* decision underscored the importance of the falsity requirement.  *See Employees' Ret. Sys. v. Whole Foods Mkt. Inc.*, 905 F.3d 892 (5th Cir. 2018).  Whole Foods had admitted that it had violated consumer protection laws concerning weights and measures, yet those violations were not sufficient to create 10b-5 liability in the absence of a false statement.  *Id.* at 901.  Here, Plaintiff does not even allege that regulators put Anadarko on notice of any regulatory violations.  Courts have cited the absence of such allegations in dismissing 10b-5 claims based on alleged misrepresentations about legal compliance.  *See, e.g.*, *Okla. Firefighters Pension & Ret. Sys. v. Capella Educ. Co*., 873 F. Supp. 2d 1070, 1082 (D. Minn. 2012) ("[A]lthough the Complaint alleges that [defendant] was not in compliance with certain existing regulations during the Class Period, it does not allege that the [Department of Education], Congress, or any other oversight body had found [defendant] to be in such violation."); *In re ITT Educ. Servs., Inc. Sec. S'holder & Derivatives Litig*., 859 F. Supp. 2d 572, 581 (S.D.N.Y. 2012) ("The Complaint itself never alleges that [the company] was ever found to be in noncompliance at any point during the Class Period.").

1. **Rule 1102.a:  Anadarko's alleged failure to detect leaks during well inspections was not itself an unsafe "condition."**

Plaintiff's own glossary makes clear that flowlines and wells are not the same.  (*Compare* SAC ¶ 60 (defining flowlines) *to id.* ¶¶ 61, 65 (defining horizontal and vertical wells).) According to Plaintiff, a well extends from the surface to a source of oil and gas reserves.  A flowline, on the other hand, is an underground pipe "through which oil or gas travels *from a well* to processing equipment or storage."  These definitions are Plaintiff's allegations, which the Court is obliged to accept as true in deciding Defendants' Motion.  But Plaintiff has now cast aside its defined terms—and asks the Court to do the same—in order to divine a violation of a Colorado rule governing *pipelines* based entirely on alleged issues with *wells*.

Rule 1102.a(2) states that "[w]henever an operator *discovers* any condition that could adversely affect the safe and proper operation of its *pipeline*, it shall correct it within a reasonable time."  (SAC ¶ 90 (emphasis added).)  In moving to dismiss, Defendants pointed out that "Rule 1102.a concerned pipeline safety, not well safety."  (Mot. at 14.)  Rather than identify pipeline issues, the Second Amended Complaint focused on issues concerning only wells, alleging that they were not up to code, lacked methane emissions controls, needed upgraded piping and oil storage tanks, or had deteriorated cellar and cement pits.  (SAC ¶ 98; Opp. at 26.) Without an allegation that Defendants discovered a *pipeline* safety condition, Plaintiff has not pled a violation of Rule 1102.a.

Evidently, Plaintiff recognized the disconnect in its pleading.  Now, in its Opposition, and for the first time, Plaintiff tries to shoehorn "flowlines" into its earlier allegations after the fact by repeatedly using the term "wells' flowlines," a phrase that appears nowhere in the Second Amended Complaint.  Grasping for support, the Opposition cites eight paragraphs in the Second Amended Complaint that supposedly show Anadarko knew of safety conditions with its

"flowlines." (Opp. at 25-26.)  But none of these paragraphs alleges a flowline issue, as Plaintiff suggests, much less a *pipeline* issue, as the Rule requires.  (*See* SAC ¶¶ 85, 108 (statements about pricing), 98 (discussing "the problems with the wells"), 111-12 ("efforts to remediate the Noble Wells"), 131 ("Even where Anadarko's pumpers did inspect a well…"), and 148 (noting "work plugging and abandoning Anadarko's wells" and "Unknown Flowline Wells").) Paragraph 166 mentions "flowlines," but only in the context of a discussion about Rule 1101.e. Plaintiff's impermissible attempt at amendment through an Opposition brief ought to be rejected. *Coach, Inc. v. Angela's Boutique*, Civ. A. No. H–10–1108, 2011 WL 2634776, at *2 (S.D. Tex. July 5, 2011) (Rosenthal, J.) (denying a motion to reconsider grant of motion to dismiss because "[a]llegations contained in a response to a motion to dismiss are not appropriately considered in a Rule 12(b)(6) motion").

Plaintiff also reads the "discovers" requirement out of Rule 1102.a—even in its own quote of the rule.  Rather than confront the rule's text, Plaintiff devotes its discussion to rebutting a strawman argument that the rule applies only to known *leaks*.  (Opp. at 26-27.)  No one is suggesting that the rule applies only to known *leaks*, but Plaintiff's reading of the rule departs entirely from the text.  The rule's specific language requires the discovery of an unsafe *condition*.  Under Plaintiff's tortured reading, Anadarko's alleged well inspection rates and remediation budget constituted the discovery of a "condition" that adversely affected the safe operation of the pipeline.  (Opp. at 26.)  But the "condition" requirement of Rule 1102.a plainly does not encompass a company's operational or budgetary issues.  Rather, this language refers to the condition of the actual physical system.  If Colorado's regulators intended to regulate inspection rates and budgetary issues in Rule 1102.a, they would have done so.  Instead, Rule 1102.a is entitled "Maintenance" and Subsection 1102.b (entitled "Repairs") discusses the

specific requirements for pipeline repairs.  The Second Amended Complaint does not allege that Defendants discovered *any* specific issue (leak or otherwise) with any specific pipeline.  Generic allegations of budget cuts and overall inspection rates for wells do not state a Rule 1102.a violation.

### 2. Rules 1101.a and 1102.d:  Plaintiff cannot switch liability theories in its Opposition.

Continuing the pattern, the Opposition's discussion of Rule 1101.a and 1102.d also fails to track the allegations in the actual Second Amended Complaint.

### (a) 1101.a:  Plaintiff failed to plead that nonmetallic pipelines lacked tracer lines.

Plaintiff's Opposition acknowledges that "rule 1101 a. required the Company to affix a metallic tracer line to every *nonmetallic pipe*."  (Opp. at 18.)  Yet the Opposition never grapples with the deficiencies described in Defendants' Motion.  (Mot. at 14-15.)  First, Plaintiff nowhere alleged that any applicable pipes were nonmetallic.  Second, Plaintiff's allegations are that *wells*, not pipelines, lacked tracer lines.  (*See, e.g.*, SAC ¶¶ 126, 130-31.)

### (b) 1102.d:  Plaintiff cannot convert its unsupported regulatory violation into a statutory violation.

The Opposition's discussion of Rule 1102.d is a complete departure from the allegations in the Second Amended Complaint.  The Second Amended Complaint alleges that Anadarko violated Rule 1102.d, which Plaintiff claimed "requires operators to register their flowlines with Colorado's 811 line locator number."  (SAC ¶¶ 90, 146.)  Tellingly, the Second Amended Complaint never quoted the rule, which actually reads:

> ***One Call participation.***  As to any pipelines over which the Commission has jurisdiction, each operator shall become a member of the Utility Notification Center of Colorado and participate in Colorado's One Call notification system, the requirements of which are established by §9-1.5-101., C.R.S. et seq.

(Mot. at Reed Decl., Ex. 3 at 1100-02.)   The rule itself contains no requirement to register flowlines themselves, but instead mandates participation in One Call—hence the boldfaced title "One Call participation."   As Defendants' Motion explained, Plaintiff's allegations about knowledge of flowlines do not state a violation of a rule whose sole mandate is participation in a hotline system.

Plaintiff now attempts to remedy this problem by stating that Anadarko actually violated a statutory section *mentioned* in the rule, but not the rule itself.  (Opp. at 18-19.)  Not only did Plaintiff fail to allege the supposed statutory violation anywhere in the Second Amended Complaint, its Opposition did not even quote the part of the rule that cites the statute.  Plaintiff cannot conflate the One Call rule with a different statute to allege a different violation in its Opposition.  *Coach*, 2011 WL 2634776, at *2.

### 3. Rule 1101.e:  Plaintiff cannot rewrite a rule that requires pressure testing for only *some* flowlines into one that requires it for *all* flowlines.

Plaintiff's Opposition fails to address the fundamental problems with the Second Amended Complaint's theory of how Rule 1101.e was violated.  Plaintiff's allegations again concerned wells, not flowlines.  (SAC ¶ 161.)  Defendants' Motion explained—and Plaintiff does not dispute—that this rule applies only to flowlines.  (Mot. at 16-17.)  While Plaintiff now contends that it meant to refer to flowlines (Opp. at 16 n.15), Plaintiff's entire theory rests on what FE 7 supposedly said.  And according to Plaintiff, FE 7 stated that Anadarko had refused to test all of its *wells* every year.  (SAC ¶ 161.)   Plaintiff cannot use its Opposition to add allegations that are inconsistent with what its own confidential witness allegedly said.

Moreover, Plaintiff's theory also rests on the flawed premise that Rule 1101.e absolutely requires operators to test every flowline every year.  Defendants' Motion explained why that is incorrect: the rule itself contains numerous exceptions to the annual pressure testing requirement,

including exceptions for flowlines on non-producing wells; flowline segments operating at less than 15 PSIG; gathering lines; and flowlines within a continuous monitoring program. (Mot. at 17-18.) Plaintiff does not dispute any of this. It merely argues that the Court cannot assume at the motion to dismiss stage that regulators had approved Anadarko's continuous monitoring program and contends that they had not approved the system. (Opp. at 17-18.) But even leaving aside the continuous monitoring program, the other exceptions clearly refute the fundamental and necessary premise of Plaintiff's argument that all flowlines had to be pressure tested annually. Plaintiff cannot plead a misstatement with particularity when its entire theory depends on a faulty legal premise. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 238 F. Supp. 3d 799, 814-15 (S.D. Tex. 2017) (dismissal appropriate "where the plaintiff fails to allege a cognizable legal theory").

### 4.  Rule 1103:  Inactive wells are not abandoned wells.

Defendants' Motion explained how Plaintiff was conflating "abandoned" and "inactive" wells in its attempt to plead a regulatory violation. Borrowing the definition of an "inactive" well, Plaintiff assumed that any well out of operation for a year was abandoned. But as Defendants explained—and Plaintiff does not dispute—inactive wells are *not* abandoned wells. If Plaintiff is applying the wrong legal standard to identify wells allegedly subject to Rule 1103, it necessarily has not provided particularized facts supporting its legal conclusion of a regulatory violation.

Plaintiff tries to finesse this by claiming that Anadarko maintained a list of wells "to abandon." (SAC ¶ 169; Opp. at 16.) But by definition, a well that Anadarko intended to abandon had not actually been abandoned. Nor does the designation of a well "to abandon" translate to a safety or other regulatory issue; on the contrary, a well might be set for abandonment because of low performance or other economic considerations. The only legal

14

hook Plaintiff provides for why these wells were abandoned is its incorrect assumption that all inactive wells were also abandoned wells.  Because that premise is demonstrably incorrect, these allegations do not support an inference that any of these wells had already been abandoned.

Next, Plaintiff asserts that after the Firestone Incident, the Colorado Governor ordered operators to inspect certain active and abandoned gas lines and cut and seal abandoned lines. Because Anadarko allegedly cut and sealed more than 2,400 flowlines in response to that directive, Plaintiff speculates that these must have been previously-abandoned flowlines that should have been cut and sealed earlier.  (Opp. at 15-16.)  But the Governor's order specifically provided that "[l]ines that have been either abandoned *or* are not in use must be inspected within 30 days and abandoned under current rules within 60 days."  (Opp. at Horne Decl. Ex. B, May 2, 2017 Colo. Gov. Press Release (emphasis added).)   That Anadarko subsequently chose to abandon and seal flowlines does not support an inference that these flowlines had been abandoned *before* the alleged misstatements at issue.  Anadarko's own statement on this point confirms this.  Anadarko announced that "2400+ *inactive* steel flowlines have been disconnected and cement plugged as required for abandonment."[5]  True to form, Plaintiff attempts to rewrite this statement, alleging incorrectly that "Anadarko admitted that it had failed to properly seal thousands of abandoned flowlines, announcing that it had cut and sealed more than 2,400 abandoned flowlines"  (Opp. at 16.)  Defendants have established that in the Colorado regulatory scheme, the words "inactive" and "abandoned" have distinct meaning.  Plaintiff cannot rely on ignoring that distinction to save its claim in the Second Amended Complaint that flowlines

---

[5]    *See* Colorado  Response,  https://www.anadarko.com/Operations/Upstream/Colorado/Colorado-Response/  (last visited on January 9, 2019) (emphasis added).

sealed after Firestone were abandoned before Firestone.  *In re Plains All Am. Pipeline, L.P. Sec. Litig. (Plains I)*, 245 F. Supp. 3d 870, 911 (S.D. Tex. 2017).

> ### E.      Investors do not rely on representations in underwriting agreements.

Plaintiff does not deny that *Plains II* addressed the precise issue concerning underwriting agreements presented in this case.  In *Plains II*, this Court concluded that statements made in underwriting agreements are not "statements of certainty made to the investing public."  *In re Plains All Am. Pipeline, L.P. Sec. Litig. (Plains II)*, 307 F. Supp. 3d 583, 638 (S.D. Tex. 2018).  Here too, the published underwriting agreement was not investor-facing, but contained specific representations that were for the benefit of the underwriters.  (SAC ¶ 232.)

Plaintiff asks this Court to reconsider its decision based on authority involving merger agreements that Plaintiff contends was not considered in *Plains II*.  (Opp. at 32-33.)  But *Plains II* discussed similar case law and still concluded that underwriting agreements were not investor-facing.  *Id.* at 637 (citing *Jaroslawicz v. M & T Bank Corp.*, Civ. A. No. 15-897-RGA, 2017 WL 1197716, at *5 (D. Del. Mar. 30, 2017)).  Plaintiff provides no reason for this Court to revisit *Plains II* at this time.[6]

## II.      Plaintiff has failed to plead a strong inference of scienter against any Defendant.

After this Court dismissed Plaintiff's prior complaint, the most noteworthy addition to Plaintiff's Second Amended Complaint was a bold allegation:  Defendants had "callously disregarded *known, widespread violations* of the Commission's rules that endangered the Colorado communities in which Anadarko did business."  (SAC ¶ 30 (emphasis added).)  Defendants' Motion pointed out that Plaintiff never alleged "that anyone actually told the

---

[6]     Plaintiff's belated theory that statements in the underwriting agreement can be attributed to Walker (Opp. at 34) cannot be considered at this late stage.  *Coach, Inc. v. Angela's Boutique*, No. H–10–1108, 2011 WL 2634776, at *2 (S.D. Tex. July 5, 2011) (Rosenthal, J.).

speakers that Anadarko was violating any laws." (Mot. at 20.) In response, Plaintiff downgraded its scienter theory to an allegation that Defendants recklessly ignored regulatory violations that *they should have* known about. (*See, e.g.*, Opp. at 12–14.)

Plaintiff's backtracking does not save its case, for even allegations of recklessness must satisfy demanding requirements. Pleading that a defendant "should have known" is not enough. *See In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 564 (N.D. Tex. 2003) (citation omitted). Plaintiff must plead severe recklessness involving "'not merely simple or even inexcusable negligence,'" but rather "'an extreme departure from the standards of ordinary care.'" *Shaw Grp.*, 537 F.3d at 533 (citations omitted). This standard is met only where "'the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Flaherty & Crumrine Preferred Income Fund v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (citations omitted).

For Plaintiff's Second Amended Complaint to survive, the Court must conclude that the speakers were aware of Colorado regulatory violations that Plaintiff and its attorneys—armed with the benefit of hindsight—could not ostensibly identify until their third attempt at pleading.[7] And even on the third attempt, Plaintiff still interpreted the regulations incorrectly, missing key distinctions between wells and pipelines while misquoting the underlying rules. Raising the hurdle higher, the Second Amended Complaint lacks a single particularized allegation that any speaker was told of any actual regulatory violation, or even the risk of a potential violation. Nor does it assert that even one of the regulations at issue was ever mentioned to the speakers. Instead, Plaintiff's only scienter allegations are that the speakers *may* have attended undated

---

[7]   The Opposition makes clear that Plaintiff is alleging that only Messrs. McBride, Walker, and Christiansen were speakers. (Opp. at 10-37.)

meetings or seen undated documents discussing safety, operations, and budget issues.  (SAC ¶¶ 134, 137.)  These allegations do not create a cogent and compelling inference of scienter.

### A.    Vague references to documents that "would" have been shared with speakers do not show scienter.

Plaintiff points to five categories of documents that allegedly informed the three speakers (*i.e.*, the Individual Defendants) that the challenged statements were false.  Missing across the board is any allegation that any document signaled a regulatory violation, or any other information sufficient to show scienter.

### 1.    Plaintiff does not identify any document that actually mentioned or warned of regulatory violations.

All five categories of documents that make up Plaintiff's scienter theory share a common trait:  none identified any regulatory violations, let alone cited the Colorado regulations that the speakers are alleged to have recklessly ignored.  In response to Defendants' Motion, Plaintiff's Opposition largely restates the Second Amended Complaint's insufficient allegations without actually asserting that any of the documents telegraphed a potential regulatory violation.  (Mot. at 26-30; Opp. at 16-17, 20-22, 26.)

The Opposition's new interpretation of the Weekly Reports, which allegedly supports Plaintiff's allegation that the speakers knew that Anadarko was violating Rule 1103's requirements about sealing abandoned flowlines, also misses the mark.  (SAC ¶¶ 170-73.)  To establish a Rule 1103 violation for a flowline, a speaker would need to run through a checklist to determine, among other things, whether a given flowline had been disconnected, purged, depleted of pressure, and cut off three feet below the ground.  (Mot. at Reed Decl. Ex. 3, COGCC Regulations at 1100-03.)  But the only alleged content of the Weekly Reports is a "Plug & Abandonment List" purportedly identifying 200-350 wells "to abandon."  (SAC ¶ 169.)  This

tells the reader nothing about a Rule 1103 violation, particularly because Rule 1103 does not apply to wells until *after* they are abandoned.

Plaintiff tries to salvage its Rule 1103 allegation by alleging that "because Anadarko could not timely seal abandoned wells it identified as inoperative, the Company built up a substantial backlog on the P&A List." (SAC ¶ 179; Opp. at 16.) But the Second Amended Complaint does not allege what a "backlog" means or what it would have signaled to the speakers. Plaintiff does not plead, for instance, that any of the referenced 200-350 wells had been abandoned but not yet plugged. And the Second Amended Complaint does not allege that the list contained any information about what actually happened to the supposedly abandoned wells. These allegations do not approach the "glaring irregularities or red flags" required to plead scienter. *Plains II*, 307 F. Supp. 3d at 643 (citation omitted); *accord Owens v. Jastrow*, 789 F.3d 529, 542 (5th Cir. 2015) ("[K]nowledge and motive alone are insufficient to raise a 'strong inference' of scienter." (citation omitted)). Nor do they approach the particularity required to raise such an inference. (Order at 13 (detailing the requirement to plead "who, what, when, where, and how" under the PSLRA).)

### 2. Plaintiff's speculation that Defendants even received the documents is insufficient to plead scienter.

As explained in the Motion, and ignored in the Opposition, the Second Amended Complaint also fails to establish a cognizable inference that the speakers actually received or reviewed the documents on which Plaintiff's scienter allegations are based. Plaintiff fails to connect Mr. McBride with the PowerPoints at all, and alleges, at most, that he *might* have seen the remaining documents. (*See, e.g.*, SAC ¶ 166 (Standard Operating Procedures were "subject to" his review).) Mr. Walker's alleged exposure to documents relies entirely on conjecture that those documents made their way to him because of his role on the Executive Committee or his

status at the "highest levels" of Anadarko.  (*See, e.g.*, SAC ¶ 137 (former employee told by superiors that PowerPoints "*would* be disseminated 'up the chain' to the 'highest levels' of the company, including to Defendant Walker"); 166 (received a "list" and "description" of Standard Operating Procedures, not the procedures themselves).)  And, as explained below in Section II.E, Mr. Christiansen is not alleged to have received any documents.  None of these allegations supports a cogent and compelling inference that the speakers actually received information about regulatory violations.  *See R2 Invs. LDC v. Phillips*, 401 F.3d 638, 646 (5th Cir. 2005) (allegations of scienter must connect defendant to the documents upon which the scienter allegation is based).

## B. Vague references to meetings that speakers may have attended at some unspecified time do not show scienter.

Plaintiff also asks the Court to draw an inference of scienter from Messrs. McBride, Walker, and Christiansen's possible attendance at certain Biannual Meetings held at some unknown time before 2016.  (*See, e.g.*, SAC ¶¶ 224, 227, 230, 233, 236.)  But these alleged meetings, either alone or in combination with the documents discussed above, do not allege a cogent and compelling inference of scienter.

### 1. Plaintiff has abandoned its theory that the speakers were told about regulatory violations at these meetings.

Defendants' Motion laid out how the topics allegedly discussed at the Biannual Meetings come nowhere close to a red flag of a regulatory violation.  (Mot. at 22-26.)  *See Plains II*, 307 F. Supp. 3d at 643.  As the Opposition acknowledges (Opp. at 20-21), the Second Amended Complaint merely alleges generically that a series of safety, budget, and operational issues concerning well inspections, monitoring and control capabilities, and flowline location were discussed at these meetings.  (*See, e.g.*, SAC ¶¶ 138, 224, 227.)  But Plaintiff fails to plead that

any regulatory violation was actually discussed or disclosed, or how any of the speakers otherwise learned of alleged regulatory violations.

On the contrary, one allegation about the Biannual Meetings stands out because it supports a strong inference *against* scienter.  Plaintiff alleges, and repeats in its Opposition, that when management was advised of alleged failures to inspect wells or locate flowlines, Colorado employees were told to solve the problem "at the local level."  (Opp. at 21; SAC ¶¶ 138, 153.) Far from suggesting that the speakers knew of or ignored regulatory violations or safety hazards, this signals that a reasonable attendee would believe that problems were being addressed.  To find otherwise requires an inference that the speakers actually interpreted the discussions of operational issues to identify regulatory violations, understood that the people on the ground in Colorado were told to correct the problem, and concluded that they would not follow their orders.  At a minimum, there is no "cogent and compelling" inference that the speakers acted with intent to deceive, and certainly not one that is more compelling than any opposing inference of non-fraudulent intent, which is what *Tellabs* requires.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 310, 314, 324, 326 (2007).

Finally, the detail and complexity of the applicable Colorado regulations also preclude a finding that the speakers knew or recklessly ignored any violation of Colorado regulations. Plaintiff's allegations and the parties' briefing on the Colorado regulations has involved cross references to statutes, analyses of statements by government officials, and interpretations of various terms of art.  (*See, e.g.*, SAC ¶ 205; Opp. at 18-19.)  It is not reasonable to infer that the Individual Defendants would have traced general operational issues to the specific Colorado regulations allegedly violated—particularly when Plaintiff itself has now recognized that its original interpretation of some of these regulations was incorrect.

21

### 2. Plaintiff does not place a single speaker at a single meeting before the alleged misrepresentations where alleged safety and budgeting issues were discussed.

The Second Amended Complaint also creates two fatal unknowns.  First, Plaintiff does not allege precisely which meetings the speakers attended.  Second, it fails to allege when the meetings took place, besides being sometime "before 2016."  (*See* SAC ¶¶ 152, 224.)

The Opposition includes the unequivocal assertion that "McBride attended the pre-2016 meeting" in which issues were raised.  (Opp. at 21.)  But that is not what the Second Amended Complaint alleges.  It states that Mr. McBride attended 50% of the meetings.  (SAC ¶ 134.)  It then asserts that issues were raised in "at least one" or "one or two" meetings before 2016, but does not allege that he actually attended one of those meetings.  (*E.g.*, SAC ¶¶ 138, 152.)  And, while it alleges that he did attend one meeting where the subject arose, it does not state when that meeting took place.  (SAC ¶ 152.)

Mr. Walker's attendance is even less certain.  He allegedly attended only 25% of the meetings, and Plaintiff never alleges whether any of those meetings took place before 2016 or included discussion of the key issues underlying the Second Amended Complaint.  These sparse details do not approach the "who, what, when, where, and how" required under Rule 9(b) and the PSLRA.  (Order at 13.)  Nor can Plaintiff spackle over the holes in its allegations by stating them with more certainty in its briefing.  *See Coach*, 2011 WL 2634776, at *2.

### C. Plaintiff's inability to explain when the speakers learned of the alleged operational issues further undercuts an inference of scienter.

In granting Anadarko's first motion to dismiss, this Court found that "[t]he biggest hurdle for the plaintiffs is the timing of the facts alleged as the basis for this theory of lability."  (Order at 30.)   Without specific allegations about when the speakers purportedly learned their challenged statements were false, it is difficult or impossible to tell what the speakers allegedly

22

knew at the time they allegedly made the challenged statements.  *See Plains II*, 307 F. Supp. 3d at 642 (requiring plaintiff to plead "which corporate officer learned what facts, from what source, *on what date*." (emphasis added)).

Plaintiff does not allege precisely when the Standard Operating Procedures, Remediation Budget,[8] Status Reports, or Weekly Reports were shown to the speakers.  Without those critical details, these documents do not support a strong inference of scienter.  The sliver of additional detail about the Biannual Meetings and accompanying PowerPoints Plaintiff now adds—claiming they occurred "before 2016"—is not enough.  Plaintiff's failure to specify when leaves open the strong inference that the speakers believed any issues were remedied sometime in the span of months (or years—Plaintiff does not say) between the meetings and the challenged statements, particularly in light of Plaintiff's allegation that the Colorado management team was directed to address the issues.  *See Tellabs*, 551 U.S. at 326 ("[o]missions and ambiguities count against inferring scienter").

Plaintiff offers only a drive-by response to these shortcomings.  It argues that it is "fanciful" that speakers might have believed the issues were resolved locally between meetings and the challenged statements.  (Opp. at 20 n.26.)  Plaintiff argues that a former employee reported that the safety issues persisted into 2016.  (*Id*.)  But to plead scienter, the *speakers themselves* must have known about any regulatory violations that persisted until February 2016, when the first challenged statement was made.  An allegation that a non-speaker former employee supposedly knew about ongoing issues does not establish scienter for the speakers.

---

[8]   Adding to the uncertainty, Plaintiff alleges that the Executive Committee approved a remediation budget "sometime before" September 2014.  (SAC ¶ 106.)  It is not clear whether this is the same remediation budget referenced later in connection with Mr. McBride.  (*See* SAC ¶ 112.)

**D.      The securities laws did not require Anadarko's executives to confirm in advance that Anadarko had complied with every applicable law.**

No Individual Defendant in this case is alleged to be a Colorado regulatory specialist or even focused solely on Colorado operations.   Far from it:   each is a high-level official responsible for broad sections of Anadarko's worldwide business, including the alleged *three quarters* of its employees not working in Colorado.   (SAC ¶¶ 3, 36.)   Mr. McBride was Anadarko's Vice President for Health, Safety & Environment.   Mr. Christiansen was Anadarko's Vice President for Corporate Communications.   And Mr. Walker was the company's Chairman, President, and CEO.   None of the Individual Defendants is alleged to have had a particular focus on Colorado operations or on regulatory compliance.   (SAC ¶¶ 37–39.)

Plaintiff nonetheless asks this Court to draw the inference that these executives had sufficient knowledge of Colorado regulations (or a duty to know them), to render it severely reckless for any speaker to learn about alleged budget and operations issues without recognizing a specific corresponding rule violation.   That is not the law.   In *Dawes*, for instance, this Court rejected plaintiff's theory that high-level executives at a large national sugar company could be presumed to know the specific details of the company's own sugar purchases.   *Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 699 (S.D. Tex. 2013) (Rosenthal, J.).   Just as the *Dawes* executives could not be presumed to know the details of a sugar company's sugar purchases, high-level oil and gas executives should not be presumed to know the details of regulations that govern just one of the states where an oil and gas company operates.   *See generally Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) ("A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company.").

Likewise, there is no merit to Plaintiff's theory that Anadarko's high-level executives had a duty to monitor Colorado regulations and thus can be liable for making statements about compliance without specifically investigating their accuracy in advance.  Indeed, it would stand the entire concept of scienter on its head, transforming it from an inquiry into what a speaker knew into a mere negligence inquiry about what a speaker *could* have learned.

Not surprisingly, Plaintiff's contention outraces its cited authority.  In *Novak*, the Second Circuit recognized that the duty to monitor concept is a "limited" doctrine that applies only in "certain circumstances."  *Novak v. Kasaks*, 216 F.3d 300, 308-11 (2d Cir. 2000).  The case law makes clear that merely alleging a failure to monitor is not enough.  Rather, Plaintiff must plead specific facts supporting the inference that a speaker was reckless in failing to confirm specific statements before making them.  In *Avaya*, for instance, the Third Circuit held that a CFO's repeated denials in response to direct, specific, and repeated questions from analysts that products and services were being discounted supported an inference of recklessness. *Institutional Inv'ts Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009).

Plaintiff's other cases similarly involved allegations that the speakers were keenly focused on, or involved in, the specific topics of the alleged misrepresentations.  *In re BP* found that the plaintiffs had adequately pleaded scienter concerning alleged misrepresentations about BP's safety based on the speaker's central role as the "champion" of the company's process safety effort and commitment to "focus on safety like a laser."  *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 783 (S.D. Tex. 2012) (citation omitted).  *In re Anadarko* concluded that the plaintiffs had adequately pleaded scienter concerning an executive's statements about the company's alleged involvement in the design of the Macondo well in the aftermath of the Deepwater Horizon explosion, when the speaker was allegedly "completely focused" on that

25

well.  *In re Anadarko Petroleum Corp. Class Action Litig.*, 957 F. Supp. 2d 806, 835 (S.D. Tex. 2013).  *Mylan* held that the plaintiffs had adequately pleaded scienter regarding allegedly misleading statements regarding the company's price-fixing conspiracy when the speakers themselves were supposedly directly involved in setting prices.  *In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at *17 (S.D.N.Y. Mar. 28, 2018).  In contrast, the court held that these speakers' role in setting prices did *not* support an inference that they were aware of any market-allocation conspiracies.  *Id.*  *Cosmas* is a pre-PSLRA, pre-*Tellabs* case finding scienter where the defendant spoke falsely about an issue central to the company:  a Chinese import restriction that entirely eliminated a potentially significant source of income for the company.  *Cosmas v. Hassett*, 886 F.2d 8, 12-13 (2d Cir. 1989).

Here, Plaintiff does not, and cannot, explain why Anadarko's senior executives were severely reckless in failing to personally investigate Anadarko's compliance with every Colorado regulation that might apply to its business.  Plaintiff's theory is nothing more than a repackaged version of the repeatedly rejected assumption that defendants must have been aware of misstatements based on their position in the company.  *See, e.g.*, *Abrams*, 292 F.3d at 432.

Finally, the concept of a duty to investigate regulatory compliance appears for the first time in the Opposition.  Abandoning the Second Amended Complaint's allegation that Defendants were actually *aware* of regulatory violations, Plaintiff offers the contradictory theory that Defendants were instead recklessly *unaware* of the regulations.  Plaintiff cannot change its theory at this late stage.  *See Coach*, 2011 WL 2634776, at *2.

### E.   Plaintiff fails to plead a speaker or allege scienter for the alleged IOC Factsheet statements.

Plaintiff has not even identified a specific speaker—let alone alleged scienter—for the IOC Factsheet statement.  Plaintiff's scienter allegations rely solely on the claim that Mr.

Christiansen "approved" the IOC Factsheet and attended "a majority" of unspecified Biannual Meetings.  As an initial matter, Plaintiff does not allege that Mr. Christiansen actually made any statements in the IOC Factsheet.  The general allegation that he approved them is legally insufficient to show that he was the speaker.  (Mot. at 31.)  Plaintiff offers no response other than to repeat that Christiansen approved the IOC Factsheet.  (Opp. at 36.)

Moreover, the Second Amended Complaint does not include particularized allegations that Mr. Christiansen had any knowledge of whether the IOC was monitoring all of Anadarko's wells.  He is alleged only to have attended a "majority" of Biannual Meetings.  Plaintiff alleges that the subject of Anadarko monitoring all wells came up at "one or two" such meetings before 2016.  But Plaintiff does not connect the dots and actually allege that Mr. Christiansen attended one of the meetings—much less a pre-February 2016 meeting—where this issue supposedly came up.[9]  (SAC ¶¶ 134, 138, 224.)

The Opposition tries to fill this gap by suggesting that an allegation of Mr. Christiansen's attendance at a "majority" of Biannual Meetings can be translated into a conclusion that he *actually* received and read the PowerPoint slides for the particular meeting where the alleged limitations of the IOC Factsheet supposedly came to light.  (Opp. at 36-37.)  This assumption is not plausible and is certainly not supported by a strong inference.  And this Court should not credit allegations that were not pleaded.  *See Coach*, 2011 WL 2634776, at *2.

### F.     Plaintiff's new motive theory does not support any inference of scienter.

Plaintiff raises in its Opposition a theory that additional allegations of motive should be "considered alongside other allegations."  (Opp. at 27.)  The word "motive," however, does not

---

[9]     Plaintiff's suggestion that Mr. Christiansen attended some meetings "through a representative" falls short because it does not identify which meetings the representative attended or what details (if any) the representative reported to him.  (Opp. at 36.)

even appear in the Second Amended Complaint.  Plaintiff cannot raise motive and opportunity allegations for the first time in its Opposition.  *See Coach*, 2011 WL 2634776, at *2.  In any event, Plaintiff's motive allegations are specious.  Plaintiff now argues that the speakers were motivated to mislead investors because the challenged statements "allowed it to escape the cash crunch it suffered after accruing $9.15 billion" in liabilities in earlier years.  (Opp. at 27-28.)  But Plaintiff does not explain the alleged significance of this cash crunch or how the specific alleged misrepresentations helped ease that crunch.  At its core, Plaintiff's theory boils down to the generic motive that Anadarko wanted to improve its financial condition.  Courts do not credit motive allegations that are universally shared by all companies and executives.  *Abrams*, 292 F.3d at 434 (generic allegations of motive based on "the need to raise capital" do not support an inference of scienter).

## III.    The Section 20(a) claim should be dismissed.

Because the Second Amended Complaint does not allege a primary violation, the Section 20(a) claims must be dismissed.  *See Plains I*, 245 F. Supp. 3d at 893.

## <u>CONCLUSION</u>

Defendants respectfully request that the Court dismiss the Second Amended Complaint with prejudice.

DATED: January 9, 2019

Respectfully submitted,

*/s/ Noelle M. Reed*
Noelle M. Reed
Fed. Bar No. 27139
Texas Bar No. 24044211
Email: Noelle.Reed@Skadden.com
Skadden, Arps, Slate,
   Meagher & Flom LLP
1000 Louisiana Street, Suite 6800
Houston, Texas  77002
Tel:  (713) 655-5122
Fax:  (713) 483-9122

*Attorney-in-Charge for Defendants*
*Anadarko Petroleum Corporation,*
*R. A. Walker, and John M. Christiansen*

*Of Counsel:*
Jay B. Kasner
(*Admitted Pro Hac Vice*)
Email: Jay.Kasner@Skadden.com
Susan L. Saltzstein
(*Admitted Pro Hac Vice*)
Email: Susan.Saltzstein@Skadden.com
Skadden, Arps, Slate,
   Meagher & Flom LLP
4 Times Square
New York, New York  10036-6522
Tel:  (212) 735-3000
Fax:  (917) 735-2000

29

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 9, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the counsel who have registered with this Court.

*/s/ Noelle M. Reed*
Noelle M. Reed