**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ROBERT EDGAR, individually and on behalf of all others similarly situated, | § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. H-17-1372 |
| ANADARKO PETROLEUM CORPORATION, *et al.*, | § § § | |
| Defendants. | § § | |

## MEMORANDUM AND OPINION

A stockholder sued Anadarko Petroleum Corp., R.A. Walker, David J. McBride, and John M. Christiansen, alleging individually and on behalf of a putative class of others who purchased Anadarko stock from February 8, 2016, to May 2, 2017, that the defendants violated §§ 10(b) and 20(a) of the Securities Exchange Act and Rule 10b–5.  (Docket Entry Nos. 1, 57).  The defendants moved to dismiss the amended complaint, which the court granted, without prejudice and with leave to amend, in June 2018.  (Docket Entry Nos. 36, 53).  The lead plaintiff, Iron Workers Benefit and Pension Fund – Iron Workers District Counsel Philadelphia & Vicinity, filed a second amended complaint in August 2018.  (Docket Entry No. 57).  The defendants again moved to dismiss, the plaintiff responded, and the defendants replied.[1]  (Docket Entry Nos. 65–66, 70, 72, 74–75).

Based on a careful review of the second amended complaint; the motions, response, and reply; the law; and the arguments of counsel presented at a hearing, the motions to dismiss are

---

[1] McBride separately moved to dismiss, and he separately replied to the plaintiff's response to the other defendants' motion.  (Docket Entry Nos. 66, 75).  McBride incorporated by reference and joined in full the other defendants' motion to dismiss.  (Docket Entry No. 66 at 1).

granted, with prejudice and without leave to amend. An order of dismissal is separately entered. The reasons for this ruling are explained in detail below.

## I. Background

### A. The Factual Allegations

The plaintiff's second amended complaint alleges the following facts, accepted as true for the purposes of this motion. Anadarko is a publicly traded oil and gas exploration and production company headquartered in The Woodlands, Texas. (Docket Entry No. 57 at ¶ 36). Anadarko operates primarily in Texas, the Gulf of Mexico, and Colorado. (*Id.* at ¶ 3). A quarter of the company's employees are based in Colorado, where Anadarko's drilling accounted for 30.1% of its oil production and 20.7% of its natural-gas production in 2015. (*Id.* at ¶¶ 3, 76).

From 2011 to 2014, Anadarko incurred $9 billion in environmental fines and settlements. (*Id.* at ¶ 4). If not for these fines and settlements, Anadarko would have recorded $8 billion in profits instead of a $1 billion loss. (*Id.* at ¶ 5). After posting that loss, Anadarko assured investors that it had changed its environmental regulatory-compliance practices. (*Id.* at ¶ 6). On September 12, 2016, Anadarko sold 40,537,500 shares of stock at $54.50 per share, its largest stock offering by dollar amount. (*Id.* at ¶ 231). The offering raised $2.2 billion. (*Id.*).

In October 2013, Anadarko acquired 1,550 wells and 100,000 acres of land in Colorado's Wattenberg Field from Noble Energy, Inc. (*Id.* at ¶¶ 7, 91). Many of the wells had been drilled 30 to 40 years earlier and did not comply with current Colorado law. (*Id.* at ¶¶ 8, 98). Some wells lacked methane-emission controls to prevent gas leaks into residential areas. (*Id.* at ¶ 98). Some wells leaked liquid into the ground and groundwater because of outdated piping and deteriorated oil-storage tanks. (*Id.*). Anadarko's "top management" knew about these problems by March 2014.

(*Id.* at ¶ 100). Anadarko's health, safety, and environment division staff regularly submitted lists of "dangerous" wells needing remediation to the company's Colorado management. (*Id.* at ¶ 101).

McBride, Anadarko's vice-president for the health, safety, and environment division, prepared a budget of over $10 million to repair the company's Colorado wells. (*Id.* at ¶¶ 38, 106). Anadarko's executive committee, including Walker, the company's chief executive officer, chairman, and president, approved the proposed remediation project in September 2014. (*Id.* at ¶¶ 37, 106). McBride supervised the budget and drafted remediation-status reports that the company's executive committee periodically reviewed. (*Id.* at ¶¶ 111–12). Anadarko cut the remediation budget in early 2015, after oil prices fell from $95.83 to $54.56 per barrel. (*Id.* at ¶¶ 108–12). The company laid off 30% of its personnel in its operations and health, safety, and environment divisions in March 2016. (*Id.* at ¶ 113).

In late 2016 and early 2017, Anadarko "ramped up" production in Colorado. (*Id.* at ¶ 115). Despite the increased drilling, Anadarko hired no additional employees. (*Id.*). In January 2017, Anadarko determined that a 28,000-gallon oil spill in Weld County, Colorado was caused by a lack of trained personnel. (*Id.* at ¶ 120). A former employee discussed the personnel problems with Christiansen, Anadarko's vice-president for corporate communications, 12 times from late 2016 to March 2017. (*Id.* at ¶¶ 39, 117, 122). Christiansen told her to "keep quiet" and to "clean up [Anadarko's] messes." (*Id.* at ¶ 122).

Even though Anadarko's health, safety, and environment division identified dangerous wells and informed Colorado managers about them, the field-operations division had the final say over remediation work. (*Id.* at ¶ 123). The division repaired wells based on their production, on whether repairs were needed to avoid delays in drilling projects, and on the potential for methane-emission

fines if repairs were not made. (*Id.* at ¶¶ 124, 126). Safety risks and the wells' proximity to residential areas or schools were not considered. (*Id.* at ¶ 127).

Anadarko hired contractors to inspect its Colorado wells. (*Id.* at ¶ 130). The contractors were required to inspect over 100 wells per week, resulting in rushed inspections that, in some instances, lasted only five minutes. (*Id.* at ¶ 131). A former employee estimated that Anadarko failed to inspect hundreds of Colorado wells. (*Id.* at ¶ 130). Because these wells were not inspected, the company could not detect whether they were dangerous or repair them. (*Id.*). And because Anadarko did not know where some of the wells' flowlines—underground pipes that move oil or gas from a well to a storage facility—were located, the company was unable to discover methane leaks in all the flowlines and could not test all the flowlines every year. (*Id.* at ¶¶ 60, 132).

Before April 2017, Anadarko had tested only 10% of the Colorado well flowlines, and only in "high risk" areas near wetlands, houses, or schools. (*Id.* at ¶¶ 162, 165). The company's Colorado standard operating procedures codified these testing practices.[2] (*Id.* at ¶ 166). A health, safety, and environment division representative approved the standard operating procedures, "subject to . . . McBride's review." (*Id.*). Walker "received a list of [the p]rocedures and a description of each." (*Id.*). Anadarko's failure to account for and conduct annual pressure tests on all the flowlines, to inspect all the wells, and to seal all the abandoned wells, violated Colorado Oil

---

[2] Because the second amended complaint describes the document as Anadarko's "Colorado Standard Operating Procedures," it appears that these procedures governed the company's operations only in Colorado. (Docket Entry No. 57 at ¶ 166).

and Gas Conservation Commission Rules 1101.a, 1101.e, 1102.a, 1102.d, and 1103.[3]  (*Id.* at ¶¶ 90, 145–46, 165, 183).

Anadarko's executives held biannual meetings in which they would receive updates from the company's five Colorado production superintendents.  (*Id.* at ¶¶ 134–35).  At these meetings, the superintendents would present the three to five "most important facts about their division, whether positive or negative."  (*Id.* at ¶ 136).  The superintendents' presentation materials "would be disseminated 'up the chain' to the 'highest levels' of the company, including to . . . Walker."  (*Id.* at ¶ 137).  After the meetings, some attendees "would . . . go to The Woodlands" to discuss the superintendents' concerns with Walker and other executives.  (*Id.*).

Walker attended about a quarter of the biannual meetings, McBride about half, and Christiansen a "majority."  (*Id.* at ¶ 134).  Between 2014 and 2016, during at least one meeting, the Colorado superintendents told Anadarko leadership about the company's lack of knowledge about the location or condition of many flowlines and the failure to inspect all the wells.  (*Id.* at ¶¶ 16, 138).  According to a former employee, "each time the Unknown Flowline Well problem was identified[,] it was also identified in a PowerPoint slide for that meeting.  There was never a solution presented."  (*Id.* at ¶ 153).  The executives directed the superintendents "to resolve the issue on a local level."  (*Id.* at ¶¶ 138, 153).

---

[3]  The second amended complaint alleges that from February 8, 2016, to May 2, 2017, Colorado Rule 1101.a stated that "[m]aterials for pipe and other components of pipelines shall be [l]ocatable by a tracer line or location device placed adjacent to or in the trench of all buried nonmetallic pipelines to facilitate the location of such pipelines."  (Docket Entry No. 57 at ¶ 90).  Rule 1101.e required operators to conduct an annual "pressure test [of all] its flowlines to their maximum anticipated operating pressure."  (*Id.*).  Rule 1102.a stated that "[w]henever an operator discovers any condition that could adversely affect the safe and proper operation of its pipeline, it shall correct it within a reasonable time."  (*Id.*).  Under Rule 1102.d, operators were required "to register their flowline and pipeline locations with the [Colorado's] Utility Notification Center."  (*Id.*).  Rule 1103 provided that "[e]ach pipeline abandoned in place shall be disconnected from all sources of supplies of natural gas and petroleum . . . and cut off . . . and sealed at the ends."  (*Id.*).

The Colorado superintendents submitted data for a weekly operating report that "would be seen by Anadarko's executive committee, including . . . Walker." (*Id.* at ¶¶ 170–71). The reports "had a header for [each superintendent] and contained space for . . . three to five bullet points." (*Id.* at ¶ 171). The reports documented the number of wells that Anadarko had to seal under Colorado Commission Rule 1103. (*Id.* at ¶¶ 168, 170).

McBride "occasionally" participated in a weekly conference call held "to update senior executives about Anadarko's activities." (*Id.* at ¶ 172). The weekly operating "reports formed the basis of the discussion at the weekly calls," which also covered compliance and safety issues. (*Id.* at ¶¶ 173, 175). Certain employees would receive the reports whether or not they participated in the call, suggesting, according to the second amended complaint, that McBride also received the reports. (*Id.* at ¶ 173).

On April 17, 2017, a home exploded near an Anadarko well in Firestone, Colorado, killing two people and critically injuring another. (*Id.* at ¶ 200). On April 26, 2017, Anadarko announced that one of its wells might have been involved in the explosion and that the company planned to shut down 3,000 similar wells in Colorado. (*Id.* at ¶ 201). Anadarko's stock price fell 4.7% the next day. (*Id.* at ¶ 202).

Anadarko had turned on the Firestone well in January 2017, in order to maintain a favorable lease. (*Id.* at ¶ 195). The well was supposed to emit methane when it was turned on. (*Id.* at ¶ 196). It did not. (*Id.*). Anadarko sent crews to inspect the well in early April 2017. (*Id.* at ¶ 197). The inspection showed that the well was not emitting methane, but Anadarko continued to operate the well even though the inspection crews could not explain why. (*Id.*). Because Anadarko was short-staffed, it did not check the well flowlines and failed to discover the leaking flowline that later caused the explosion. (*Id.* at ¶ 199).

On May 2, 2017, the Firestone-Frederick Fire Department confirmed the link between Anadarko's Firestone well and the home explosion. (*Id.* at ¶ 204). A flowline connected to the well had leaked methane into the home's drains, which exploded when a hot-water heater was being installed. (*Id.*). The second amended complaint alleges that Anadarko had violated Colorado Commission Rule 1103 by abandoning the flowline without disconnecting and sealing it. (*Id.* at ¶ 25).

The governor of Colorado ordered inspections of all active and abandoned well flowlines within 1,000 feet of occupied buildings on May 2, 2017. (*Id.* at ¶ 205). The State notified oil companies, including Anadarko, of the Rule 1103 requirement to seal abandoned flowlines. (*Id.*). The notice directed well operators to comply with Rule 1103 by June 30, 2017. (*Id.*).

On May 3, 2017, Anadarko's stock price fell by 7.7%. (*Id.* at ¶ 206). In a statement attributed to Walker, Anadarko expressed sympathy for the explosion victims, but executives admitted internally that they were not worried about the accident. (*Id.* at ¶¶ 207–08). During an Anadarko town hall meeting, the Firestone explosion came up only when Walker mentioned that Anadarko was "not too concerned" about it. (*Id.* at ¶ 208).

On May 24, 2017, Anadarko reported that a methane cloud had been discovered near the Firestone explosion site, with high methane levels. (*Id.* at ¶ 211). The next day, a fire at an Anadarko oil container in Weld County, Colorado killed one worker and injured three others. (*Id.* at ¶ 212). On June 30, 2017, Anadarko announced it had sealed over 2,400 abandoned flowlines since May 2, 2017, the date of the State's notice to comply with Rule 1103. (*Id.* at ¶ 213).

B.    **The False Statement Allegations**

According to the second amended complaint, the defendants made the following material misrepresentations that violated of §§ 10(b) and 20(a) of the Exchange Act and Rule 10b–5:

- a factsheet dated February 8, 2016, and "approved by . . . Christiansen," stated that Anadarko's Wattenberg, Colorado operations center "[p]rovides real-time remote-monitoring capabilities for 6,800+ wells" and "[e]nables employees to shut in wells remotely";

- Anadarko's Form 10-K filed on February 16, 2016, and signed by Walker, stated that the company "believes that it is in material compliance with existing environmental and occupational health and safety regulations";

- health, safety, environment, and sustainability overviews dated March 12, 2016, and March 3, 2017, and signed by Walker and McBride, stated that "Anadarko operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations";

- Anadarko's Form S-3 filed on August 12, 2016, incorporated the February 2016 Form 10-K; and

- an underwriting agreement filed on September 14, 2016, represented to an underwriter that Anadarko has "been in compliance with all applicable [laws] and other legally enforceable requirements relating to the prevention of pollution, the preservation of environmental quality, the protection of natural resources, or the remediation of environmental contamination."

(*Id.* at ¶¶ 216–219, 225–36).

The plaintiff alleges that the factsheet is false or misleading because "Anadarko could not remotely monitor or deactivate about 800 of its 6,800 wells" and "many of the wells were . . . too old to have had any remote-monitoring or deactivation capabilities installed." (*Id.* at ¶¶ 219, 221). The Form 10-K, overviews, Form S-3, and underwriting agreement are false or misleading, the plaintiff alleges, because:

> Walker, McBride, and Christiansen attended and/or received PowerPoint slides of Biannual Meetings at which Anadarko's Colorado Production superintendents disclosed that Anadarko did not know where 10% of its flowlines were, in violation of [Colorado Commission] Rules[;] McBride presented and Walker received a presentation demonstrating that hundreds of [w]ells were unsafe and had to be plugged or remediated, recognized as much by authorizing . . . a budget, and then slashed the budget, leaving the wells unremediated or unplugged, in violation of [the] Rule[s;] Anadarko only pressure-tested 10% of its wells every year, and never pressure-tested 80% of its wells, in violation of [the] Rule[s], a fact enshrined in Anadarko's Standard Operating Procedures approved by McBride and provided to

and summarized for Walker; . . . Walker, McBride, and Christiansen attended and/or received PowerPoint slides of Biannual Meetings at which [the] Superintendents reported that Anadarko[] failed to inspect 3-5% of its wells . . . in violation of [the] Rule[s]; and [the] Superintendents stated that they needed immediate additional funds to remedy the problems set out in . . . the Biannual Meetings, but Anadarko's senior executives refused to provide the additional funds.

(*Id.* at ¶¶ 227, 230, 233, 236).

The defendants have moved to dismiss the second amended complaint under Rule 12(b)(6) for failure to state a claim on which relief can be granted. (Docket Entry Nos. 65, 66). The plaintiff responded, the defendants replied, and the court heard arguments from counsel. (Docket Entry Nos. 70, 72, 74, 75, 80). The issues raised by the second amended complaint, the motions, the response, and the reply, are analyzed below.

## II.     The Legal Standards

### A.      Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550, U.S. at 556).

"To withstand a Rule 12(b)(6) motion, the complaint must allege 'more than labels and conclusions,'" and "a formulaic recitation of the elements of a cause of action will not do." *Norris v. Hearst Tr.*, 500 F.3d 454, 464 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). [A] "complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Conversely, 'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Id.* (alteration omitted) (quoting *Twombly*, 550 U.S. at 558).

When a complaint fails to state a claim, the court should generally give the plaintiff a chance to amend under Rule 15(a) before dismissing the action with prejudice, unless it is clear that to do so would be futile. *See Carroll v. Fort James Corp.*, 470 F.3d 1171, 1175 (5th Cir. 2006) (Rule 15(a) "evinces a bias in favor of granting leave to amend"); *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."). A court in its discretion may deny a motion to amend for futility if the amended complaint would fail to state a claim on which relief could be granted.

*Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016). The decision to grant or deny leave "is entrusted to the sound discretion of the district court." *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 232 (5th Cir. 2012).

## B. Rule 9(b) and the Private Securities Litigation Reform Act

When "the complaint involves an allegation of fraud," Rule 9(b) requires the complaint to plead "with particularity the circumstances constituting fraud." *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016) (quoting FED. R. CIV. P. 9(b)). The Private Securities Litigation Reform Act "has raised the pleading bar even higher and enhances Rule 9(b)'s particularity requirement for pleading fraud in two ways." *Id.* (citing *Ind. Elec. Workers' Pension Tr. Fund. IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008)). "First the plaintiff must specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading." *Id.* (quotation omitted). "Second, for each act or omission alleged to be false or misleading, plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." *Id.* (quotation omitted).

## C. The Exchange Act

Under § 10(b) of the Securities Exchange Act of 1934, "[i]t shall be unlawful for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5 implements § 10(b) by forbidding any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b–5. Section 10(b) gives "purchasers or sellers of securities injured by . . . violation[s]" a

private right of action. *Tellabs, Inc., v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007). The private right of action is "available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

To state a claim under § 10(b), a plaintiff must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the plaintiff's purchase or sale of a security; (4) the plaintiff's reliance on the misrepresentation or omission in purchasing or selling; (5) economic loss; and (6) loss causation. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005). The Fifth Circuit has explained that:

> a plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b–5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and [the Private Securities Litigation Reform Act]: (1) specify each statement alleged to have been misleading, i.e., contended to be fraudulent; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the representation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*Neiman v. Bulmahn*, 854 F.3d 741, 746 (5th Cir. 2017) (alterations omitted) (quoting *Goldstein v. MCI WorldCom*, 340 F.3d 238, 245 (5th Cir. 2003)).

Under § 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a). Section 20(a) liability is "predicated on the existence of an independent violation of the securities laws." *Rubinstein v. Collins*, 20 F.3d 160, 166 n.15 (5th Cir. 1994). A party who fails to state an underlying claim for an Exchange Act violation fails to state a claim under § 20(a). *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365

F.3d 353, 383 (5th Cir. 2004) (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 n.8 (5th Cir. 1996)).

### III.    Analysis

The central issue is whether the second amended complaint sufficiently alleges scienter as to Walker, McBride, and Christiansen under § 10(b) and Rule 10b–5. "In evaluating a complaint's scienter allegations, a court must 'assess all the allegations holistically.'" *Diodes*, 810 F.3d at 956 (quoting *Tellabs*, 551 U.S. at 326). The Fifth Circuit has clarified that:

> [a] three-step framework guides this evaluation. First, the factual allegations in the pleadings must be accepted as true. Second, the court must consider the entire complaint. Third, the court must consider plausible inferences supporting as well as opposing a strong inference of scienter. Ultimately, in order to create an inference of scienter, the allegations in the complaint must be "cogent and compelling," not simply "reasonable," or "permissible."

*Neiman*, 854 F.3d at 747 (alterations omitted) (quotations omitted).

"The required state of mind is an 'intent to deceive, manipulate, or defraud,' or 'severe recklessness.'" *Shaw Grp.*, 537 F.3d at 533 (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003)). Severe recklessness is:

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014) (quoting *Rosenzweig*, 332 F.3d at 866); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 424 (5th Cir. 2001) ("[R]ecklessness in this context [is] severe recklessness, which, properly defined and adequately distinguished from mere negligence, resembles a slightly lesser species of intentional conduct." (quotation omitted)). "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with

particularity facts giving rise to a strong inference that the defendants acted with the [necessary culpability].'" *Tellabs*, 551 U.S. at 326 (quoting 15 U.S.C. § 78u–4(b)(2)).

"Although circumstantial evidence can support a strong inference of scienter, allegations of motive and opportunity standing alone will not suffice." *Shaw Grp.*, 537 F.3d at 533 (citing *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002); *Rosenzweig*, 332 F.3d at 867). But motive and opportunity, if alleged, can "enhance the strength of the inference of scienter." *Id.* (quoting *Southland*, 365 F.3d at 368).

A complaint must allege specific facts about the defendant speaker's state of mind when each challenged statement was made. The complaint cannot allege that another person knew facts that make the statement misleading and impute that knowledge to the defendant. *Southland*, 365 F.3d at 366. Pleading that a defendant had access to internal information that contradicted his or her public statements is also insufficient. *In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 816–17 (S.D. Tex. 2012). To the extent that scienter is based on the availability of an internal document, the complaint must make specific allegations about the document, its author, contents and character, and when and by whom it was received, to link it to the defendant making the challenged statement. *Abrams*, 292 F.3d at 432; *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 356 (5th Cir. 2002).

These standards are applied to the second amended complaint allegations as to each defendant.

## A. Christiansen

The second amended complaint attributes only one alleged misrepresentation to Christiansen: a factsheet that included the statement that Anadarko's Wattenberg, Colorado operations center "[p]rovides real-time remote-monitoring capabilities for 6,800+ wells" and "enables employees to

shut in wells remotely." (Docket Entry No. 57 at ¶¶ 218, 223; Docket Entry No. 72 at 36). The second amended complaint alleges that the statement was false because "half of the [Wattenberg Field wells] were not equipped for any sort of remote interaction." (Docket Entry No. 57 at ¶ 18). According to the second amended complaint, Christiansen "authorized" or "approved" of the factsheet, which Anadarko published on its website in February 2016. (*Id.* at ¶¶ 18, 216, 223).

The second amended complaint alleges that Christiansen attended "the majority" of biannual meetings during which Colorado production superintendents presented the three to five "most important facts about their division." (*Id.* at ¶¶ 16, 134, 136). The second amended complaint alleges that when Christiansen "could not attend [a biannual meeting], he sent a representative." (*Id.* at ¶ 134). "The fact that only half of [the w]ells had remote monitoring and control capabilities," the second amended complaint alleges, "was described in PowerPoint slides for, and discussed at, one or two of the [m]eetings." (*Id.* at ¶ 224).

The defendants argue that while Christiansen might have generally approved of or authorized the factsheet, the second amended complaint does not allege that he was a "speaker" of the statement about the Wattenberg operations center, precluding a strong inference of scienter under § 10(b) and Rule 10b–5. The defendants also argue that the second amended complaint "does not properly plead that Mr. Christiansen had knowledge of the [statement's] falsity." (Docket Entry No. 65 at 31). The defendants contend that the second amended complaint allegations impermissibly stack inferences supporting the argument that "Christiansen attended the 'majority' of the biannual meetings" and can be held to know or have been "informed as to the . . . falsity of the [factsheet]." (*Id.* at 31–32). According to the defendants, the second amended complaint fails to allege that Christiansen attended the one or two meetings during which the Colorado superintendents discussed the limits of the Wattenberg operation center's remote monitoring and control capabilities. (*Id.*).

15

The plaintiff responds that Christiansen "made" the challenged statement included in the factsheet because, as "head of Anadarko's corporate communications, [he] oversaw Anadarko's 'media relations, public affairs [and] external communications including the company's website.'" (Docket Entry No. 72 at 36). The plaintiff argues that the second amended complaint adequately alleges Christiansen's scienter because he valued the biannual meetings "so highly that he . . . attended all of the[m], either in person or through a representative." (*Id.*). "Even if the discussion [about the operation center's capabilities] were held on a date on which he sent a representative," the plaintiff argues, "the only reasonable inference from the fact that Christiansen sent a representative . . . is that [he] would have, at a minimum, reviewed the PowerPoint slides and received a summary report from his representative." (*Id.* at 36–37). According to the plaintiff, Christiansen's scienter is also demonstrated by his allegedly curt reply to a former employee's statement expressing concern about Anadarko's Colorado operations, and an alleged misstatement to a newspaper that Anadarko did not anticipate the Firestone explosion. (*Id.* at 37) ("No one really foresaw this as a potential issue.").

The Fifth Circuit has held that:

> corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded. However, corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue. Such specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement.

*Southland*, 365 F.3d at 365. In *Southland*, the plaintiffs had alleged that the defendant executives "each controlled the contents of and participated in writing [the company's] SEC filings, reports,

and releases." *Id*. The court found that "this conclusory allegation fails to specify which of these documents is attributable to each defendant, let alone which portion or statements within these documents are assignable to each individual defendant." *Id*.

The second amended complaint's allegations about Christiansen's involvement in, and knowledge of facts relating to, the factsheet statement fail to satisfy *Southland*, requiring the dismissal of the claim against him. The second amended complaint relies on Christiansen's title as Anadarko's vice-president of corporate communications to allege that he "approved" of or "authorized" the factsheet.[4] (Docket Entry No. 57 at ¶¶ 18, 216, 223). The second amended complaint does not allege "specific facts" linking Christiansen to the challenged statement in the factsheet, including that he drafted it or even signed the factsheet. The allegations do not support an inference that Christiansen "made" the challenged statement, as required for liability under § 10(b) and Rule 10b–5. *Southland*, 365 F.3d at 365.

Even if Christiansen had "made" the statement in the factsheet, the second amended complaint fails to allege facts sufficiently supporting a strong inference that he did so with scienter. In *Tellabs*, the Supreme Court instructed that "omissions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendants acted with the [necessary culpability].'" 551 U.S. at 326 (quoting 15 U.S.C. § 78u–4(b)(2)). Instead of alleging particularized facts as to Christiansen's state of mind, the second amended complaint alleges that he attended some meetings in which Colorado managers discussed pressing issues. The second amended complaint does not allege facts showing that Christiansen

---

[4] At oral argument, the plaintiff's counsel confirmed that the only ground for connecting Christiansen to the alleged misrepresentation is his role as vice-president of corporate communications. Counsel argued that because Christiansen's duties required him to "approve" Anadarko's statements, he was a "speaker" under § 10(b) and Rule 10b-5.

knew, or was severely reckless in not knowing, that the Wattenberg operations center could not monitor over 6,800 or remotely "shut in" wells, or that he learned this information before or during the time that Anadarko posted the factsheet on its website.

The plaintiff cannot meet the particularity requirement by asking the court to infer that because Christiansen went, or sent a representative, to the biannual meetings, he knew that the factsheet statement about the Wattenberg operations center's remote monitoring and control capabilities was false. The allegations fall far short of the specificity that *Tellabs*, the Private Securities Litigation Reform Act, and Rule 9(b) all require. The second amended complaint fails to allege when Christiansen attended biannual meetings; when the superintendents briefed those attending a meeting on the Watternberg operations center's capabilities; whether any of Christiansen's representatives relayed the superintendents' concerns about the center to him; or whether Christiansen received or reviewed the meeting presentation materials.[5] *See In re BP p.l.c.*

_____

[5] At oral argument, the plaintiff's counsel relied on *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336 (5th Cir. 2002), to contend that because the second amended complaint places Christiansen at a meeting in which Colorado superintendents told attendees that only half of the Colorado wells could be remotely monitored and controlled, the pleading alleges facts supporting a strong inference that Christiansen acted with scienter in "making" the challenged statement in the factsheet. In *ABC Arbitrage*, the Fifth Circuit found that allegations about an internal report were pleaded with particularity because they alleged "the name of this documentary evidence, its date, and the name and position of the person who made the statement quoted, whom, by virtue of his position, would possess the information pleaded, and so provides an adequate basis for believing that [the defendant's] statements . . . were false." *ABC Arbitrage*, 291 F.3d at 357. Similarly, the Fifth Circuit held that allegations about a specific meeting between a high-ranking corporate official and an individual defendant were pleaded with particularity because the complaint alleged when the meeting occurred and facts indicating that the official "would possess the information pleaded." *Id.*

Here, by contrast, the second amended complaint does not allege with particularity facts about internal documents detailing the Wattenberg operations center's capabilities, much less that Christiansen reviewed or read such documents. Nor does it allege that an Anadarko employee met with or told Christiansen about the Wattenberg operations center's capabilities. The second amended complaint alleges only that Christiansen or a delegee might have attended a biannual meeting in which Colorado superintendents discussed the Wattenberg operations center's remote-monitoring system. The pleading does not state that Christiansen attended the meeting; that he sent someone who reported to him the subjects discussed at the meeting; the date of the meeting at which the Wattenberg operations center was discussed; or other facts that could show Christiansen acted with scienter, assuming he "made" the statement.

*Sec. Litig.*, 922 F. Supp. 2d 600, 630–31 (S.D. Tex. 2013) (a complaint must allege facts tying a statement to a defendant in order to be actionable under § 10(b) and Rule 10b–5).

The plaintiff also argues that the second amended complaint sufficiently alleges that Christiansen acted with scienter when he allegedly dismissed an employee's concerns about Colorado staffing issues[6] and, in December 2017, told a newspaper reporter that Anadarko did not anticipate the Firestone explosion. The first, the employee's statement of concerns, was about Anadarko's personnel strength, not the Wattenberg operations center's remote monitoring and control capabilities. Christiansen made the second statement after the factsheet had been posted on Anadarko's website and after the class period ended on May 2, 2017. *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 377 (S.D. Tex. 2011) ("A plaintiff cannot charge a defendant with intentionally misleading investors about facts the defendant may have become aware of *after* making an allegedly misleading statement." (emphasis in original)).

The second amended complaint does not allege that Christiansen "made" the statements in the factsheet, and it fails to allege facts that could support an inference that if he did so, it was with the requisite scienter. The claim against Christiansen is dismissed, with prejudice and without leave to amend, because the plaintiff has amended twice without curing the pleading deficiencies.

---

[6] The second amended complaint does not specify when Christiansen allegedly dismissed the employee's concerns. (*See* Docket Entry No. 57 at ¶¶ 20, 122, 215, 230).

### B.    McBride and Walker

#### 1.    A Motive to Deceive[7]

Motive, if alleged, may bolster whatever inference of scienter might be drawn from a complaint. The plaintiff argues that the second amended complaint alleges that McBride and Walker had a motive to commit fraud, strengthening the inference that they acted with the requisite culpability. (Docket Entry No. 72 at 27). The plaintiff points out that Anadarko lost $1 billion from environmental fines and settlements and, needing cash, "had been forced to conduct the largest offering in its history in September 2016, raising net proceeds of $2.2 billion." (*Id.* at 27–28). McBride and Walker had a motive to deceive investors about the company's compliance, the plaintiff contends, "to reassure investors to sell [the] stock." (*Id.* at 28).

The defendants argue that the second amended complaint fails to plead facts supporting a strong inference that either McBride or Walker had a motive to commit fraud, and the plaintiff "cannot raise motive . . . allegations for the first time in [the] Opposition." (Docket Entry No. 74 at 28). The defendants assert that the plaintiff's theory "boils down to the generic motive that Anadarko wanted to improve its financial condition," and the Fifth Circuit, like other circuits, does not "credit motive allegations that are universally shared by all companies and executives." (*Id.*).

"Generally, a court ruling on a motion to dismiss may rely on only the complaint and its proper attachments." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008). The court may also consider "documents incorporated into the complaint by reference[] and matters of which a court may take judicial notice." *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross &*

---

[7] At oral argument, the plaintiff's counsel conceded that the second amended complaint fails to allege facts that could show that either McBride or Walker had a motive to deceive investors. The court examines the pleading for motive because the plaintiff's written response to the motions to dismiss contended that McBride and Walker had a motive to commit fraud, and because counsel argued that Anadarko itself had a motive to overstate its compliance with Colorado law.

*Blue Shield of Ga., Inc.*, 892 F.3d 719, 726 (5th Cir. 2018). Factual allegations first asserted in a response to a motion to dismiss are not appropriately reviewed in a Rule 12(b)(6) motion. *See id.*; *Dorsey*, 540 F.3d at 338 ("Because the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint, including those made on appeal."); *see also Coach, Inc. v. Angela's Boutique*, No. H-10-1108, 2011 WL 2634776, at *2 (S.D. Tex. July 5, 2011).

The second amended complaint alleges that from 2011 to 2014, "Anadarko accrued more than $9 billion in charges for environmental fines and settlements"; because of "its troubled past, Anadarko's compliance with safety and environmental regulations was extremely material to investors"; and on "September 12, 2016, Anadarko sold 40,537,500 shares, raising net proceeds of $2.2 billion." (Docket Entry No. 57 at ¶¶ 4–6, 231). The second amended complaint fails to allege, however, facts supporting a strong inference that either McBride or Walker had a motive to make false material statements to investors. As the defendants correctly observe, the second amended complaint does not contain the word "motive." Nor does it connect Anadarko's 2011 to 2014 losses to the 2016 stock offering, or allege that absent the stock offering, Anadarko would have suffered harmful financial consequences. And because the plaintiff first raised this motive theory in its response to the defendants' motions to dismiss, the court cannot use it to infer scienter. *Coach*, 2011 WL 2634776, at *2.

Even if the plaintiff had included these factual allegations in the second amended complaint, the pleading would still be inadequate as to McBride and Walker. The plaintiff relies on group pleading in asserting that the defendants—collectively—knowingly or recklessly made the misstatements to raise capital. According to the plaintiff, McBride and Walker deceived investors because disclosing the truth would have damaged Anadarko's stock value, "and Anadarko would

[have] be[en] unable to raise the capital it needed to continue its operations." (Docket Entry No. 72 at 28). But the "desire to raise capital in the normal course of business does not support a strong showing of scienter because virtually all corporate insiders share this goal." *Neiman*, 854 F.3d at 748 (quoting *Owens v. Jastrow*, 789 F.3d 529, 539 (5th Cir. 2015)). "The 'outlier' to this proposition is *Goldstein*," in which investors accused a chief financial officer of fraudulently inflating the company's financial results to complete a "crucial" $129 billion merger. *Id.* (explaining *Goldstein*, 340 F.3d at 250). The Fifth Circuit found that the allegations sufficiently supported a strong inference that the defendant had a motive to commit fraud, "not only because [he] would lose millions in compensation if the stock price dropped, but also because such a drop would accelerate payment on his personal loans." *Owens*, 789 F.3d at 539 (explaining *Goldstein*, 340 F.3d at 250).

Here, by comparison, the plaintiff generally asserts that two years after posting the loss from the fines and settlements, Anadarko needed to raise capital to "continue its operations." (Docket Entry No. 72 at 28). The plaintiff does not allege that Anadarko "was in critical negotiations to facilitate financing or to seek out potential creditors." *See Neiman*, 854 F.3d at 748. Nor does the plaintiff allege that Anadarko had to sell a certain amount of stock or raise a particular amount of money to complete a merger, to close a deal, or to finish a transaction that was "crucial" to the future success of the company. *Goldstein*, 340 F.3d at 250. While the plaintiff alleges that the fines and settlements caused Anadarko to post losses in 2011 and 2014, the company posted profits in 2012 and 2013.[8] (Docket Entry No. 57 at ¶ 85). And most of Anadarko's losses from 2014 to 2016 arose from "the collapse of oil prices," not environmental fines and settlements. (*Id.* at ¶ 85 n.7). Although the 2016 stock offering raised a record amount of capital, it was nonetheless a routine

---

[8] The complaint alleges that even though Anadarko lost $1 billion from 2011 to 2014, the company recorded profits in 2012 and 2013. (*See* Docket Entry No. 57 at ¶¶ 5, 85).

event.  The allegations about the offering fail to support an inference of a deceitful motive or scienter as to McBride or Walker.  *See Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 213 (5th Cir. 2009) (motives "universal to corporations and their officers do[] not suffice to establish an inference of scienter of fraud").

Unlike the complaint allegations in *Goldstein*, the second amended complaint does not allege that McBride or Walker personally benefitted from the 2016 stock offering.  The plaintiff's response to the motions to dismiss argues only that because "Anadarko's compliance with environmental regulations was 'uniquely important' given its history, its motive to make false statements to reassure investors to sell $2.2 billion of stock supports a finding of a strong showing of scienter." (Docket Entry No. 72 at 28).  To sufficiently plead that the defendants "engaged in a conspiracy to commit securities fraud in order to inflate the price of the company's stock to allow for successful stock offerings," the plaintiff must allege "that the defendants profited from the inflated stock value or the offerings."  *Abrams*, 292 F.3d at 434; *see Shaw Grp.*, 537 F.3d at 543 (motive requires allegations of "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." (quoting *Phillips v. LCL Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999))); *see also Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994); *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994).

There is no allegation in the second amended complaint that either McBride or Walker personally profited from the 2016 stock offering.  The general motive attributed to Anadarko is not enough to support a strong inference that either or both of these defendants acted with scienter, and it does not "meaningfully enhance the strength of the inference of scienter."  *Southland*, 365 F.3d at 366 ("[T]he required state of mind must actually exist in the individual making . . . the representation."); *see also Diodes*, 810 F.3d at 957 ("This court has rejected the 'group pleading

approach to scienter,' and focuses on the state of mind of the corporate officials who make, issue, or approve the statement rather than the 'collective knowledge of the corporation's officers and employees.'" (quoting *Shaw Grp.*, 537 F.3d at 533)).

## 2. The Circumstantial-Evidence Allegations

"Although lack of motive is not fatal to" the plaintiff's claims, when, "as here, the plaintiff[ has] not alleged a clear motive for the alleged misstatements or omissions, the strength of [the] circumstantial evidence of scienter must be correspondingly greater." *Neiman*, 854 F.3d at 748 (quoting *R2 Invs.*, 401 F.3d at 644). The facts alleged as circumstantial evidence do not satisfy this requirement.

### i. McBride

The second amended complaint attributes to McBride the statements in the March 2016 and March 2017 health, safety, environment, and sustainability overviews that Anadarko complied with applicable laws. (Docket Entry No. 57 at ¶¶ 228, 234). The second amended complaint alleges that these statements were false because Anadarko had violated Colorado Commission Rules 1101.a, 1101.e, 1102.a, 1102.d, and 1103. According to the second amended complaint, Anadarko violated these regulations by failing to account for and conduct annual pressure tests on all the flowlines, to inspect all the wells, and to seal all the abandoned wells. (*Id.* at ¶¶ 228–230, 234–236).

The defendants argue that the second amended complaint does not allege that McBride "had knowledge of any regulatory violation or knowledge of . . . regulations that would have cause[d him] to link well 'problems' to a particular regulatory violation." (Docket Entry No. 65 at 22). The defendants contend that McBride, the head of Anadarko's health, safety and environment division, "was not responsible for the company's Colorado operations," and that there is "no basis to conclude that [he] would possess detailed familiarity with those operations." (*Id.*). The defendants argue that

the allegations about the biannual meetings, presentation materials, weekly reports, standard operating procedures, and remediation budget fail to raise a compelling inference of scienter as to Anadarko's compliance with each regulatory requirement for every Colorado well and flowline. According to the defendants, the second amended complaint merely alleges "that McBride and others may have attended meetings sometime before 2016 in which various topics—unknown flowlines, inspection rates, and remote monitoring—were discussed," but the complaint allegations do not state the "year in which these meetings supposedly occurred." (*Id.* at 22). The defendants contend that while "it is possible that these topics were briefly discussed at one meeting years before the alleged misstatements," the complaint allegations provide "no reason to think that any speaker in 2016 or 2017 would have remembered these isolated references to operational issues . . . that may have occurred years later." (*Id*. at 23).

In addition, the defendants argue that the second amended complaint fails to allege that the meeting McBride attended took place before he signed either overview. (*Id.*). According to the defendants, the second amended complaint "require[s] the Court to accept a daisy chain of inferences" because, to know that Anadarko had violated the law, McBride would have had to learn of certain company practices in a specific state, understand that those practices were illegal, and believe that Colorado managers were not resolving the issues. (*Id.* at 24). That last inference is unconvincing, the defendants argue, because Anadarko executives directed the Colorado superintendents to resolve the unknown-flowlines issue, and the second amended complaint "does not allege that the executives were later told that the problems had not been addressed." (*Id.*). The defendants argue that "[f]ar from suggesting that the speakers knew of or ignored regulatory violations or safety hazards, this signals that a reasonable attendee would believe that the problems were being addressed." (Docket Entry No. 74 at 21).

The defendants contend that the allegation that McBride may have attended a meeting in which Colorado superintendents discussed some uninspected wells does not support an inference of scienter. (Docket Entry No. 65 at 25). The "failure to specifically place Mr. McBride at this meeting is fatal to [the plaintiff's] claim," the defendants argue, because the complaint must "allege specific facts that show Mr. McBride actually received information that would lead him to know that his statement was allegedly false, or that he was reckless." (*Id.*).

The defendants make similar arguments as to the weekly reports, PowerPoint slides, remediation budget, and standard operating procedures. According to the defendants, the second amended complaint does not allege that McBride received or reviewed these sources of information, much less that they addressed only Anadarko's Colorado, as opposed to nationwide, operations. (*Id.* at 26–29). As a result, the court would have to infer that McBride received the documents, read them, and knew that their content showed Colorado law violations. The court would also have to infer that McBride knew of these violations before he signed the overviews, because the second amended complaint fails to allege when McBride received or reviewed the documents and learned the information.

The plaintiff responds that the second amended complaint sufficiently alleges that McBride acted with scienter because he "knew or [was] severely reckless in not knowing that Anadarko's Colorado operations were materially unsafe and were, therefore, non-compliant with Colorado rules and regulations." (Docket Entry No. 72 at 11). McBride had the necessary culpability, the plaintiff contends, because the second amended complaint alleges:

- that McBride knew about Anadarko's failure to seal abandoned wells, in violation of Colorado Commission Rule 1103;

- that McBride knew about the failure to seal abandoned wells, because he was an occasional participant on a weekly call, and a former employee confirmed that call

participants received weekly reports that included the number of Anadarko's unplugged and abandoned wells in Colorado;

- "adequate corroborating details about" the weekly reports, including their "contents, author(s), recipients, the dates the author(s) prepared them, and the dates the defendants reviewed them";

- that McBride had access to information that would have allowed him to learn that Anadarko failed to annually test its well flowlines, in violation of Rule 1101.e;

- that McBride knew about the failure to test all the Colorado well flowlines because Anadarko's standard operating procedures, which were "subject to . . . McBride's review," required testing of only a fifth of Anadarko's Colorado well flowlines every other year; and

- that McBride was "reckless in not knowing that [Anadarko's] flowline inspection policy and practice" violated Colorado law.

(*Id.* at 16–17, 22 n.30).

In a similar vein, the plaintiff argues that the second amended complaint alleges that, at a minimum, McBride recklessly ignored that Anadarko did not know the location of every Colorado flowline, as required by Rules 1101.a and 1102.d.  (*Id.* at 18).  The complaint alleges that McBride knew about this issue because:

- "Anadarko's Colorado office held biannual, 4-hour meetings of its senior management[,] specifically to apprise senior executives of the status and developments of [the company's] Colorado operations";

- McBride attended half of these meetings and had access to PowerPoint slides that summarized the pressing issues the Colorado production superintendents raised at the meetings;

- McBride "was present for at least one of the [m]eetings when" superintendents alerted executives to this issue; and

- it was in the weekly reports.

(*Id.* at 18, 20, 21–22).

Lastly, the plaintiff argues that McBride "ignored that Anadarko recklessly violated Commission Rule 1102.a." because, according to the second amended complaint, he had access to information showing "condition[s] that could adversely affect the safe and proper operations of its pipeline within a reasonable time." (*Id.* at 25). These conditions included Anadarko's failure to account for, or annually test, all the Colorado well flowlines. (*Id.* at 26). The plaintiff also argues that the second amended complaint alleges that McBride knew of unsafe well and flowline conditions in Colorado because he "supported . . . a remediation budget of tens of millions of dollars [even] though Anadarko was having an unprofitable year," but he "knew that almost no remediation was taking place" because "he administered the budget." (*Id.*). Those factual allegations show, the plaintiff contends, that McBride was aware "that Anadarko systematically and knowingly operated unsafely in Colorado and that it violated [Colorado] Commission [R]ules." (*Id.* at 26–27). The plaintiff argues that the second amended complaint adequately alleges that McBride acted with severe recklessness.

Under *Tellabs*, the court must accept all well-pleaded allegations as true, consider the entire complaint, and account for plausible inferences opposing as well as supporting a scienter inference. 551 U.S. at 322–23. Because the second amended complaint does not allege that McBride had a motive to commit fraud, "the strength of [the] circumstantial evidence of scienter must be correspondingly greater." *Neiman*, 854 F.3d at 748 (quoting *R2 Invs.*, 401 F.3d at 644).

The second amended complaint fails to allege with particularity facts giving rise to a strong inference that McBride acted with knowledge or severe recklessness when he signed the March 2016 or March 2017 overviews. The complaint allegations do not include facts that McBride knew, or was told, that Anadarko was violating Colorado law. The complaint does not allege, for example, that McBride received notice of a Commission Rule violation from a Colorado agency, or that an

employee warned McBride that Anadarko did not know where every flowline was located, in violation of Colorado law. Because the complaint does not allege that McBride knew of an unlawful practice under Colorado law, it fails to "allege that the reports or meetings included information at odds with [McBride's] public statements"; as a result, the plaintiff cannot satisfy its pleading burden. *Shaw Grp.*, 537 F.3d at 540; *see also Abrams*, 292 F.3d at 433; *Tuchman*, 14 F.3d at 1069.

The second amended complaint alleges five sources of knowledge from which McBride might have learned about unsafe practices that violated Colorado law: biannual meetings; PowerPoint presentations; weekly reports; standard operating procedures; and the remediation budget. As to the biannual meetings, the second amended complaint alleges that McBride attended half of the meetings, and that from 2014 to 2016, Colorado production superintendents discussed that Anadarko failed to inspect certain wells "during at least one of the meetings." (Docket Entry No. 57 at ¶¶ 16, 134, 138). These allegations do not state that McBride attended that meeting or when it occurred, let alone that he learned that inspecting only a fifth of Anadarko's Colorado wells violated Colorado law before signing the overviews.

Additional allegations about uninspected wells fail to cure this deficiency. According to the second amended complaint, PowerPoint slides that summarized the meetings' discussions "would be disseminated 'up the chain' to the 'highest levels' of the company." (*Id.* at ¶¶ 136–37). The uninspected-wells issue, the second amended complaint alleges, appeared in one of these PowerPoint slide decks. (*Id.* at ¶ 138). These factual allegations are not particularized. They fail to state when, and if, McBride received or reviewed this PowerPoint deck. *See Neiman*, 854 F.3d at 748–49; *Goldstein*, 340 F.3d at 252. In short, the second amended complaint fails to connect McBride to the PowerPoint deck containing relevant slides. *See In re Comput. Scis. Corp. Sec. Litig.*, 890 F. Supp. 2d 650, 663–64 (E.D. Va. 2012) ("[I]n alleging that the 2008 EMEA—Nordic

Report 'would have been sent' to Laphen and DeBuck, the Complaint merely speculates that Laphen and Debuck received this report and offers no other facts supporting this assertion.").

A similar deficiency is in the complaint allegations about Anadarko's failure to annually test a certain number of its Colorado wells. The second amended complaint alleges that Anadarko's standard operating procedures, which were "subject to McBride's review,"[9] codified a practice of testing only 20% of the company's wells every other year. (*Id.* at ¶¶ 17, 166). The second amended complaint does not allege that McBride reviewed these procedures,[10] knew of this practice, or knew that it violated Colorado law. The allegations as to knowledge from weekly reports and the remediation budget fail to raise an inference of scienter for the same reasons.[11] (*See id.* at ¶¶ 105–06,173); *see ABC Arbitrage*, 291 F.3d at 356 (the "plaintiff needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them" (quotation omitted)).

The second amended complaint allegations at most support an inference that McBride *should have known* that Anadarko's Colorado operations were unsafe and, therefore, illegal. This theory conflates safety with legal compliance and reduces scienter to negligence. *See Abrams*, 292 F.3d

---

[9] The second amended complaint does not specify what is meant by "subject to McBride's review."

[10] Contrary to the plaintiff's written response to the defendants' motions to dismiss, the second amended complaint does not "allege[] with specificity that McBride not only saw but approved the Standard Operating Procedures." (Docket Entry No. 72 at 17). As detailed above, the second amended complaint alleges that his division approved them and that they were "subject to his review," neither of which creates an inference of scienter. The plaintiff mischaracterizes other aspects of the second amended complaint, including whether McBride received and reviewed the weekly reports. (*See id.* at 22 n.32 (arguing that the complaint creates an "unassailable" inference that McBride received the weekly reports)).

[11] The plaintiff contends that the court should infer scienter from McBride's alleged access to the weekly reports because the second amended complaint alleges facts about the reports' contents, authors, recipients, and when the reports were prepared and reviewed. (Docket Entry No. 72 at 22). The second amended complaint alleges that the reports included information about unsealed wells and "three to five bullet points." (Docket Entry No. 57 at ¶¶ 170–71). A former employee submitted information that would be included in the reports "by Thursday COB." (*Id.* at ¶ 170). These allegations are not "corroborating details" that allow the court to draw an inference of scienter against McBride. *See Abrams*, 292 F.3d at 432.

at 430 ("Severe recklessness is limited to those highly unreasonable . . . misrepresentations that involve not merely simple or even inexcusable negligence." (quotation omitted)).  It also runs afoul of "the predominant theme in this circuit's case law that 'an officer's position with a company does not suffice to create an inference of scienter.'"  *Diodes*, 810 F.3d at 958 (quoting *Nathenson*, 267 F.3d at 424); *see also Shaw Grp.*, 537 F.3d at 540–41; *Abrams*, 292 F.3d at 432.

While the Fifth Circuit has recognized "a handful of cases in which special circumstances, 'taken together with an officer's position, may support a strong inference of scienter,'" those special circumstances are not present here.  *Diodes*, 810 F.3d at 958–59 (quoting *Dorsey*, 540 F.3d at 342).  The special circumstances include: (1) a small company in which corporate executives are likely to be familiar with day-to-day operations; (2) transactions "critical to the company's continued vitality"; (3) omitted information readily apparent to the speaker; and (4) internally inconsistent statements.  *Id.* at 959; *see also Izadjoo v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 515 (S.D. Tex. 2017).  Anadarko is a large company with over 5,000 employees.  (Docket Entry No. 57 at ¶ 83).  McBride was vice-president of Anadarko's worldwide health, safety, and environment division.  There is no basis in the complaint allegations to infer that he knew the specifics of Anadarko's Colorado operations, for which he was not responsible.  (*See id.* at ¶¶ 16 n.1, 38, 41).  Second, while the second amended complaint alleges that Anadarko's Colorado wells accounted for 30.1% of its worldwide oil production, it does not allege that the company's existence hinged on its operations there.  (*Id.* at ¶ 76).  Third, the second amended complaint does not allege that McBride was ever told that Anadarko was violating Colorado law.  Finally, the second amended complaint alleges no inconsistent statements by McBride.

The second amended complaint also alleges that McBride *might* have known about some unsafe practices or Colorado law violations.  The plaintiff asks the court to find that the second

amended complaint adequately pleads scienter based on the allegations that McBride: (1) attended a biannual meeting or had access to internal records that documented unsafe practices in Colorado that violated Colorado law; (2) learned about these practices; (3) understood that the practices were illegal; and (4) knew about the practices and violations before March 2016 or March 2017. In light of the plaintiff's failure to allege motive and the Supreme Court's instruction that "omissions and ambiguities count against inferring scienter," this attenuated chain of inferences falls short of Rule 9(b) and the Private Securities Litigation Reform Act's stringent requirements. Because the second amended complaint does not allege facts supporting a strong inference that McBride knew about illegal practices in Colorado before he signed the overviews, "the danger of misleading [Anadarko investors was not] known to [him] or [was not] so obvious that [he] must have been aware of it." *Flaherty*, 565 F.3d at 207 (quoting *R2 Invs.*, 401 F.3d at 643). Accepting the allegations as true and considering them together, the second amended complaint fails to allege facts supporting an inference that McBride acted with scienter. *Tellabs*, 551 U.S. at 326.

### ii. Walker

The circumstantial-evidence allegations similarly provide insufficient support for an inference that Walker acted with scienter. The second amended complaint alleges that Walker attended a quarter of the biannual meetings. There is no allegation that he attended any particular meeting, much less the one or two meetings at which Colorado superintendents discussed state-specific well and flowline concerns. (Docket Entry No. 57 at ¶¶ 16, 134). The second amended complaint alleges that PowerPoint decks summarizing the meetings "would be disseminated" to senior executives who attended the meetings, including Walker. (*Id.* at ¶ 137). These allegations do not support an inference that, or when, Walker received the deck, read the relevant slides, or

knew that their contents showed Colorado-law violations. *See Tellabs*, 551 U.S. at 326; *see also In re Comput. Scis. Corp.*, 890 F. Supp. 2d at 663–64.

The second amended complaint also generally alleges that certain managers "would then go to" Anadarko's headquarters "to present the matters discussed [to] senior executives, including . . . Walker." (*Id.* at ¶ 137). The second amended complaint again fails to allege with particularity that managers presented the information from the biannual meetings to Walker, instead speculating only that such presentations might have occurred.

Similar deficiencies appear in the complaint allegations about the weekly reports, remediation budget, and standard operating procedures. The second amended complaint alleges that a former employee told a "superior . . . that the Weekly Operating Reports would be seen by Anadarko's Executive Committee, including . . . Walker." (*Id.* at ¶ 171). The second amended complaint alleges that Walker "received a list of Anadarko's Standard Operating Procedures and a description of each," and that he "received periodic status reports on efforts to remediate" Anadarko's Colorado wells. (*Id.* at ¶¶ 111, 166). These general allegations fail to support a strong inference that Walker acted with scienter because they fail to state facts showing when, and if, Walker received the internal information or ever learned that Anadarko violated Colorado law. *ABC Arbitrage*, 291 F.3d at 356.

Because the second amended complaint does not allege facts supporting an inference that Walker knew, or was severely reckless in not knowing, that Anadarko's Colorado operations were illegal, the scienter requirement is not met. *Tellabs*, 551 U.S. at 323.

### 3. The Confidential-Witness Allegations

The second amended complaint's confidential-witness allegations fail to cure these shortcomings. Many of the allegations as to these witnesses do not allege facts supporting an

inference of scienter because they accuse nonspeakers, not Christiansen, McBride, or Walker, of misconduct. (*See* Docket Entry No. 57 at ¶ 55 ("Anadarko is liable for the acts of . . . Holly, Walkers, [and] Bracken . . . under the doctrine of *respondeat superior*.")). These witnesses only speculate that the individual defendants might have received or reviewed internal reports documenting unsafe practices. (*See id.* at ¶ 173 ("That the Weekly Operating Reports were distributed to [Former Employee] 1, an occasional participant, shows that they were not only distributed to actual participants—suggesting that . . . McBride, an occasional participant, also received the Weely Operating Reports.")). They are not alleged to have said that Christiansen, McBride, or Walker read a particular reporting stating, or were told by company employees, that Anadarko violated Colorado laws. Without this information, the confidential-witness allegations, like the second amended complaint as a whole, fail to state facts that could support an inference that McBride or other defendants had the necessary culpability when they made the challenged statements.

### 4.    McBride and Walker: A Duty to Confirm

According to the plaintiff, "[b]efore making their unequivocal statement that Anadarko complied with all laws," Walker and McBride "had a duty to check whether the widespread unsafe Anadarko practices [they allegedly] knew about were prohibited by Colorado law." (Docket Entry No. 72 at 14). The second amended complaint alleges that McBride and Walker failed to confirm that Anadarko complied with Colorado law, the plaintiff argues, showing that they acted with scienter. (*Id.*). The defendants contend that, putting aside the insufficiency of the allegations that Walker and McBride knew about unsafe practices that violated Colorado law, "there is no merit to [the p]laintiff's theory that Anadarko's high-level executives had a duty to monitor Colorado regulations and thus can be liable for making statements about compliance without specifically

investigating their accuracy in advance." (Docket Entry No. 74 at 25). "[I]t would stand the entire concept of scienter on its head," the defendants argue, "transforming it from an inquiry into what a speaker knew into a . . . negligence inquiry about what a speaker could have learned." (*Id.*).

The cases the plaintiff relies on to support its theory of a duty to confirm are distinguishable. In *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009), a defendant made "consistent denials of unusual discounting" to "specific analyst queries." The Third Circuit held that those denials raised an inference of recklessness "as long as what [the defendant] knew made obvious the risk that his [statements] would mislead investors." *Id*. In *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000), the Second Circuit explained that under "certain circumstances, we have found allegations of recklessness to be sufficient where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." The court cited two cases that met those criteria: (1) a defendant "consistently reassured the plaintiff that the investment advisor responsible for the plaintiff's portfolio 'knew what he was doing' but never actually investigated the advisor's decisions"; and (2) a "defendant allegedly included false statements in SEC filings despite 'the obviously evasive and suspicious statements made to him' by the corporate officials upon whom he was relying for his information." *Id*. Lastly, in *Cosmos v. Hassett*, 886 F.2d 8, 12–13 (2d Cir. 1989), a corporate officer misled investors by stating that sales to China continued to be a significant "source of revenue" for the company after China had imposed import restrictions limiting sales. *Id.* at 12. The Second Circuit found that because the company relied on its sales to China, the allegations supported an inference that the defendant knew about the import restrictions and was reckless as to the falsity of the statement. (*Id.* at 13).

Here, unlike the allegations against the defendant officer in *Avaya*, Walker and McBride are not alleged to have answered specific questions about the company's legal compliance with repeated—or any—denials. McBride was not specifically responsible for the company's adherence to Colorado Commission Rules. Neither was Walker, who served as Anadarko's chief executive, president, and chairman. In contrast to the pleadings in *Cosmos* and *Novak*, the second amended complaint does not include factual allegations that employees or documents informed McBride or Walker of Colorado law violations. The allegations do not support an inference that they misrepresented Anadarko's compliance with the Colorado Commission Rules despite "obviously . . . suspicious statements" to the contrary. *Novak*, 216 F.3d at 309; *Cosmos*, 886 F.2d at 13.

Neither McBride nor Walker had a duty to confirm Anadarko's compliance with Colorado law before the challenged statements were made. *See, e.g.*, *Abrams*, 292 F.3d at 432 ("A pleading of scienter may not rest on the inference that [the] defendants must have been aware of the misstatement based on their positions within the company."). No inference of scienter can be drawn from their alleged failure to investigate whether Anadarko's Colorado operations complied with the Colorado Commission Rules.

Because the second amended complaint fails to allege scienter as to McBride or Walker, the claims against them under § 10(b) and Rule 10b–5 are dismissed, with prejudice and without leave to amend, because prior efforts to amend have failed to cure the deficiencies and further attempts would be futile. *Villarreal*, 814 F.3d at 766.

The claim against Anadarko is also dismissed, with prejudice and without leave to amend, because the second amended complaint fails to allege facts that could show scienter as to any individual defendant. *Southland*, 365 F.3d at 366 ("A defendant corporation is deemed to have the

requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter.").

### C. Control-Person Liability

The plaintiff alleges in Count II that Walker is liable under § 20(a) of the Exchange Act as a "controlling person." (Docket Entry No. 57 at ¶¶ 262–66). Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder" for securities fraud. 15 U.S.C. § 78t(a). "Control person liability is secondary only and cannot exist in the absence of a primary violation." *Southland*, 365 F.3d at 383. Because the plaintiff's primary claims under § 10(b) and Rule 10b–5 have been dismissed, the § 20(a) claim is dismissed under Rule 12(b)(6) for failure to state a claim on which relief can be granted. This dismissal is also with prejudice and without leave to amend, because another amendment after prior unsuccessful efforts would be futile.

## IV. Conclusion

The defendants' motions to dismiss, (Docket Entry Nos. 65, 66), are granted. The plaintiff, after two opportunities to amend, again fails to cure the identified deficiencies. The court finds that further amendment would be futile. The second amended complaint is dismissed, with prejudice and without leave to amend. An order of dismissal is separately entered.

SIGNED on March 13, 2019, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge